# EXHIBIT B

# Part 3 of 4

thereon.  Tenant shall not permit or suffer any overloading of the floors thereof, and shall not place therein any heavy business machinery, safes, computers, data processing machines, or other items heavier than customarily used for general office purposes without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Tenant shall not use or permit to be used any part of the Building for any dangerous, noxious or offensive trade or business and shall not cause or permit any nuisance, noise, action, or disturbance of other tenants of the Building.

**6.      Security Deposit.**

The Security Deposit shall be delivered to Landlord upon the execution of this Lease by Tenant and held by Landlord without liability for interest (unless required by Law) as security for the performance of Tenant's obligations.  The Security Deposit is not an advance payment of Rent or a measure of damages.  Landlord may use all or a portion of the Security Deposit to satisfy past due Rent or to cure any Default (defined in Section 18) by Tenant.  If Landlord uses any portion of the Security Deposit, Tenant shall, within five (5) days after demand, restore the Security Deposit to its original amount.  Landlord shall return any unapplied portion of the Security Deposit to Tenant within sixty (60) days after the later to occur of: (a) determination of the final Rent due from Tenant; or (b) the later to occur of the Expiration Date or the date Tenant surrenders the Premises to Landlord in compliance with Section 25.  Landlord may assign the Security Deposit to a successor or transferee and, following the assignment, Landlord shall have no further liability for the return of the Security Deposit.  Landlord shall not be required to keep the Security Deposit separate from its other accounts.

**7.      Building Services.**

7.01      Landlord shall furnish Tenant with the following services: (a) water for use in the Base Building lavatories; (b) customary heat and air conditioning in season during Building Service Hours; (c) standard janitorial service on Business Days; (d) Elevator service; (e) Electricity in accordance with the terms and conditions in Section 7.02; and (f) such other services as Landlord reasonably determines are necessary or appropriate for the Property.  Tenant shall have the right to receive HVAC service during hours other than Building Service Hours by paying Landlord's then standard charge for additional HVAC service and providing such prior notice as is reasonably specified by Landlord

7.02      Electrical Service to the Premises.

A.      Landlord shall have the exclusive right to select any company providing electrical service to the Premises, to aggregate the electrical service for the Building and Premises with other buildings, to purchase electricity through a broker and/or buyers group, and to change the providers and manner of purchasing electricity.

B.      Tenant's use of electrical service shall not exceed, either in voltage, rated capacity, use beyond Building Service Hours or overall load, that which Landlord reasonably deems to be standard for the Building.  If Tenant requests permission

to consume excess electrical service, Landlord may refuse to consent or may condition consent upon conditions that Landlord reasonably elects (including, without limitation, the installation of utility service upgrades, meters, submeters, air handlers or cooling units), and the additional usage (to the extent permitted by Law), installation and maintenance cost shall be paid for by Tenant. Landlord shall have the right to separately submeter electrical usage for the Premises or to measure electrical usage by survey or other methods that Landlord, in its reasonable judgment, deems appropriate and the reasonable cost of any submeter installed by Landlord to measure the electrical consumption in the Premises shall be paid by Tenant.

7.03    Landlord's failure to furnish, or any interruption, diminishment or termination of services due to the application of Laws, the failure of any equipment, the performance of repairs, improvements or alterations, utility interruptions or the occurrence of an event of Force Majeure (defined in Section 26.03) (collectively a "**Service Failure**") shall not render Landlord liable to Tenant, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement. However, if the Premises, or a material portion of the Premises, are made untenantable for a period in excess of five (5) consecutive Business Days as a result of a Service Failure that is reasonably within the control of Landlord to correct, then Tenant, as its sole remedy, shall be entitled to receive an abatement of Rent payable hereunder during the period beginning on the sixth (6th) consecutive Business Day of the Service Failure and ending on the day the Service Failure ends. If the entire Premises have not been rendered untenantable by the Service Failure, the amount of abatement shall be equitably prorated. The foregoing abatement provisions of this Section 7.03 shall not apply if the Service Failure is due to fire or other casualty or any other event that is not within the reasonable control of Landlord. Instead, in such an event, the terms and provisions of Section 16 shall apply.

7.04    During the Term of this Lease, if Landlord or its property manager at Tenant's request performs any service, incurs any cost or expense, or furnishes any goods to or for the use or benefit of Tenant, or if, pursuant to any provision contained in this Lease, Landlord or its property manager at its option performs, or causes to be performed, any obligation hereunder that Tenant failed to perform, then and in each such instance, in addition to the amount that Tenant is thereupon obligated as a result of the foregoing to pay or reimburse to Landlord, Tenant shall pay to Landlord an administrative fee equal to twenty percent (20%) of such amount.

## 8.    Leasehold Improvements.

All improvements in and to the Premises, including any Alterations (collectively, "**Leasehold Improvements**") shall remain upon the Premises at the end of the Term without compensation to Tenant. Landlord, however, by written notice to Tenant at least thirty (30) days prior to the Expiration Date, may require Tenant, at its expense, to remove (a) any Cable (defined in Section 9.01) installed by or for the benefit of Tenant, and (b) excluding the Landlord Work constructed and installed by Landlord in accordance with the provisions of the Work Letter, any Alterations that, in Landlord's reasonable judgment, are of a nature that would require removal and repair

9

costs that are materially in excess of the removal and repair costs associated with standard office improvements (collectively referred to as **"Required Removables"**).  The Required Removables shall include, without limitation, internal stairways, raised floors, personal baths and showers, vaults, rolling file systems and structural alterations and modifications.  The designated Required Removables shall be removed by Tenant at its expense before the Expiration Date.  Tenant shall repair all damage caused by the installation or removal of Required Removables.  If Tenant fails to perform its obligations under this Section 8 in a timely manner, Landlord may perform such work at Tenant's expense.  Tenant, at the time it requests approval for a proposed Alteration, may request in writing that Landlord advise Tenant whether the Alteration or any portion of the Alteration is a Required Removable.  Within ten (10) days after receipt of Tenant's request, Landlord shall advise Tenant in writing as to which portions of the Alteration are Required Removables.

9.    **Repairs and Alterations.**

9.01    Tenant shall periodically inspect the Premises to identify any conditions that are dangerous or in need of maintenance or repair.  Tenant shall promptly provide Landlord with notice of any such conditions. Tenant shall, at its sole cost and expense, perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease, and keep the Premises in good condition and repair, reasonable wear and tear excepted. Tenant's repair and maintenance obligations include, without limitation, repairs to:  (a) floor covering; (b) interior partitions; (c) doors; (d) the interior side of demising walls; (e) electronic, voice and data cabling and related equipment that is installed by or for the exclusive benefit of Tenant (collectively, **"Cable"**); (f) supplemental air conditioning units, kitchens, including hot water heaters, plumbing, and similar facilities exclusively serving Tenant; and (g) Alterations.  To the extent Landlord is not reimbursed by insurance proceeds, Tenant shall reimburse Landlord for the cost of repairing damage to the Building caused by the acts of Tenant, the other Tenant Related Parties, or their respective contractors or vendors.  If Tenant fails to make any repairs to the Premises for more than fifteen (15) days after notice from Landlord (although notice shall not be required in an emergency), Landlord may make the repairs, and Tenant shall pay the reasonable cost of the repairs, together with an administrative charge in an amount equal to 10% of the cost of the repairs.

9.02    Landlord shall keep and maintain in good repair and working order and perform maintenance upon:  (a) structural elements of the Building; (b) mechanical (including HVAC), electrical, plumbing and fire/life safety systems serving the Building in general; (c) Common Areas; (d) roof of the Building; (e) exterior windows of the Building; and (f) elevators serving the Building.  Landlord shall promptly make repairs for which Landlord is responsible.

9.03    Tenant shall not make alterations, repairs, additions or improvements or install any Cable (collectively referred to as **"Alterations"**) without first obtaining the written consent of Landlord in each instance, which consent shall not be unreasonably withheld or delayed.  However, Landlord's consent shall not be required for any Alteration that satisfies all of the following criteria (a **"Cosmetic Alteration"**):  (a) is of a cosmetic nature such as painting, wallpapering, hanging pictures and installing carpeting; (b) is not visible from the exterior of the

10

Premises or Building; (c) will not affect the Base Building; and (d) does not require work to be performed inside the walls or above the ceiling of the Premises. Cosmetic Alterations shall be subject to all the other provisions of this Section 9.03. Prior to starting work, Tenant shall furnish Landlord with plans and specifications (provided if any Cosmetic Alteration is of such a minor nature that plans and specifications are not necessary, then Tenant shall not be required to furnish Landlord with plans and specifications); names of contractors reasonably acceptable to Landlord (provided that Landlord may designate specific contractors with respect to Base Building); required permits and approvals; evidence of contractor's and subcontractor's insurance in amounts reasonably required by Landlord and naming Landlord and its property manager as additional insureds; and any security for performance in amounts reasonably required by Landlord. Changes to the plans and specifications must also be submitted to Landlord for its approval. Alterations shall be constructed in a good and workmanlike manner using materials of a quality reasonably approved by Landlord. Tenant shall reimburse Landlord for any sums paid by Landlord for third party examination of Tenant's plans for non-Cosmetic Alterations. In addition, Tenant shall pay Landlord a fee for Landlord's oversight and coordination of any non-Cosmetic Alterations equal to 10% of the cost of the Alterations. Upon completion, Tenant shall furnish Landlord with "as-built" plans for non-Cosmetic Alterations, completion affidavits and full and final waivers of lien in recordable form executed by all contractors, subcontractors and suppliers who performed labor or provided materials for any Alterations. Landlord's approval of an Alteration shall not be deemed a representation by Landlord that the Alteration complies with Laws.

**10.     Entry by Landlord.**

Landlord may enter the Premises to inspect, show or clean the Premises or to perform or facilitate the performance of repairs, alterations or additions to the Premises or any portion of the Building. Except in emergencies or to provide Building services, Landlord shall provide Tenant with reasonable prior verbal notice of entry and shall use reasonable efforts to minimize any interference with Tenant's use of the Premises. If reasonably necessary, Landlord may temporarily close all or a portion of the Premises to perform repairs, alterations and additions. However, except in emergencies, Landlord will not close the Premises if the work can reasonably be completed on weekends and after Building Service Hours. Entry by Landlord shall not constitute a constructive eviction or entitle Tenant to an abatement or reduction of Rent.

**11.     Assignment and Subletting.**

11.01     Except in connection with a Permitted Disposition (defined in Section 11.04), Tenant shall not assign, sublease, transfer or encumber any interest in this Lease or allow any third party to use any portion of the Premises (collectively or individually, a **"Transfer"**) without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed if Landlord does not exercise its recapture rights under Section 11.02. If the entity which controls the voting shares/rights of Tenant changes at any time, such change of ownership or control shall constitute a Transfer unless Tenant is an entity whose outstanding stock is listed on a recognized securities exchange or if at least 80% of its voting stock is owned by another entity, the voting stock of which is so listed. Any attempted Transfer in violation of

11

this Section 11.01 is voidable by Landlord. In no event shall any Transfer whether or not consented to or approved by Landlord, including a Permitted Disposition, release or relieve Tenant from any obligation under this Lease.

11.02    Tenant shall provide Landlord with financial statements for the proposed transferee, a fully executed copy of the proposed assignment, sublease or other Transfer documentation and such other information as Landlord may reasonably request. Within fifteen (15) Business Days after receipt of the required information and documentation, Landlord shall either: (a) consent to the Transfer by execution of a consent agreement in a form reasonably designated by Landlord; (b) reasonably refuse to consent to the Transfer in writing; or (c) in the event of an assignment of this Lease or subletting of more than 20% of the Rentable Area of the Premises for more than 50% of the remaining Term (excluding unexercised options), recapture the portion of the Premises that Tenant is proposing to Transfer. If Landlord exercises its right to recapture, then Tenant may rescind the proposed Transfer by delivering a written rescission notice to Landlord no later than five (5) days after Landlord exercises its recapture right, in which event Tenant's proposed Transfer and Landlord's exercise of its recapture right shall be null and void and of no force or effect. If Tenant does not timely deliver such written rescission notice to Landlord, then this Lease shall be automatically amended (or terminated if the entire Premises is being assigned or sublet) to delete the applicable portion of the Premises effective on the proposed effective date of the Transfer. Tenant shall pay Landlord a review fee of $1,500.00 for Landlord's review of any Permitted Disposition or requested Transfer. In addition, Tenant shall reimburse Landlord for its actual reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Landlord in connection a Permitted Disposition or such proposed Transfer.

11.03    Tenant shall pay Landlord 50% of all rent and other consideration which Tenant receives as a result of a Transfer that is in excess of the Rent payable to Landlord for the portion of the Premises and Term covered by the Transfer. Tenant shall pay Landlord for Landlord's share of the excess within thirty (30) days after Tenant's receipt of the excess. Tenant may deduct from the excess, on a straight-line basis, all reasonable and customary expenses directly incurred by Tenant attributable to the Transfer. If Tenant is in Default, Landlord may require that all sublease payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of Tenant's share of payments received by Landlord.

11.04    Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right from time to time during the Term, without Landlord's prior consent or approval, to make a Permitted Disposition (as herein defined) provided that each of the following conditions precedent to the proposed Permitted Disposition has been satisfied as determined by Landlord: (a) as of the effective date of the proposed Permitted Disposition, Tenant is not in Default; and (b) Tenant has given Landlord not less than ten (10) business days' prior written notice of Tenant's intent to make a Permitted Disposition, which notice shall include the name of the proposed transferee, the terms and provisions of the proposed Permitted Disposition, and the effective date of the proposed Disposition and shall be accompanied by a draft of the proposed assignment or sublease agreement to be executed by Tenant and the proposed transferee (which assignment or sublease agreement must expressly provide that the use of the Premises by the transferee shall

conform to the Permitted Use hereunder, the transferee shall comply with all provisions of this Lease, and in the case of an assignment, the transferee assumes all of Tenant's obligations under this Lease accruing from and after the effective date of the Permitted Disposition). Tenant's notice of the proposed Permitted Disposition shall also include such other information and documentation evidencing the proposed Permitted Disposition and showing that each of the above conditions has been satisfied. For purposes of this Section 11.04, the term **"Permitted Disposition"** means, provided all conditions precedent set forth in this Section 11.04 have been satisfied, the right to assign this Lease, or sublease all or any portion of the Premises, without Landlord's prior consent or approval to: (i) a Tenant Affiliate (as herein defined), provided Tenant remains liable to pay the rent and to perform all other obligations to be performed by Tenant hereunder; or (ii) a Successor Entity (as herein defined) whose net worth (as determined from the Successor Entity's most recent annual audited financial statements and quarterly unaudited financial statements prior to the transfer) is equal to or exceeds the net worth of Tenant (as determined from the Tenant's most recent annual audited financial statements and quarterly unaudited financial statements prior to the transfer). For purposes of this Section 11.04, the term **"Tenant Affiliate"** means any corporation, limited liability company, partnership, or other entity which controls, is controlled by or under common control with Tenant. For purposes of this Section 11.04, the term **"Successor Entity"** means any corporation, limited liability company, partnership or other entity (w) that has merged with or into Tenant; (x) into which Tenant has merged; (y) that was created from any restructuring or reorganization of Tenant; or (z) which acquires all or substantially all of the assets or stock of Tenant.

**12.    Liens.**

Tenant shall not permit mechanics' or other liens to be placed upon the Property, Premises or Tenant's leasehold interest in connection with any work or service done or purportedly done by or for the benefit of Tenant or its transferees. Tenant shall give Landlord notice at least fifteen (15) days prior to the commencement of any work in the Premises to afford Landlord the opportunity, where applicable, to post and record notices of non-responsibility. Tenant, within fifteen (15) days of notice from Landlord, shall fully discharge any lien by settlement, by bonding or by insuring over the lien in the manner prescribed by the applicable lien Law. If Tenant fails to do so, Landlord may bond, insure over or otherwise discharge the lien. Tenant shall reimburse Landlord for any amount paid by Landlord, including, without limitation, reasonable attorneys' fees.

**13.    Indemnity and Waiver of Claims.**

13.01    Tenant shall indemnify, defend and hold Landlord and its trustees, members, principals, beneficiaries, partners, officers, directors, employees, Mortgagees (defined in Section 23) and agents (the **"Landlord Related Parties"**) harmless from and against any and all claims, liability, loss, cost or expense (including reasonable attorneys' fees) arising out of or in connection with (i) any injury or damage to any person or property occurring in, on or about the Premises or any part thereof or the Building or Common Area, if such injury or damage is caused in part or in whole by any act or omission by Tenant, its agents, contractors, employees, or invitees or (ii) any breach or default in the performance of any obligation on Tenant's part to be

13

performed under this Lease.  If any action or proceeding is brought against Landlord or any of the Landlord Related Parties by reason of any such claim, upon notice from Landlord, Tenant shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord.  Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause, **EVEN IF SUCH DAMAGE OR INJURY RESULTS FROM THE NEGLIGENCE (BUT NOT THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF LANDLORD OR LANDLORD RELATED PARTIES,** and Tenant hereby waives all claims with respect thereto against Landlord.  The foregoing provisions shall survive the expiration or termination of this Lease.

13.02    If the Premises, the Building, or the Common Areas, or any part thereof, is damaged by fire or other cause against which Tenant is required to carry insurance pursuant to this Lease, Landlord shall not be liable to Tenant for any loss, cost or expense arising out of or in connection with such damage.   Tenant hereby releases Landlord, its directors, officers, shareholders, partners, employees, agents and representatives, from any liability, claim or action arising out of or in connection with such damage.  Furthermore, Tenant shall pursuant to Section 14 maintain insurance against loss, injury, or damage which may be sustained by the person, goods, wares, merchandise or property of Tenant, its agents, contractors, employees, invitees or customers, or any other person in or about the Premises, caused by or resulting from fire, steam, electricity, gas, water, or rain, which may leak or flow from or into any part of the Premises or the Building, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures of the same, whether such damage or injury results from conditions arising within the Premises or other portions of the Building, or from other sources, and Landlord shall not be liable therefor, **EVEN IF SUCH DAMAGE OR INJURY RESULTS FROM THE NEGLIGENCE OF LANDLORD OR LANDLORD RELATED PARTIES,** unless caused by gross negligence or willful misconduct of Landlord or Landlord Related Parties, and in that event only to the extent not covered by the insurance which Tenant is required to carry pursuant to this Lease.  Landlord shall not be liable to Tenant for any damages arising out of or in connection with any act or omission of any other tenant of the Premises or for losses due to theft or burglary or other wrongful acts of third parties.

## 14.    Insurance.

Tenant shall maintain the following insurance ("**Tenant's Insurance**"):  (a) Commercial General Liability Insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a minimum combined single limit of $2,000,000.00; (b) Property/Business Interruption Insurance written on an All Risk or Special Form, with coverage for broad form water damage including earthquake sprinkler leakage, at replacement cost value and with a replacement cost endorsement covering all of Tenant's business and trade fixtures, equipment, movable partitions, furniture, merchandise and other personal property within the Premises ("**Tenant's Property**"); (c) Workers' Compensation Insurance in amounts required by Law; and (d) Employers Liability Coverage of at least $1,000,000.00 per occurrence.  Any company writing Tenant's Insurance shall have an A.M. Best rating of not less than A-VIII.  All Commercial General Liability Insurance policies shall name as additional insureds Landlord (or its successors and assignees), the managing agent for the Building (or any successor), and their

14

respective members, principals, beneficiaries, partners, officers, directors, employees, and agents, and other designees of Landlord and its successors as the interest of such designees shall appear. All policies of Tenant's Insurance shall contain endorsements that the insurer(s) shall give Landlord and its designees at least thirty (30) days' advance written notice of any cancellation, termination, material change or lapse of insurance. Tenant shall provide Landlord with a certificate of insurance evidencing Tenant's Insurance prior to the earlier to occur of the Commencement Date or the date Tenant is provided with possession of the Premises, and thereafter as necessary to assure that Landlord always has current certificates evidencing Tenant's Insurance. So long as the same is available at commercially reasonable rates, Landlord shall maintain so called All Risk or Special Form property insurance on the Building at replacement cost value as reasonably estimated by Landlord.

### 15.   Subrogation.

Notwithstanding anything to the contrary set forth herein, Landlord and Tenant hereby waive and shall cause their respective insurance carriers to waive any and all rights of recovery, claims, actions or causes of action against the other for any loss or damage with respect to Tenant's Property, Leasehold Improvements, the Building, the Premises, or any contents thereof, **INCLUDING RIGHTS, CLAIMS, ACTIONS AND CAUSES OF ACTION BASED ON NEGLIGENCE**, which loss or damage is (or would have been, had the insurance required by this Lease been carried) covered by insurance.  Landlord and Tenant shall give each insurance company which issues policies of insurance, with respect to the items covered by this waiver, written notice of the terms of this mutual waiver, and shall have such insurance policies properly endorsed, if necessary, to prevent the invalidation of any of the coverage provided by such insurance policies by reason of such mutual waiver.  For the purpose of the foregoing waiver, the amount of any deductible applicable to any loss or damage shall be deemed covered by, and recoverable by the insured under the insurance policy to which such deductible relates.

### 16.   Casualty Damage.

16.01      If all or any portion of the Premises becomes untenantable by fire or other casualty to the Premises (collectively a **"Casualty"**), Landlord, with reasonable promptness, shall cause a general contractor selected by Landlord to provide Landlord and Tenant with a written estimate of the amount of time required using standard working methods to Substantially Complete the repair and restoration of the Premises and any Common Areas necessary to provide access to the Premises (**"Completion Estimate"**).  If the Completion Estimate indicates that the Premises or any Common Areas necessary to provide access to the Premises cannot be made tenantable within two hundred seventy (270) days from the date the repair is started, then either party shall have the right to terminate this Lease upon written notice to the other within ten (10) days after receipt of the Completion Estimate.  Tenant, however, shall not have the right to terminate this Lease if the Casualty was caused by the negligence or intentional misconduct of Tenant or any Tenant Related Parties. In addition, Landlord, by notice to Tenant within ninety (90) days after the date of the Casualty, shall have the right to terminate this Lease if:  (1) the Premises have been materially damaged and there is less than two (2) years of the Term remaining on the date of

the Casualty; (2) any Mortgagee requires that the insurance proceeds be applied to the payment of the mortgage debt; or (3) a material uninsured loss to the Building occurs.

16.02    If this Lease is not terminated, Landlord shall commence and proceed with reasonable diligence to repair and restore the Building, Common Areas and the Leasehold Improvements (excluding any Alterations that were performed by Tenant in violation of this Lease). Such restoration shall be to substantially the same condition that existed prior to the Casualty, except for modifications required by Law or any other modifications to the Common Areas deemed desirable by Landlord. However, in no event shall Landlord be required to spend more than the insurance proceeds received by Landlord. Landlord shall not be liable for any inconvenience to Tenant, or injury to Tenant's business resulting in any way from the Casualty or the repair thereof. Provided that Tenant is not in Default, during any period of time that all or a material portion of the Premises is rendered untenantable as a result of a Casualty, the Rent shall abate for the portion of the Premises that is untenantable and not used by Tenant.

## 17.    Condemnation.

Either party may terminate this Lease if any material part of the Premises is taken or condemned for any public or quasi-public use under Law, by eminent domain or private purchase in lieu thereof (a **"Taking"**). Landlord shall also have the right to terminate this Lease if there is a Taking of any portion of the Building or Property which would have a material adverse effect on Landlord's ability to profitably operate the remainder of the Building. The terminating party shall provide written notice of termination to the other party within forty-five (45) days after it first receives notice of the Taking. The termination shall be effective on the date the physical taking occurs. If this Lease is not terminated, Base Rent and Tenant's Pro Rata Share shall be appropriately adjusted to account for any reduction in the square footage of the Building or Premises. All compensation awarded for a Taking shall be the property of Landlord. The right to receive compensation or proceeds are expressly waived by Tenant; provided, however, that Tenant may file a separate claim for Tenant's Property and Tenant's reasonable relocation expenses, provided the filing of the claim does not diminish the amount of Landlord's award. If only a part of the Premises is subject to a Taking and this Lease is not terminated, Landlord, with reasonable diligence, will restore the remaining portion of the Premises as nearly as practicable to the condition immediately prior to the Taking.

## 18.    Events of Default.

Each of the following occurrences shall be a **"Default"**: (a) Tenant's failure to pay any portion of Rent when due (**"Monetary Default"**); provided, however, that notwithstanding anything to the contrary contained herein: (i) as to the first two (2) failures by Tenant in any period of twelve (12) consecutive months to make any such Rent payment when due, Landlord shall give Tenant written notice of such failure and an opportunity for Tenant to cure such failure by paying to Landlord, no later than five (5) days after Tenant's receipt of such written notice, the entire amount of such past due Rent payment; and (ii) as to the third and any subsequent failure by Tenant in any such period of twelve (12) consecutive months to make any such Rent payment when due, Landlord shall have no obligation whatsoever to give Tenant any notice, either written

16

or oral, or opportunity to cure such third or any subsequent failure during such period; (b) Tenant's failure (other than a Monetary Default) to comply with any term, provision, condition or covenant of this Lease, if the failure is not cured within ten (10) days after written notice to Tenant provided, however, if Tenant's failure to comply cannot reasonably be cured within ten (10) days, Tenant shall be allowed additional time (not to exceed thirty (30) days) as is reasonably necessary to cure the failure so long as Tenant begins the cure within ten (10) days and diligently pursues the cure to completion; (c) Tenant or any guarantor becomes insolvent, makes a transfer in fraud of creditors, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts when due or forfeits or loses its right to conduct business; (d) the leasehold estate is taken by process or operation of Law arising from any act or omission of Tenant; or (e) Tenant is in default beyond any notice and cure period under any other lease or agreement with Landlord at the Building or Property. If Landlord provides Tenant with written notice of Tenant's failure to comply with any specific provision of this Lease on two (2) separate occasions during any twelve (12) month period, Tenant's subsequent violation of such specific provision shall, at Landlord's option, be an incurable Default by Tenant. All notices sent under this Section 18 shall be in satisfaction of, and not in addition to, notice required by Law.

## 19. Remedies.

19.01    Upon Default, Landlord shall have the following rights and remedies, in addition to those allowed by law or equity, any one or more of which may be exercised without further notice to or demand upon Tenant and which may be pursued successively or cumulatively as Landlord may elect:

A.    Landlord may re-enter the Premises and attempt to cure any default of Tenant, in which event Tenant shall, upon demand, reimburse Landlord as Additional Rent for all reasonable costs and expenses which Landlord incurs to cure such default;

B.    Landlord may terminate this Lease by giving to Tenant written notice of Landlord's election to do so, in which event the Term shall end, and all right, title and interest of Tenant hereunder shall expire, on the date stated in such notice;

C.    Landlord may terminate the right of Tenant to possession of the Premises without terminating this Lease by giving written notice to Tenant that Tenant's right to possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice; and

D.    Landlord may enforce the provisions of this Lease by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease.

Landlord shall not be required to serve Tenant with any notices or demands as a prerequisite to

17

its exercise of any of its rights or remedies under this Lease, other than those notices and demands specifically required under this Lease.  In order to regain possession of the Premises and to deny Tenant access thereto, Landlord or its agent may, at the expense and liability of the Tenant, alter or change any or all locks or other security devices controlling access to the Premises without posting or giving notice of any kind to Tenant and Landlord shall have no obligation to provide Tenant a key to new locks installed in the Premises or grant Tenant access to the Premises.  Tenant shall not be entitled to recover possession of the Premises, terminate this Lease, or recover any actual, incidental, consequential, punitive, statutory or other damages or award of attorneys' fees, by reason of Landlord's alteration or change of any lock or other security device and the resulting exclusion from the Premises of the Tenant or Tenant's agents, servants, employees, customers, licensees, invitees or any other persons from the Premises except in the event it is proved that Landlord wrongfully or constructively evicted Tenant from the Premises. Landlord may, without notice, remove and either dispose of or store, at Tenant's expense, any property belonging to Tenant that remains in the Premises after Landlord has regained possession thereof as provided for by this Lease.  Tenant acknowledges that the provisions of this subparagraph of this Lease supersede the Texas Property Code and Tenant further warrants and represents that it hereby knowingly waives any rights it may have thereunder.  **TENANT EXPRESSLY WAIVES THE SERVICE OF ANY STATUTORY DEMAND OR NOTICE WHICH IS A PREREQUISITE TO LANDLORD'S COMMENCEMENT OF EVICTION PROCEEDINGS AGAINST TENANT, INCLUDING THE DEMANDS AND NOTICES SPECIFIED IN ANY APPLICABLE STATE STATUTE OR CASE LAW.  TENANT KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LAWSUIT BROUGHT BY LANDLORD TO RECOVER POSSESSION OF THE PREMISES FOLLOWING LANDLORD'S TERMINATION OF THIS LEASE OR THE RIGHT OF TENANT TO POSSESSION OF THE PREMISES PURSUANT TO THE TERMS OF THIS LEASE AND ON ANY CLAIM FOR DELINQUENT RENT WHICH LANDLORD MAY JOIN IN ITS LAWSUIT TO RECOVER POSSESSION. LANDLORD IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THE FOREGOING WAIVER.**

19.02    If Landlord exercises either of the remedies provided in Sections 19.01(B) or 19.01(C), Tenant shall surrender possession and vacate the Premises and immediately deliver possession thereof to Landlord, and Landlord may re-enter and take complete and peaceful possession of the Premises, and Landlord may remove all occupants and property therefrom, using such force as may be necessary to the extent allowed by law, without being deemed guilty in any manner of trespass, eviction or forcible entry and detainer and without relinquishing Landlord's right to Rent or any other right given to Landlord hereunder or by operation of law.

19.03    If Landlord elects to terminate this Lease or terminates the right of Tenant to possession of the Premises without terminating this Lease by reason of a Default by Tenant, Landlord shall have the right to immediate recovery of all amounts then due hereunder.  Such termination of possession shall not release Tenant, in whole or in part, from Tenant's obligation to pay Rent hereunder for the full Term, and Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Rent accruing as it becomes due

under this Lease during the period from the date of such notice of termination of possession to the stated end of the Term.  In any such case, Landlord shall make reasonable efforts, in accordance with Section 19.05 hereof, to relet the Premises.  In attempting to relet the Premises, Landlord may make repairs, alterations and additions in or to the Premises and redecorate the same to the extent reasonably deemed by Landlord necessary or desirable, and Tenant upon demand shall pay the reasonable cost of all of the foregoing together with Landlord's reasonable expenses of reletting.  The rents from any such reletting shall be applied first to the payment of the expenses of reentry, redecoration, repair and alterations and the expenses of reletting (including reasonable attorneys' fees and brokers' fees and commissions) and second to the payment of Rent herein provided to be paid by Tenant.  Any excess or residue shall operate only as an offsetting credit against the amount of Rent due and owing as the same thereafter becomes due and payable hereunder.

19.04    If this Lease is terminated by Landlord, Landlord shall be entitled to recover from Tenant all Rent accrued and unpaid for the period up to and including such Expiration Date, as well as all other additional sums payable by Tenant, or for which Tenant is liable or for which Tenant has agreed to indemnify Landlord, which may be then owing and unpaid, and all reasonable costs and expenses, including court costs and reasonable attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder.  In addition, Landlord shall be entitled to recover as damages for loss of the bargain and not as a penalty (a) the unamortized portion of any concessions offered by Landlord to Tenant in connection with this Lease, including without limitation Landlord's contribution to the cost of tenant improvements, if any, installed by either Landlord or Tenant pursuant to this Lease or any work letter in connection with this Lease, (b) the aggregate sum which at the time of such termination represents the excess, if any, of the present value of the aggregate Rent which would have been payable after the Expiration Date had this Lease not been terminated, including, without limitation, the amount projected by Landlord to represent Additional Rent for the remainder of the Term, over the then present value of the then aggregate fair rent value of the Premises for the balance of the Term, such present worth to be computed in each case on the basis of a 10% per annum discount from the respective dates upon which such Rent would have been payable hereunder had this Lease not been terminated, and (c) any damages in addition thereto, including without limitation reasonable attorneys' fees and court costs, which Landlord sustains as a result of the breach of any of the covenants of this Lease other than for the payment of Rent.

19.05    Landlord shall use commercially reasonable efforts to mitigate any damages resulting from a Default by Tenant under this Lease.  Landlord's obligation to mitigate damages after a Default by Tenant under this Lease shall be satisfied in full if Landlord undertakes to lease the Premises to another tenant (a **"Substitute Tenant"**) in accordance with the following criteria: (a) Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for the Premises until Landlord obtains full and complete possession of the Premises including, without limitation, the final and unappealable legal right to relet the Premises free of any claim of Tenant; (b) Landlord shall not be obligated to lease or show the Premises, on a priority basis, or offer the Premises to a prospective tenant when other premises in the Building suitable for that prospective tenant's use are (or soon will be) available; (c) Landlord shall not be obligated to lease the Premises to a Substitute Tenant for a rent less than the current

fair market rent then prevailing for similar uses in comparable buildings in the same market area as the Building, nor shall Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Building; (d) Landlord shall not be obligated to enter into a lease with a Substitute Tenant whose use would: (i) violate any restriction, covenant, or requirement contained in the lease of another tenant of the Building; (ii) adversely affect the reputation of the Building; or (iii) be incompatible with the operation of the Building; and (e) Landlord shall not be obligated to enter into a lease with any proposed Substitute Tenant which does not have, in Landlord's reasonable opinion, sufficient financial resources to operate the Premises in a first class manner and to fulfill all of the obligations in connection with the lease thereof as and when the same become due.

19.06    The receipt by Landlord of less than the full Rent due shall not be construed to be other than a payment on account of Rent then due, nor shall any statement on Tenant's check or any letter accompanying Tenant's check be deemed an accord and satisfaction, and Landlord may accept such payment without prejudice to Landlord's right to recover the balance of the Rent due or to pursue any other remedies provided in this Lease. The acceptance by Landlord of Rent hereunder shall not be construed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease. No act or omission by Landlord or its employees or agents during the Term of this Lease shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord.

19.07    In the event of any litigation between Tenant and Landlord to enforce or interpret any provision of this Lease or to enforce any right of either party hereto, the unsuccessful party to such litigation shall pay to the successful party all costs and expenses, including reasonable attorney's fees, incurred therein.

19.08    All property of Tenant removed from the Premises by Landlord pursuant to any provision of this Lease or applicable law may be handled, removed or stored by Landlord at the cost and expense of Tenant, and Landlord shall not be responsible in any event for the value, preservation or safekeeping thereof. Tenant shall pay Landlord for all expenses incurred by Landlord with respect to such removal and storage so long as the same is in Landlord's possession or under Landlord's control. All such property not removed from the Premises or retaken from storage by Tenant within 30 days after the end of the Term or termination of this Lease or Tenant's right to possession of the Premises, however terminated, at Landlord's option, shall be conclusively deemed to have been conveyed by Tenant to Landlord by bill of sale with general warranty of title without further payment or credit by Landlord to Tenant.

## 20.    Limitation of Liability.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE, THE LIABILITY OF LANDLORD (AND OF ANY SUCCESSOR LANDLORD) SHALL BE LIMITED TO THE INTEREST OF LANDLORD IN THE PROPERTY. TENANT SHALL LOOK SOLELY TO LANDLORD'S INTEREST IN THE PROPERTY FOR THE RECOVERY OF ANY JUDGMENT OR AWARD AGAINST LANDLORD OR ANY

LANDLORD RELATED PARTY. NEITHER LANDLORD NOR ANY LANDLORD RELATED PARTY SHALL BE PERSONALLY LIABLE FOR ANY JUDGMENT OR DEFICIENCY, AND IN NO EVENT SHALL LANDLORD OR ANY LANDLORD RELATED PARTY BE LIABLE TO TENANT FOR ANY LOST PROFIT, DAMAGE TO OR LOSS OF BUSINESS OR ANY FORM OF SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE. BEFORE FILING SUIT FOR AN ALLEGED DEFAULT BY LANDLORD, TENANT SHALL GIVE LANDLORD AND THE MORTGAGEE(S) WHOM TENANT HAS BEEN NOTIFIED HOLD MORTGAGES (DEFINED IN SECTION 23 BELOW), NOTICE AND REASONABLE TIME TO CURE THE ALLEGED DEFAULT.

**21.    Relocation.**

Landlord, at its expense, at any time before or during the Term, may relocate Tenant from the Premises to space of reasonably comparable size and utility ("**Relocation Space**") within the Building or adjacent buildings within the same project upon at least sixty (60) days' prior written notice to Tenant.  From and after the date of the relocation, the Base Rent and Tenant's Pro Rata Share shall be adjusted based on the rentable square footage of the Relocation Space.  Landlord shall pay Tenant's reasonable costs of relocation, including all costs for moving Tenant's furniture, equipment, supplies and other personal property, as well as the cost of printing and distributing change of address notices to Tenant's customers and one month's supply of stationery showing the new address.

**22.    Holding Over.**

If Tenant fails to surrender all or any part of the Premises at the termination of this Lease, occupancy of the Premises after termination shall be that of a tenancy at sufferance.  Tenant's occupancy shall be subject to all the terms and provisions of this Lease, and Tenant shall pay an amount (on a per month basis without reduction for partial months during the holdover) equal to 150% of the sum of the Base Rent and Additional Rent due for the period immediately preceding the holdover.  No holdover by Tenant or payment by Tenant after the termination of this Lease shall be construed to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise. If Landlord is unable to deliver possession of the Premises to a new tenant or to perform improvements for a new tenant as a result of Tenant's holdover and Tenant fails to vacate the Premises within fifteen (15) days after notice from Landlord, Tenant shall be liable for all damages that Landlord suffers from the holdover.

**23.    Subordination to Mortgages; Estoppel Certificate.**

Tenant accepts this Lease subject and subordinate to any mortgage(s), deed(s) of trust, ground lease(s) or other lien(s) now or subsequently arising upon the Premises, the Building or the Property, and to renewals, modifications, refinancings and extensions thereof (collectively referred to as a "**Mortgage**"). The party having the benefit of a Mortgage shall be referred to as a "**Mortgagee**".  This clause shall be self-operative, but upon request from a Mortgagee, Tenant shall execute a commercially reasonable subordination agreement in favor of the Mortgagee.  As

an alternative, a Mortgagee shall have the right at any time to subordinate its Mortgage to this Lease. Upon request, Tenant, without charge, shall attorn to any successor to Landlord's interest in this Lease. Landlord and Tenant shall each, within ten (10) days after receipt of a written request from the other, execute and deliver a commercially reasonable estoppel certificate to those parties as are reasonably requested by the other (including a Mortgagee or prospective purchaser). Without limitation, such estoppel certificate may include a certification as to the status of this Lease, the existence of any defaults and the amount of Rent that is due and payable.

## 24.   Notice.

All demands, approvals, consents or notices (collectively referred to as a **"notice"**) shall be in writing and delivered by hand or sent by registered or certified mail with return receipt requested or sent by overnight or same day courier service at the party's respective Notice Address(es) set forth in Section 1.12. Each notice shall be deemed to have been received on the earlier to occur of actual delivery or the date on which delivery is refused, or, if Tenant has vacated the Premises or any other Notice Address of Tenant without providing a new Notice Address, three (3) days after notice is deposited in the U.S. mail or with a courier service in the manner described above. Either party may, at any time, change its Notice Address (other than to a post office box address) by giving the other party written notice of the new address, and Tenant may change the address for its counsel by giving Landlord written notice of its counsel's new address.

## 25.   Surrender of Premises.

At the termination of this Lease or Tenant's right of possession, Tenant shall remove Tenant's Property from the Premises, and quit and surrender the Premises to Landlord, broom clean, and in good order, condition and repair, ordinary wear and tear and damage which Landlord is obligated to repair hereunder excepted. If Tenant fails to remove any of Tenant's Property within five (5) days after termination of this Lease or Tenant's right to possession, Landlord, at Tenant's sole cost and expense, shall be entitled (but not obligated) to remove and store Tenant's Property. Landlord shall not be responsible for the value, preservation or safekeeping of Tenant's Property. Tenant shall pay Landlord, upon demand, the expenses and storage charges incurred. If Tenant fails to remove Tenant's Property from the Premises or storage, within thirty (30) days after notice, Landlord may deem all or any part of Tenant's Property to be abandoned and title to Tenant's Property shall automatically vest in Landlord.

## 26.   Miscellaneous.

26.01   This Lease shall be interpreted and enforced in accordance with the Laws of the state of Texas and Landlord and Tenant hereby irrevocably consent to the jurisdiction and proper venue of such state. If any term or provision of this Lease shall to any extent be void or unenforceable, the remainder of this Lease shall not be affected. If there is more than one Tenant or if Tenant is comprised of more than one party or entity, the obligations imposed upon Tenant shall be joint and several obligations of all the parties and entities, and requests or demands from any one person or entity comprising Tenant shall be deemed to have been made by all such persons or entities. Notices to any one person or entity shall be deemed to have been given to all

persons and entities. Tenant represents and warrants to Landlord that each individual executing this Lease on behalf of Tenant is authorized to do so on behalf of Tenant and that Tenant is not, and the entities or individuals constituting Tenant or which may own or control Tenant or which may be owned or controlled by Tenant are not, among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists.

26.02     If either party institutes a suit against the other for violation of or to enforce any covenant, term or condition of this Lease, the prevailing party shall be entitled to all of its costs and expenses, including, without limitation, reasonable attorneys' fees. Landlord and Tenant hereby waive any right to trial by jury in any proceeding based upon a breach of this Lease. Either party's failure to declare a default immediately upon its occurrence, or delay in taking action for a default, shall not constitute a waiver of the default, nor shall it constitute an estoppel.

26.03     Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant (other than the payment of the Security Deposit or Rent), the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist acts, civil disturbances and other causes beyond the reasonable control of the performing party (**"Force Majeure"**).

26.04     Landlord shall have the right to transfer and assign, in whole or in part, all of its rights and obligations under this Lease and in the Building and Property. Upon transfer Landlord shall be released from any further obligations hereunder and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations, provided that, any successor pursuant to a voluntary, third party transfer (but not as part of an involuntary transfer resulting from a foreclosure or deed in lieu thereof) shall have assumed Landlord's obligations under this Lease.

26.05     Tenant hereby represents, warrants and covenants to Landlord that, except for Landlord's Broker identified in Section 1.10 of this Lease, Tenant has not dealt with, contacted, or been contacted by any real estate broker, agent or salesperson in connection with this Lease. Tenant hereby indemnifies and holds Landlord harmless against any claim, demand, action, cause of action, lawsuit, damages, judgment, settlement, cost, expense or other obligation of any kind, including, but not limited to, reasonable attorneys' fees and court costs incurred by Landlord if Tenant's representations and warranties contained in Section 1.10 hereof or this Section 26.05 are untrue or inaccurate in any respect.

26.06     Time is of the essence with respect to Tenant's performance of its obligations hereunder and its exercise of any expansion, renewal or extension rights granted to Tenant. The expiration of the Term, whether by lapse of time, termination or otherwise, shall not relieve either party of any obligations which accrued prior to or which may continue to accrue after the expiration or termination of this Lease.

26.07     Tenant may peacefully have, hold and enjoy the Premises, subject to the terms of this Lease, so long as Tenant timely pays the Rent due hereunder and fully performs all of its covenants and agreements.  This covenant shall be binding upon Landlord and its successors only during its or their respective periods of ownership of the Building.

26.08     This Lease does not grant any rights to light or air over or about the Building. Landlord excepts and reserves exclusively to itself any and all rights not specifically granted to Tenant under this Lease.  This Lease constitutes the entire agreement between the parties and supersedes all prior agreements and understandings related to the Premises, including all lease proposals, letters of intent and other documents.  Neither party is relying upon any warranty, statement or representation not contained in this Lease.  This Lease may be modified only by a written agreement signed by an authorized representative of Landlord and Tenant.

26.09     Landlord and Tenant agree that each provision of the Lease for determining charges, amounts and Additional Rent payments by Tenant (including without limitation, Section 4 of this Lease and Exhibit B to this Lease) is commercially reasonable, and as to each such charge or amount, constitutes a "method by which the charge is to be computed" for purposes of Section 93.012 (Assessment of Charges) of the Texas Property Code, as such section now exists or as it may be hereafter amended or succeeded.

26.10     Tenant hereby grants to Landlord a lien on and security interest in all furniture, fixtures, equipment, inventory, merchandise and other personal property owned by Tenant and now or hereafter located in, on or about the Premises or Building, whether such items are presently owned by Tenant or are after acquired, to secure the payment of all Rent and other charges due and to become due under this Lease and to further secure the full and timely performance by Tenant of all of its other obligations under this Lease, such lien and security interest to be prior to any other lien and security interest on such property except a timely perfected purchase money security interest in favor of the seller or lessor of such property to secure the unpaid purchase price or lease payments thereof.  Tenant hereby expressly waives all exemption laws.  This Lease constitutes a security agreement between Landlord and Tenant for purposes of granting Landlord rights in the collateral described in this Section 26.10.  Landlord shall be entitled to exercise and enforce all rights and remedies of a secured party under the Uniform Commercial Code in force in the state or commonwealth in which the Building is situated, including, without limitation, the right to foreclose and conduct sales of the collateral.  Tenant hereby authorizes Landlord, as the secured party, to file a financing statement to perfect the security interest granted herein.  Landlord shall, following Tenant's written request, subordinate its liens and security interests under this Lease to a bank or other financial institution unrelated and unaffiliated with Tenant and its affiliates, which bank or institution has made or is making a loan or other extension of credit to Tenant to be secured by liens and security interests in furniture, fixtures, equipment, inventory, merchandise and other personal property owned by Tenant and located in the Premises (but not secured by any right, title or interest of Tenant in this Lease or the leasehold estate created hereby), provided such subordination is pursuant to a written subordination agreement in form and substance mutually satisfactory to Landlord and such bank or financial institution.

24

26.11    Except and only to the extent expressly provided in this Lease (including, in particular, Exhibit E), Tenant shall have no option or right whatsoever to renew or extend the Term or any option to lease, right of first offer to lease, or right of first refusal to lease any other space Building.  Tenant hereby acknowledges and agrees that it has no option or right to purchase the Premises, the Building or other property of Landlord and no option or right of first refusal to purchase the Premises, the Building or other property of Landlord.

26.12    The submission by Landlord to Tenant of one or more drafts of this Lease for Tenant's review and comment does not constitute, and shall not be deemed or construed to be, an offer, option, commitment or agreement by Landlord to execute such draft or drafts, and such submission does not grant or confer any rights or interests to Tenant or impose any obligations on Landlord regardless of any reliance, change or position, or partial performance by either Landlord or Tenant in respect of such submission.  No such drafts shall be binding or enforceable against Landlord or Tenant, it being the intent of each of the parties hereto that this Lease shall not be effective, binding or enforceable against either party hereto until (i) this Lease is duly executed and delivered by both Landlord and Tenant; and (ii) the Guaranty attached hereto as **Exhibit G** is executed and delivered by the Guarantor to Landlord.

26.13    **TENANT HEREBY WAIVES ALL RIGHTS TO PROTEST THE APPRAISED VALUE OF THE PROPERTY OR TO APPEAL THE SAME AND ALL RIGHTS TO RECEIVE NOTICES OF REAPPRAISALS AS SET FORTH IN SECTIONS 41.413 AND 42.015 OF THE TEXAS TAX CODE.**

26.14    **TENANT HEREBY WAIVES ALL ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET. SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.  AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY CONSENTS TO THIS WAIVER.**

26.15    Each party hereto represents and warrants to the other party hereto that the agent, partner or officer executing this Lease on its behalf is fully authorized, directed and empowered to execute and deliver this Lease in such capacity as the act and deed of the party on whose behalf he or she is executing this Lease and that all partnership, corporate or company action requisite to such execution and delivery has been taken by such party.

26.16    This Lease will be executed in multiple counterparts, and each counterpart when fully executed and delivered by the parties hereto will be an original agreement, but all such counterparts will constitute one agreement.

[Signatures on Following Page]

Landlord and Tenant have executed this Lease as of the date first above written.

LANDLORD:

**YPI 1010 LAMAR, LLC**, a Delaware limited liability company

By: _____
John R. Cook, Vice President

TENANT:

**WEGMAN PARTNERS LLC**, a Texas limited liability company

By: _____
Name: _____
Its duly authorized _____

26

**EXHIBIT A**

**OUTLINE AND LOCATION OF PREMISES**



Suite 1540
1010
Lamar
Level 15

Radian
ARCHITECTURE

| Issue Name | Date |
|---|---|
| SCHEME #1 | 05.15.12 |

Project Area: **1,860 NRSF**
Project Number: **12Y.04**
Scale: **1/8"=1'-0"**
Sheet Number:

**SCHEME 1**
**FURNITURE**

OFFICE 4
9'7"x17'2"

CONF.
15'0"x11'1"

OFFICE 3
9'8"x12'11"

WAITING
13'2"x11'7"

OFFICE 2
9'11"x12'1"

BREAK
13'3"x9'11"

4'4" GFI

SERVER
6'2"x9'11"
220

FILE ROOM
14'8"x13'10"

OFFICE 1
9'6"x16'2"

LEGEND

EXISTING TELEPHONE/DATA PULL & PLATE TO REMAIN

EXISTING OUTLET ON DEMO'D PARTITION TO REMAIN

ALL OUTLETS IN PROXIMITY OF PLUMBING MUST BE GFI

EXISTING DUPLEX OUTLET TO REMAIN

EXISTING FOURPLEX OUTLET TO REMAIN

15th FLOOR KEY PLAN

NEW PARTITIONS ARE SHOWN SHADED IN. (TYP.)

AT ALL ITEMS CALLED OUT AS BEING DEMO'D, CONTRACTOR MUST INVESTIGATE EXIST. CONDITIONS TO VERIFY THAT ITEM CAN BE REMOVED AND TO DETERMINE THE AMOUNT OF WORK MADE NECESSARY TO REMOVE IT (INCLUDING DEACTIVATION OR RELOCATION OF SERVICES ASSOCIATED WITH THAT ITEM).

ALL ROOM SIZES ARE APPROXIMATE.

FURNITURE LAYOUTS ARE SCHEMATIC AND DO NOT REPRESENT TENANT'S ACTUAL FURNITURE SIZES OR QUANTITIES.

THESE DRAWINGS ARE FOR DESIGN INTENT ONLY (NOT FOR CONSTRUCTION) AND MAY NOT BE TO SCALE. ADDITIONAL CODE COMPLIANCE AND PRICING INFORMATION WILL BE INCLUDED IN CONSTRUCTION DRAWINGS (TO BE PROVIDED LATER)

# EXHIBIT A-1

## LEGAL DESCRIPTION OF LAND

All that certain 20,603 square feet of land, out of that same called 20,789 square foot tract described in the deed dated January 3, 1994, from Rock properties to Lamar-Fannin Partnership, Ltd., recorded at Clerk File No. P-633427, Film Code No. 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, of the Official Public Records of Real Property of Harris County, Texas, being all of Lot 5 and a portion of Lots 4, 9, 10 and 11, of Block 255, out of South Side Buffalo Bayou (unrecorded and recognized), Houston, Harris County, Texas and being more particularly described by metes and bounds as follows:

Commencing at found City of Houston Engineering Department Reference Monument No. 41 at the intersection of the City of Houston Engineering Department Reference Lines in the center lines of Main Street (90' wide) and Polk Avenue, Thence N 35° 00' 00" E - 660.0l', with said Reference Line in Main Street to a point; Thence S 55° 00' 00" H - 337.50', with the Reference Line in Lamar Avenue (originally 80' wide, currently 69.3' wide) to a point; Thence S 35° 00' 00" W - 29.30', with the Reference Line in Fannin Street to a point; Thence N 55° 00' 00" W - 40.00', to a found brass "L" plate marking the east corner of the 10.7' wide strip described in Cause No. 87651, First Baptist Church of Houston versus the City of Houston, recorded in Volume 8, Page 460, of the District Court Minutes, for the POINT OF BEGINNING of the herein described tract;

THENCE S 35° 00' 00" W, at 10.7' passing the east corner of aforementioned Block 255 and with the northwest right-of-way line of Fannin Street (80' wide) for a total distance of 108.20', to a found building corner for corner;

THENCE N 55° 00' 00" W - 67.50', with the northeast line of that certain 38,579 square foot tract described in the deed dated January 10, 1997, from Lamar-Fannin Partnership, Ltd. to Sakowitz Building-Houston, L.L.C., recorded at Clerk File No, S-279492, Film Code No. 5I1-47-1804, of the Official Public Records of Real Property of Harris County, Texas, to a point for corner;

THENCE N 35° 00' 00" E - 0.50', continuing with said northeast line of the 38,579 square foot tract, to a point for corner;

THENCE N 55° 05' 28" W − 125.13'. continuing along said northeast line of the 38,579 square foot tract, to a point for corner;

THENCE N 35° 01' 04" E - 0.10', with an interior southeast line of said 38,579 square foot tract, to a point for corner;

THENCE S 54° 59' 43" E - 1.24', with the southwest line of that certain 6,644 square foot tract, described in the deed dated August 2, 1995, from Zale Delaware, Inc. to NAJU, Inc., recorded at Clerk File No. R-513136, File Code No. 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, of the official Public Records of Real Property of Harris County, Texas, to a point for corner;

THENCE N 35° 33' 10" E, with the southeast line of said 6,644 square foot tract, at 97.11' passing the original southwest right-of-way line of aforementioned Lamar Avenue and the northeast line of aforementioned Block 255, S.S.B.B., and continuing for a total distance of 107.81', to a point for corner;

THENCE S 55° 00' 00" E − 190.35', with the northeast line of the 10.7' wide strip described in Cause. No. 87651, First Baptist Church of Houston versus the City Houston, recorded in Volume 8, Page 460, of the District Court Minutes, to the POINT OF BEGINNING of the herein described tract and containing 20,603 square feet (0.4730 acre) of land, more or less.

TOGETHER with the rights under that certain Permit for Use And Occupancy Of A Portion of The City's Right-of-Way recorded under Harris County Clerk's File Number(s) F963827 and Correction Permit For Use And Occupancy Of A Portion Of The City's Right-of-Way recorded under Harris County Clerk's File Number(s) M526795.

## END OF EXHIBIT A-1

## EXHIBIT B

## EXPENSES AND TAXES

1.  **Payments**.

1.01      Tenant shall pay Tenant's Pro Rata Share of the amount, if any, by which Expenses (defined below) for each calendar year during the Term exceed Expenses for the Base Year (the **"Expense Excess"**) and also the amount, if any, by which Taxes (defined below) for each calendar year during the Term exceed Taxes for the Base Year (the **"Tax Excess"**).  If Expenses or Taxes in any calendar year decrease below the amount of Expenses or Taxes for the Base Year, Tenant's Pro Rata Share of Expenses or Taxes, as the case may be, for that calendar year shall be $0.00.  Landlord shall provide Tenant with a good faith estimate of the Expense Excess and of the Tax Excess for each calendar year during the Term.  On or before the first day of each month, Tenant shall pay to Landlord a monthly installment equal to one-twelfth of Tenant's Pro Rata Share of Landlord's estimate of both the Expense Excess and Tax Excess.  After its receipt of the revised estimate, Tenant's monthly payments shall be based upon the revised estimate.  If Landlord does not provide Tenant with an estimate of the Expense Excess or the Tax Excess by January 1 of a calendar year, Tenant shall continue to pay monthly installments based on the previous year's estimate(s) until Landlord provides Tenant with the new estimate.

1.02      As soon as is practical following the end of each calendar year, Landlord shall furnish Tenant with a statement of the actual Expenses and Expense Excess and the actual Taxes and Tax Excess for the prior calendar year.  If the estimated Expense Excess or estimated Tax Excess for the prior calendar year is more than the actual Expense Excess or actual Tax Excess, as the case may be, for the prior calendar year, Landlord shall either provide Tenant with a refund or apply any overpayment by Tenant against Additional Rent due or next becoming due, provided if the Term expires before the determination of the overpayment, Landlord shall refund any overpayment to Tenant after first deducting the amount of Rent due.  If the estimated Expense Excess or estimated Tax Excess for the prior calendar year is less than the actual Expense Excess or actual Tax Excess, as the case may be, for such prior year, Tenant shall pay Landlord, within thirty (30) days after its receipt of the statement of Expenses or Taxes, any underpayment for the prior calendar year.

2.  **Expenses**.

2.01      **"Expenses"** means all costs and expenses incurred in each calendar year in connection with operating, maintaining, repairing, and managing the Building and the Property.  Expenses include, without limitation: (a) all labor and labor related costs; (b) management fees; (c) the cost of equipping, staffing and operating an on-site and/or off-site management office for the Building, provided if the management office services one or more other buildings or properties, the shared costs and expenses of equipping, staffing and operating such management office(s) shall be equitably prorated and apportioned between the Building and the other buildings or properties; (d) accounting costs; (e) the cost of services; (f) rental and purchase cost

of parts, supplies, tools and equipment; (g) insurance premiums and deductibles; (h) electricity, gas and other utility costs (excluding (i) amounts received by Landlord as reimbursement for above standard electrical consumption, and (ii) the cost of electricity incurred to provide overtime HVAC to specific tenants (as reasonably estimated by Landlord); and (iii)the amortized cost of capital improvements (as distinguished from replacement parts or components installed in the ordinary course of business) made subsequent to the Base Year which are:  (1) performed primarily to reduce current or future operating expense costs, upgrade Building security or otherwise improve the operating efficiency of the Property; or (2) required to comply with any Laws that are enacted, or first interpreted to apply to the Property, after the date of this Lease).  The cost of capital improvements shall be amortized by Landlord over the lesser of the Payback Period (defined below) or the useful life of the capital improvement as reasonably determined by Landlord.  The term **"Payback Period"** means the reasonably estimated period of time that it takes for the cost savings resulting from a capital improvement to equal the total cost of the capital improvement. Landlord, by itself or through an affiliate, shall have the right to directly perform, provide and be compensated for any services under this Lease.  If Landlord incurs Expenses for the Building or Property together with one or more other buildings or properties, whether pursuant to a reciprocal easement agreement, common area agreement or otherwise, the shared costs and expenses shall be equitably prorated and apportioned between the Building and Property and the other buildings or properties.

2.02     Expenses shall not include: the cost of capital improvements (except as set forth above); depreciation; principal payments of mortgage and other non-operating debts of Landlord; the cost of repairs or other work to the extent Landlord is reimbursed by insurance or condemnation proceeds; costs in connection with leasing space in the Building, including brokerage commissions; lease concessions, rental abatements and construction allowances granted to specific tenants; costs incurred in connection with the sale, financing or refinancing of the Building; fines, interest and penalties incurred due to the late payment of Taxes or Expenses; organizational expenses associated with the creation and operation of the entity which constitutes Landlord; or any penalties or damages that Landlord pays to Tenant under this Lease or to other tenants in the Building under their respective leases.

2.03     If at any time during a calendar year the Building is not at least 95% occupied or Landlord is not supplying services to at least 95% of the total Rentable Square Footage of the Building, Expenses shall, at Landlord's option, be determined as if the Building had been 95% occupied and Landlord had been supplying services to 95% of the Rentable Square Footage of the Building.  If Expenses for a calendar year are determined as provided in the prior sentence, Expenses for the Base Year shall also be determined in such manner.

2.04     Notwithstanding the foregoing provisions of this Section 2, for the purpose only of calculating the Expense Excess for each calendar year during the Term, Expenses in any calendar year commencing after the Commencement Date (an **"Applicable Year"**) shall not exceed the difference of (a) the sum of (i) all Controllable Expenses (defined below) actually incurred during calendar year 2012 compounded at a cumulative annual rate of five percent (5%) for each calendar year (or portion thereof) commencing with calendar year 2012 through and including the Applicable Year; and (ii) all Non-Controllable Expenses (defined below) incurred

B-2

by Landlord during the Applicable Year; LESS (b) the sum of all Controllable Expenses and all Non-Controllable Expenses actually incurred by Landlord during calendar year 2012. The term **"Controllable Expenses,"** as used in this Lease, means all Expenses incurred by Landlord OTHER THAN Non-Controllable Expenses. The term **"Non-Controllable Expenses,"** as used in this Lease, means all insurance costs, expenses of snow and ice removal, security costs, and utilities expenses of the Building and the Property.

3. **Taxes.**

3.01       The term **"Taxes"** means all real property taxes, assessments, excises, association dues, fees, levies, charges and other taxes of every kind and nature whatsoever, general and special, extraordinary and ordinary, foreseen and unforeseen, including interest on installment payments, which may be levied or assessed against or arise in connection with ownership, use, occupancy, rental, leasing, operation or possession of the Building and/or the Property, or paid as rent under any ground lease, including, but not limited to: (a) any tax on the rent or other revenue from the Property, or any portion thereof, or as against the business of owning or leasing the Property, or any portion thereof, including any business, gross margins, or similar tax payable by Landlord which is attributable to rent or other revenue derived from the Property, and any sales, use, franchise or other tax now or hereafter imposed by any governmental authority upon Rent received by Landlord or on the revenue of Landlord from the Property; (b) any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the Rent payable hereunder, including assessments for special improvement districts and building improvement districts, governmental charges, fees and assessments for police, fire, traffic mitigation or other governmental service of purported benefit to the Property, taxes and assessments levied in substitution or supplementation in whole or in part of any such taxes and assessments; (c) the Property's share of any real estate taxes and assessments under any reciprocal easement agreement, common area agreement or similar agreement as to the Property; (d) personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the Property, or any portion thereof; (e) any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Property; (f) any assessment, tax, fee, levy or charge substituted, in whole or in part, for a tax previously in existence, or assessed in lieu of a tax increase; and (g) all costs and fees incurred by Landlord in connection with seeking reductions in any tax liabilities described in (a), (b), (c), (d), (e) and (f) of this Section 3.01, including, but not limited to, any costs incurred by Landlord for compliance, review and appeal of tax liabilities. Without limitation, Taxes shall not include any income, capital levy, transfer, capital stock, gift, estate or inheritance tax. If a change in Taxes is obtained for any year of the Term during which Tenant paid Tenant's Pro Rata Share of any Tax Excess, then Taxes for that year will be retroactively adjusted and Landlord shall provide Tenant with a credit, if any, based on the adjustment. Likewise, if a change is obtained for Taxes for the Base Year, Taxes for the Base Year shall be restated and the Tax Excess for all subsequent years shall be recomputed.

3.02       Tenant shall pay Landlord the amount of Tenant's Pro Rata Share of any such increase in the Tax Excess within thirty (30) days after Tenant's receipt of a statement from Landlord.

**4. Audit Rights.**

Tenant, within 60 days after receiving Landlord's statement of Expenses, may give Landlord written notice (**"Review Notice"**) that Tenant intends to review Landlord's records of the Expenses for the calendar year to which the statement applies. Within a reasonable time after receipt of the Review Notice, Landlord shall make all pertinent records available for inspection that are reasonably necessary for Tenant to conduct its review. If any records are maintained at a location other than the management office for the Building, Tenant may either inspect the records at such other location or pay for the reasonable cost of copying and shipping the records. If Tenant retains an agent to review Landlord's records, the agent must be with a CPA firm licensed to do business in the state where the Property is located and shall not be compensated on a contingency fee basis. Tenant shall be solely responsible for all costs, expenses and fees incurred for the audit. Within 90 days after the records are made available to Tenant, Tenant shall have the right to give Landlord written notice (an **"Objection Notice"**) stating in reasonable detail any objection to Landlord's statement of Expenses for that year. If Tenant fails to give Landlord an Objection Notice within the 90 day period or fails to provide Landlord with a Review Notice within the 60 day period described above, Tenant shall be deemed to have approved Landlord's statement of Expenses and shall be barred from raising any claims regarding the Expenses for that year. In no event shall Tenant be entitled to review or audit Landlord's records for any given calendar year (including, but not limited to, the Base Year) more than one (1) time. The records obtained by Tenant shall be treated as confidential. In no event shall Tenant be permitted to examine Landlord's records or to dispute any statement of Expenses unless Tenant has paid and continues to pay all Rent when due. Any errors agreed by the parties hereto shall be promptly corrected, provided that Landlord shall have the right to cause another independent audit, at Landlord's expense, to be made of such computations. Landlord shall credit any overpayment determined by the audit report against the next Rent due and owing by Tenant or, if no further Rent is due, refund such overpayment directly to Tenant within 30 days of determination. Likewise, Tenant shall pay Landlord any underpayment determined by the audit report within 30 days of determination. The foregoing obligations shall survive the expiration or termination of this Lease. If the audit proves that Landlord's calculation of Expenses for the calendar year under inspection was overstated by more than five percent (5%), then, after verification, Landlord shall pay Tenant's actual reasonable out-of-pocket audit and inspection fees incurred in connection with Tenant's audit, not to exceed $3,000, within 30 days after receipt of Tenant's invoice therefor.

## EXHIBIT C

## WORK LETTER

1.      This Work Letter (this **"Work Letter"**) is attached to and part of that certain Office Lease Agreement (the **"Lease"**) executed by **YPI 1010 LAMAR, LLC**, a Delaware limited liability company (**"Landlord"**) and **WEGMAN PARTNERS**, a Texas LLC ~~partnership~~ (**"Tenant"**), for the lease of certain premises containing 1,860 rentable square feet, as more particularly described in the Lease (the **"Premises"**), on the 15th floor of the office building located at 1010 Lamar Street, Houston, Texas 77002, commonly known as Younan Square (the **"Building"**).  Except as expressly defined in this Work Letter, each defined term used in this Work Letter has the same meaning given to such term in the Lease.

2.      Landlord and Tenant acknowledge that Plans (as herein defined) for the Landlord Work have not yet been prepared.  Therefore, it is impossible to determine the exact cost of the Landlord Work at this time.  Accordingly, Landlord and Tenant agree that Landlord's total obligation to pay for or fund the cost of the Landlord Work, plus the sum of all other disbursements, if any, made by Landlord pursuant to the provisions of this Work Letter shall not exceed, in the aggregate, an amount equal to **$16.00 per rentable square foot of the Premises** (the **"Construction Allowance"**).  Tenant shall at its sole cost and expense pay for all costs of the Landlord Work and such other disbursements made by Landlord under this Work Letter to the extent that such costs and disbursements exceed the Construction Allowance.  If the sum of such costs and disbursements made by Landlord under this Work Letter is less than the Construction Allowance, Tenant shall not be entitled to any credit, payment or abatement on account thereof and Landlord shall retain any unused portion of the Construction Allowance.

3.      Landlord shall enter into a direct contract for the Landlord Work with a general contractor, which is the lowest bidder of at least three (3) general contractors mutually agreeable to Landlord and Tenant, which competitively bid the Landlord Work.  Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Landlord Work. Tenant shall pay Landlord, within ten (10) days after Landlord's written demand, a construction fee equal to three (3%) of the cost of the Landlord Work to compensate Landlord or its designee for construction management services in connection with the Landlord Work.  The construction fee shall be disbursed by Landlord from the Construction Allowance.

4.      Space planning, architectural and engineering (mechanical, electrical and plumbing) drawings for the Landlord Work shall be prepared at Tenant's sole cost and expense, subject to funding by Landlord from the Construction Allowance.   The space planning, architectural and mechanical drawings are collectively referred to herein as the **"Plans"**.

5.      Tenant shall deliver to Landlord any information reasonably requested by Landlord and shall deliver to Landlord the written  approval or disapproval signed by Tenant of any preliminary or final layout, drawings, or plans within two (2) Business Days after written request.  The approval or disapproval must be in writing and any disapproval shall set forth in reasonable detail the reasons for Tenant's disapproval.  Tenant shall devote such time in

consultation with Landlord and Landlord's architect and engineer as may be required to provide all information Landlord deems necessary in order to enable Landlord's architect and engineer to complete, and obtain Tenant's written approval of the Plans for Landlord Work by not later than ten (10) days after full execution of the Lease and this Work Letter by Landlord and Tenant (the "**Plans Due Date**").   In the event that Tenant fails to approve the Plans by the Plans Due Date, Tenant shall be responsible for one (1) day of Tenant Delay for each day during the period beginning on the day following the Plans Due Date and ending on the date Tenant approves the Plans in writing delivered to Landlord.  Neither the approval of the Plans nor the supervision of the Landlord Work by Landlord shall constitute a representation or warranty by Landlord as to the accuracy, adequacy, sufficiency and propriety of the Plans or the quality of workmanship or compliance of the Landlord Work with applicable law.

6.    Prior to commencing construction of the Landlord Work, Landlord shall submit to Tenant a written estimate setting forth the anticipated cost of the Landlord Work, including, but not limited to labor and materials, architect's fees, contractor's fees and permit fees.  Within three (3) Business Days thereafter, Tenant shall either deliver to Landlord in writing Tenant's approval of the cost estimate or Tenant's detailed written objections thereto in sufficient detail, including any desired changes to the proposed Landlord Work.  In the event Tenant notifies Landlord of any objections and/or any desired changes, Tenant shall work with Landlord in good faith to alter the scope of the Landlord Work in order to reach a mutually acceptable alternative cost estimate; provided that each day after the expiration of the three (3) Business Day period that Tenant has not approved the original cost estimate shall be a day of Tenant Delay.

7.    If Landlord's estimate and/or the actual cost of the Landlord Work, together with the sum of all other disbursements made by Landlord under this Work Letter, exceed the Construction Allowance (such excess being herein referred to as the "**Excess Costs**"), Tenant shall pay to Landlord such Excess Costs within two (2) Business Days after Landlord's written demand.  Landlord shall not be required to proceed with the Landlord Work until Tenant pays any Excess Costs and any delay in the completion of the Landlord Work due to a delay by Tenant in paying Excess Costs shall be deemed a Tenant Delay.  The statements of costs submitted to Landlord by its contractors shall be conclusive for purposes of determining the actual cost of the items described therein.  The Excess Costs constitute Rent payable pursuant to the Lease, and the failure to timely pay same constitutes a material event of default by Tenant under the Lease.

8.    If Tenant shall request any changes to the Landlord Work that are approved by Landlord ("**Change Orders**"), Landlord shall have any necessary revisions to the Plans prepared, and Tenant shall reimburse Landlord on demand for the cost of preparing such revisions. Landlord shall notify Tenant in writing of the estimated increased cost, if any, which will be chargeable to Tenant by reason of such Change Orders, which increased cost shall be deemed Excess Costs hereunder and shall be subject to the provisions of Paragraph 7 hereof.  Tenant shall, within one (1) Business Day after receiving Landlord's estimate of the cost of the Change Order, notify Landlord in writing whether it desires to proceed with such Change Order.  In the absence of such written authorization, Landlord shall have the option to continue work on the Premises, disregarding the requested Change Order, or Landlord may elect to discontinue work on the Premises until Landlord receives written notice of Tenant's decision, in which event

C-2

Tenant shall be responsible for any delay in completion of the Landlord Work resulting therefrom. In addition, Landlord shall be entitled to a construction fee equal to three (3%) of the increased cost, if any, chargeable to Tenant by reason of such Change Orders.

9.      A portion of the Construction Allowance, not to exceed in the aggregate **$2.00** per rentable square foot of the Premises, may be used by Tenant to reimburse amounts actually incurred by Tenant for costs and expenses in relocating and moving to the Premises (including, but not limited to, costs of installing voice and data cabling in the Premises), provided that Tenant delivers to Landlord copies of invoices and similar supporting documentation and Tenant's canceled checks or other satisfactory written evidence of such amounts actually paid by Tenant therefor. To the extent that the entire Construction Allowance has not already been disbursed by Landlord, as provided herein, then any such reimbursement shall be made to Tenant within thirty (30) days after Landlord's receipt of such invoices, supporting documentation, canceled checks and evidence of payment.

10.     Landlord shall cause the Landlord Work to be constructed substantially in accordance with the approved Plans, so long as no Default by Tenant has occurred under the Lease. Landlord shall notify Tenant in writing when the Landlord Work is Substantially Complete. Within ten (10) days after Landlord notifies Tenant that the Landlord Work is Substantially Complete, Tenant shall prepare a written "punch list" based on a walkover of the Premises by Landlord's property manager and Tenant's representatives specifying the items of the Landlord Work that Tenant claims were not Substantially Completed by Landlord as required by this Work Letter, and Landlord shall, within thirty (30) days after Landlord's receipt of the punch list, remedy all punch list items that Landlord's architect or engineer agrees are included in the scope of the Landlord Work.

11.     If Landlord is delayed in the performance of the Landlord Work as a result of the acts or omissions of Tenant or any of the other Tenant Related Parties, or their respective contractors or vendors, including, without limitation, Change Orders requested by Tenant to the approved Plans, Tenant's failure to perform its obligations under the Lease, or the specification of any materials or equipment with long lead times, such delay or delays shall constitute and be deemed and construed to be Tenant Delay and the Landlord Work shall be deemed to be Substantially Complete on the date that Landlord could reasonably have been expected to Substantially Complete the Landlord Work absent any Tenant Delay.

12.     This Work Letter exclusively governs and controls all Landlord Work to be performed by Landlord in the Premises, and no other work letter, tenant finish agreement or other leasehold improvements provisions contained in the Lease shall apply to or govern the performance by Landlord of the Landlord Work.

13.     If Tenant has access to or takes possession of the Premises prior to the Commencement Date, then Tenant shall not disrupt or delay Landlord's performance of the Landlord Work.

14.     This Work Letter shall not apply to any additional space in the Building hereafter

C-3

leased by Tenant at any time or from time to time or to any portion of the Premises or any additions to the Premises if the Term is hereafter renewed or extended.

15.     This Work Letter will be executed in multiple counterparts, and each counterpart when fully executed and delivered by the parties hereto will be an original agreement, but all such counterparts will constitute one agreement.

*(signature page follows)*

Each of Landlord and Tenant has executed this Work Letter as of the Effective Date.

LANDLORD:                                    **YPI 1010 LAMAR, LLC**, a Delaware limited
                                             liability company

                                             By: _____
                                             John Cook, Vice President

TENANT:                                      **WEGMAN   PARTNERS**,   a   *Texas LLC*
                                             ~~partnership~~

                                             By: _____
                                             Name: *Colby Wegman*
                                             Its duly authorized *President*

C-5

**EXHIBIT D**

**ACCEPTANCE OF LANDLORD WORK LETTER AGREEMENT**

_____, 2012

Wegman Partners
1010 Lamar, Suite ___
Houston, Texas 77002

Re:     Acceptance of Landlord Work Letter Agreement pursuant to that certain Office Lease
        Agreement (the "**Lease**") executed by **YPI 1010 LAMAR, LLC**, a Delaware limited
        liability company ("**Landlord**") and **WEGMAN PARTNERS**, a _____
        partnership ("**Tenant**"), for the lease of certain premises, as more particularly described
        therein (the "**Premises**"), in the building located at 1010 Lamar, Houston, Texas 77002,
        commonly known as Younan Square

Dear Tenant:

Unless otherwise defined herein, each term used in this Acceptance of Landlord Work Letter
Agreement has the same meaning given to such term in the above-referenced Lease.   In
accordance with the provisions of the Lease, Tenant hereby accepts the Landlord Work
constructed by Landlord pursuant to the Work Letter attached as **Exhibit C** to the Lease.  In
addition, Tenant hereby certifies to Landlord as follows:

1.     Landlord first gave Tenant access to the Premises on _____, 2012.

2.     Landlord notified Tenant on _____, 2012, that the Landlord Work was
       Substantially Complete.

3.     The actual Commencement Date is _____, 2012.

4.     Tenant first occupied the Premises on _____, 2012.

5.     Tenant first conducted business in the Premises on _____, 2012.

6.     The Expiration Date is _____.

Please acknowledge Tenant's agreement to the provisions hereof by signing all three (3) counterparts of this Acceptance of Landlord Work Letter Agreement in the space provided below and returning three (3) fully-executed counterparts to my attention.

Sincerely,


_____
Authorized Signatory for Landlord

**AGREED TO AND ACCEPTED** by
Tenant on _____, 2012:

**WEGMAN PARTNERS**, a _____
partnership


By: _____
Name: _____
Its duly authorized _____

## EXHIBIT E

## BUILDING RULES AND REGULATIONS

The following rules and regulations shall apply, where applicable, to the Premises, the Building, the parking facilities (if any), the Property and the appurtenances.  In the event of a conflict between the following rules and regulations and the remainder of the terms of the Lease, the remainder of the terms of the Lease shall control.  Capitalized terms have the same meaning as defined in the Lease.

1.  Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises.  No rubbish, litter, trash, or material shall be placed, emptied, or thrown in those areas.  At no time shall Tenant permit Tenant's employees to loiter in Common Areas or elsewhere about the Building or Property.

2.  Plumbing fixtures and appliances shall be used only for the purposes for which designed and no sweepings, rubbish, rags or other unsuitable material shall be thrown or placed in the fixtures or appliances.  Damage resulting to fixtures or appliances by Tenant, its agents, employees or invitees shall be paid for by Tenant and Landlord shall not be responsible for the damage.

3.  No signs, advertisements or notices shall be painted or affixed to windows, doors or other parts of the Building, except those of such color, size, style and in such places as are first approved in writing by Landlord.  All tenant identification and suite numbers at the entrance to the Premises shall be installed by Landlord, at Tenant's cost and expense, using the standard graphics for the Building. Except in connection with the hanging of lightweight pictures and wall decorations, no nails, hooks or screws shall be inserted into any part of the Premises or Building except by the Building maintenance personnel without Landlord's prior approval, which approval shall not be unreasonably withheld.

4.  Landlord may provide and maintain in the first floor (main lobby) of the Building an alphabetical directory board or other directory device listing tenants and no other directory shall be permitted unless previously consented to by Landlord in writing.

5.  Tenant shall not place any lock(s) on any door in the Premises or Building without Landlord's prior written consent, which consent shall not be unreasonably withheld, and Landlord shall have the right at all times to retain and use keys or other access codes or devices to all locks within and into the Premises.  A reasonable number of keys to the locks on the entry doors in the Premises shall be furnished by Landlord to Tenant at Tenant's cost and Tenant shall not make any duplicate keys.  All keys shall be returned to Landlord at the expiration or early termination of the Lease.

6.  All contractors, contractor's representatives and installation technicians performing work in the Building shall be subject to Landlord's prior approval, which approval shall not be

unreasonably withheld, and shall be required to comply with Landlord's standard rules, regulations, policies and procedures, which may be revised from time to time.

7.  Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of merchandise or materials requiring the use of elevators, stairways, lobby areas or loading dock areas, shall be restricted to hours reasonably designated by Landlord.  Tenant shall obtain Landlord's prior approval by providing a detailed listing of the activity, which approval shall not be unreasonably withheld.  If approved by Landlord, the activity shall be under the supervision of Landlord and performed in the manner required by Landlord.  Tenant shall assume all risk for damage to articles moved and injury to any persons resulting from the activity.  If equipment, property, or personnel of Landlord or of any other party is damaged or injured as a result of or in connection with the activity, Tenant shall be solely liable for any resulting damage, loss or injury.

8.  Landlord shall have the right to approve the weight, size, or location of heavy equipment or articles in and about the Premises, which approval shall not be unreasonably withheld. Damage to the Building by the installation, maintenance, operation, existence or removal of Tenant's Property shall be repaired at Tenant's sole expense.

9.  Corridor doors, when not in use, shall be kept closed.

10.  Tenant shall not:  (1) make or permit any improper, objectionable or unpleasant noises or odors in the Building, or otherwise interfere in any way with other tenants or persons having business with them; (2) solicit business or distribute or cause to be distributed, in any portion of the Building, handbills, promotional materials or other advertising; or (3) conduct or permit other activities in the Building that might, in Landlord's sole opinion, constitute a nuisance.

11.  No animals, except those assisting handicapped persons, shall be brought into the Building or kept in or about the Premises.

12.  No inflammable, explosive or dangerous fluids or substances shall be used or kept by Tenant in the Premises, Building or about the Property, except for those substances as are typically found in similar premises used for general office purposes and are being used by Tenant in a safe manner and in accordance with all applicable Laws.  Tenant shall not, without Landlord's prior written consent, which consent may be withheld or denied for any or no reason in Landlord's sole discretion, use, store, install, spill, remove, release or dispose of, within or about the Premises or any other portion of the Property, any asbestos-containing materials or any solid, liquid or gaseous material now or subsequently considered toxic or hazardous under the provisions of 42 U.S.C. Section 9601 et seq. or any other applicable environmental Law which may now or later be in effect.  Tenant shall comply with all Laws pertaining to and governing the use of these materials by Tenant and shall remain solely liable for all costs of abatement and removal.

13.   Tenant shall not use or occupy the Premises in any manner or for any purpose which might injure the reputation or impair the present or future value of the Premises or the Building. Tenant shall not use, or permit any part of the Premises to be used for lodging, sleeping or for any illegal purpose.

14.   Tenant shall not take any action which would violate Landlord's labor contracts or which would cause a work stoppage, picketing, labor disruption or dispute or interfere with Landlord's or any other tenant's or occupant's business or with the rights and privileges of any person lawfully in the Building ("**Labor Disruption**").  Tenant shall take the actions necessary to resolve the Labor Disruption, and shall have pickets removed and, at the request of Landlord, immediately terminate any work in the Premises that gave rise to the Labor Disruption, until Landlord gives its written consent for the work to resume.  Tenant shall have no claim for damages against Landlord or any of the Landlord Related Parties nor shall the Commencement Date of the Term be extended as a result of the above actions.

15.   Tenant shall not install, operate or maintain in the Premises or in any other area of the Building, electrical equipment that would overload the electrical system beyond its capacity for proper, efficient and safe operation as determined solely by Landlord.  Tenant shall not furnish cooling or heating to the Premises, including, without limitation, the use of electric or gas heating devices, without Landlord's prior written consent.  Tenant shall not use more than its proportionate share of telephone lines and other telecommunication facilities available to service the Building.

16.   Tenant shall not operate or permit to be operated a coin or token operated vending machine or similar device (including, without limitation, telephones, lockers, toilets, scales, amusement devices and machines for sale of beverages, foods, candy, cigarettes and other goods), except for machines for the exclusive use of Tenant's employees and invitees.

17.   Bicycles and other vehicles are not permitted inside the Building or on the walkways outside the Building, except in areas designated by Landlord.

18.   Landlord may from time to time adopt systems and procedures for the security and safety of the Building and Property, its occupants, entry, use and contents.  Tenant, its agents, employees, contractors, guests and invitees shall comply with Landlord's systems and procedures.

19.   Landlord shall have the right to prohibit the use of the name of the Building or any other publicity by Tenant that in Landlord's sole opinion may impair the reputation of the Building or its desirability.  Upon written notice from Landlord, Tenant shall refrain from and discontinue such publicity immediately.

20.   Neither Tenant nor its agents, employees, contractors, guests or invitees shall smoke or permit smoking in the Common Areas, unless a portion of the Common Areas have been

E-3

declared a designated smoking area by Landlord, nor shall the above parties allow smoke from the Premises to emanate into the Common Areas or any other part of the Building. Landlord shall have the right to designate the Building (including the Premises) as a non-smoking building, in which case smoking in the Building of any tobacco product in any form, including, but not limited to, cigarettes, cigars and pipes, shall be strictly prohibited at all times and smoking shall only be permitted by Landlord in the areas outside of the Building as may be designated by Landlord from time to time in its sole discretion.

21. Landlord shall have the right to designate and approve standard window coverings for the Premises and to establish rules to assure that the Building presents a uniform exterior appearance. Tenant shall ensure, to the extent reasonably practicable, that window coverings are closed on windows in the Premises while they are exposed to the direct rays of the sun.

22. Deliveries to and from the Premises shall be made only at the times in the areas and through the entrances and exits reasonably designated by Landlord. Tenant shall not make deliveries to or from the Premises in a manner that might interfere with the use by any other tenant of its premises or of the Common Areas, any pedestrian use, or any use which is inconsistent with good business practice.

23. The work of cleaning personnel shall not be hindered by Tenant after 5:30 p.m., and cleaning work may be done at any time when the offices are vacant. Windows, doors and fixtures may be cleaned at any time. Tenant shall provide adequate waste and rubbish receptacles to prevent unreasonable hardship to the cleaning service.

# EXHIBIT F

## ADDITIONAL PROVISIONS

I.   PARKING.

    A.    Landlord shall make available to Tenant during the initial Term, for Tenant's nonexclusive use during the Term, for so long as Tenant is not in Default under this Lease, four (4) unassigned and unreserved parking spaces in the parking garage serving the Building. Tenant shall pay to Landlord, as Additional Rent, a monthly parking charge equal to $170.00 (plus all applicable taxes) for each unassigned and unreserved parking space. Tenant's failure to pay any monthly parking charge shall constitute a Monetary Default under the Lease. All unassigned and unreserved parking spaces made available by Landlord pursuant hereto shall be on a non-exclusive, unassigned and unreserved, first-come, first-served basis. Landlord reserves the right upon written notice posted in the Building or in the parking garage to change the parking system for the parking garage to provide special requirements for weekend, holiday or after hours usage and to temporarily close the parking garage, or portions thereof, to make such repairs or alterations as Landlord may deem appropriate. In addition, to the extent available from time to time, Tenant may at its sole cost and expense contract directly with the operator of the parking garage serving the Building for the use of one (1) or more reserved parking spaces on a monthly basis at the then market rate for reserved parking (plus all applicable taxes).

    B.    Tenant shall pay the replacement fee charged from time to time by Landlord for the loss of any magnetic parking card or parking sticker issued by Landlord. As partial consideration for use of the foregoing parking spaces, Tenant hereby waives on behalf of itself all claims, whether based on negligence or other grounds, against Landlord, its agents and employees arising out of any loss or damage to automobiles or other property while located in the parking garage or arising out of any personal injuries sustained in connection with the use of the parking garage.

    C.    Tenant's failure to comply with the rules and regulations governing the use of the parking garage, including, but not limited to, the rules establishing time limits on the use of the parking spaces in the parking garage, shall constitute a Default under the Lease and shall entitle Landlord, in addition to any other rights and remedies available to Landlord under the Lease and applicable law, to terminate Tenant's right to use the parking spaces hereunder and tow any vehicles which are in violation of such rules and regulations from the parking garage at the sole cost and expense of Tenant and without liability for damages resulting therefrom.

II.   PROOF OF TENANT'S INSURANCE.

Prior to Tenant's entering into or taking occupancy of the Premises, Tenant shall submit to Landlord a certificate of insurance, including a separate attached endorsement naming Landlord and Landlord's property manager, YOUNAN PROPERTIES, INC., as additional insureds (where applicable under Section 14 of this Lease), for all Tenant's Insurance required to be maintained by Tenant under Section 14 of this Lease.

III.   SIGNAGE.

Landlord at its expense shall provide Tenant at no charge with the Building standard suite signage and one (1) Building lobby directory listing for Tenant's identity.

IV.   RENEWAL OPTION.

Provided that as of the date of the Renewal Notice (as herein defined) and also as of the last day of the initial Term, no Default by Tenant has occurred and is continuing after any applicable notice is given and any applicable cure period has expired, Tenant shall have the option of further extending the Term (the "**Option to Renew**") for one (1) additional consecutive renewal term (the "**Renewal Term**") of sixty (60) months, subject to and in accordance with the following terms and conditions:  (i) Tenant shall exercise the Option to Renew by giving Landlord written notice (the "**Renewal Notice**") of Tenant's exercise of the Option to Renew no earlier than twelve (12) months and no later than six (6) months prior to the expiration of the initial Term; (ii) the Renewal Term, if any, shall commence on the day immediately following the last day of the initial Term; (iii) the rent rate applicable to the Renewal Term shall be equal to the then Fair Market Rate (as herein defined) as reasonably determined by Landlord for the then Premises; (iv) the Base Year applicable to the Renewal Term shall be the year in which the Renewal Term commences; and (v) if Tenant does not timely exercise the Option to Renew for the Renewal Term, then all of Tenant's rights to renew or extend the Term shall automatically terminate and be null and void and of no further force or effect.  As used herein, the term "**Fair Market Rate**" means the amount per rentable square foot of the then Premises that a willing, comparable tenant would pay and a willing, comparable landlord would accept in an arm's length transaction, for delivery on or about the expiration of the initial Term for comparable non-renewal, non-expansion space in the Building and in other comparable buildings in the central business district of Houston, Texas, similarly improved, without any allowances (such as construction allowances, moving allowances, tenant finish allowances, rent credits, etc.), rent abatements, or other rent concessions and taking into account the other terms and provisions hereof.  In no event shall the Fair Market Rate impute a value upon any leasehold improvements or fixtures installed by Tenant at its expense.  Landlord shall have no obligation to determine the Fair Market Rate and other terms and conditions of the Renewal Term, or to notify Tenant thereof, any earlier than thirty (30) days after Landlord's receipt of the Renewal Notice.  If Tenant does not accept Landlord's determination of the Fair Market Rate of the Renewal Term within fifteen (15) days after Tenant's receipt of Landlord's written determination of the Fair Market Rate, or if Landlord fails to timely provide its written determination of the Fair Market Rate, then Tenant may either (a) retract the Renewal Notice, whereupon Tenant's right to exercise

the Option to Renew hereunder shall automatically terminate and be null and void and of no further force or effect, and the Lease shall automatically expire on the expiration of the initial Lease Term; or (b) notify Landlord in writing of Tenant's appointment of a licensed real estate agent (an **"Expert"**) and the identity and contact information of such Expert. Upon receipt of written notice from Tenant of the appointment, identity and contact information of an Expert, Landlord shall, within fifteen (15) days thereafter, appoint its own Expert and furnish Tenant with the identity and contact information of such Expert. The instructions of the two (2) Experts appointed by the parties hereunder shall be to agree to a Fair Market Rate based on the criteria contained in this Paragraph IV. If the Fair Market Rate determined by one Expert is within five percent (5%) of the Fair Market Rate determined by the other Expert, then the average of the two (2) Fair Market Rates shall be the Fair Market Rate hereunder. However, if the two (2) Experts are unable to agree within ten (10) days on a Fair Market Rate, and the Fair Market Rate determined by one Expert is more than five percent (5%) of the Fair Market Rate determined by the other Expert, then the two (2) Experts will jointly appoint a third Expert, who shall be subject to the written approval of Landlord and Tenant. If the two (2) Experts jointly appoint a third Expert who is not approved in writing by either or both of Landlord and Tenant, then the two (2) Experts shall continue to jointly appoint a third Expert until Landlord and Tenant both approve such third Expert. The Fair Market Rate will thereupon be determined by the third Expert based on the criteria contained in this Paragraph IV and such determination shall be conclusive and binding on Landlord and Tenant unless it is higher than the higher of the first two (2) determinations, in which case, the middle of the three (3) determinations will control for all purposes. If Tenant is not willing to accept the Fair Market Rental determined in accordance with the foregoing determination process, then Tenant shall have the right, exercisable by giving Landlord written notice no later than ten (10) days after the conclusion of the determination process and reimbursing to Landlord all of Landlord's reasonable costs of the determination obtained by Landlord from Landlord's Expert and 100% of the costs of the determination of the third Expert, to retract the Renewal Notice, whereupon Tenant's right to exercise the Option to Renew hereunder shall automatically terminate and be null and void and of no further force or effect, and this Lease shall automatically expire at the end of the initial Term. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS PARAGRAPH IV, (i) Tenant's rights pursuant to this Paragraph IV are personal to Tenant and nontransferable and shall automatically terminate if Tenant assigns the Lease or any of Tenant's rights under the Lease to any person or entity or subleases all or any portion of the Premises to any person or entity (other than a pursuant to a Permitted Disposition); and (ii) Tenant's rights pursuant to this Paragraph IV shall automatically terminate if, as of the date of the Renewal Notice  and also as of the last day of the initial Term, a Default by Tenant has occurred and is continuing after any applicable notice is given and any applicable cure period has expired.

**END OF EXHIBIT F**

# OFFICE LEASE AGREEMENT

between

## YPI 1010 LAMAR, LLC
## ("Landlord")

and



## ("Tenant")

for space located at

## YOUNAN SQUARE, 1010 LAMAR STREET,
## HOUSTON, TEXAS

## OFFICE LEASE AGREEMENT

**THIS OFFICE LEASE AGREEMENT** (the "**Lease**") is made and entered into as of _____, 2012, by and between **YPI 1010 LAMAR, LLC**, a Delaware limited liability company ("**Landlord**") and ███████████████████████████ ("**Tenant**").  The following exhibits and attachments are incorporated into and made a part of the Lease: **Exhibit A** (Outline and Location of Premises), **Exhibit A-1** (Legal Description of Land), **Exhibit B** (Expenses and Taxes), **Exhibit C** (Work Letter), **Exhibit D** (Acceptance of Landlord Work Letter Agreement), **Exhibit E** (Building Rules and Regulations) and **Exhibit F** (Additional Provisions).

**1.  Basic Lease Information.**

1.01   "**Building**":   The building located at 1010 Lamar, Houston, Texas 77002, commonly known as Younan Square.  The Building" contains 263,385 rentable square feet.

1.02   "**Premises**":  The area shown on **Exhibit A** to this Lease.  The Premises is located on the 18th floor of the Building and known as Suite 18__.   The Premises contains 15,779 rentable square feet.

1.03   "**Base Rent**":   Beginning on the Commencement Date, Tenant shall pay to Landlord for the lease of the Premises the following monthly installments of Base Rent:

| Full calendar months of Lease Term | Annual rate per square foot of Rentable Area | Monthly installments of Base Rent |
|---|---|---|
| 01 – 06 | $ 19.00 | $24,983.42 * |
| 07 – 18 | $ 19.00 | $24,983.42 |
| 19 – 30 | $ 19.50 | $25,640.88 |
| 31 – 42 | $ 20.00 | $26,298.33 |
| 43 – 54 | $ 20.50 | $26,955.79 |
| 55 – 66 | $ 21.00 | $27,613.25 |

**\*   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE,** during the first six (6) full calendar months of the Term, the monthly installments of Base Rent ONLY shall be abated, and if a Default by Tenant occurs under this Lease resulting in early termination of this Lease or early termination of Tenant's right to possession of the Premises, then Landlord shall be entitled to recover all Base Rent that was abated as provided in this Section 1.03.

If the Commencement Date does not fall on the first day of a calendar month, Tenant shall pay Base Rent for the lease of the Premises during the initial partial calendar month at the rate of $19.00 per rentable square foot per year, and such Base Rent payment shall not be abated.  After the actual Commencement Date is determined, Landlord shall invoice Tenant for the amount of the Base Rent due for any initial partial calendar month of the Term.

1.04 **"Tenant's Pro Rata Share"**:  5.99%, which is the percentage equal to the fraction, the numerator of which is 15,779 rentable square feet (*i.e.*, the total rentable square feet of the Premises) and 263,385 rentable square feet (*i.e.*, the total rentable square feet of the Building).

1.05 **"Base Year"** for Taxes (defined in **Exhibit B**):  2013; **"Base Year"** for Expenses (defined in **Exhibit B**):  2013.

1.06 **"Term"**:  A period of approximately sixty-six (66) months, beginning on the earlier to occur of (a) the date on which Landlord notifies Tenant that the Landlord Work (as defined in Section 1.14 hereof) is Substantially Complete (as defined in the Work Letter); or (b) December 1, 2012 (the **"Commencement Date"**).  Unless earlier terminated in accordance with this Lease, the Term shall expire on the last day of the month that is sixty-six (66) months after the Commencement Date (the **"Expiration Date"**).

1.07 **"Work Letter"**:  The Work Letter (the **"Work Letter"**) executed by Landlord and Tenant and attached to this Lease as **Exhibit C**.

1.08 **"Security Deposit"**:  $27,613.25, which shall be deposited by Tenant with Landlord on the date of the execution of this Lease by Tenant.

1.09 **"Guarantor"**:  Any party that agrees in writing to guarantee Tenant's obligations under the Lease.  As of the date of this Lease, there is no Guarantor.

1.10 **"Brokers"**:  Collier's International (**"Tenant's Broker"**) exclusively represented Tenant in connection with this Lease.  PM Realty Group (**"Landlord's Broker"**) exclusively represented Landlord in connection with this Lease.  Tenant represents and warrants to Landlord that (a) except for Tenant's Broker, no real estate broker, agent or salesperson represented Tenant in connection with this Lease; and (b) except for Tenant's Broker and Landlord's Broker, Tenant has not dealt with any real estate broker, agent or salesperson in connection with this Lease.

1.11 **"Permitted Use"**:  General office use and no other use or purpose.

1.12 **"Notice Addresses"**:

Landlord:

YPI 1010 Lamar, LLC
c/o Younan Properties, Inc.
1010 Lamar, Suite 150
Houston, TX 77002
          Attn:  Property Manager

with a copy to:

YPI 1010 Lamar, LLC
c/o Younan Properties, Inc.
21700 Oxnard Street, 8th Floor
Woodland Hills, California 91367
    Attn:  General Counsel

Tenant:



Payments of Rent only shall be made payable to the order of Landlord at the following address: YPI 1010 Lamar LLC, P.O. Box 677437, Dallas, TX 75267-74377, or such other name and address as Landlord shall from time to time designate in writing to Tenant.

    1.13    **"Business Days"**:  Monday through Friday of each week, exclusive of New Year's Day, Presidents Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving, and Christmas Day (collectively, the **"Holidays"**).  Landlord may hereafter designate additional Holidays that are commonly recognized by other office buildings in the area where the Building is located.  **"Building Service Hours"** are from 8:00 a.m. to 6:00 p.m. on Business Days, and from 8:00 a.m. to 1:00 p.m. on Saturdays, excluding Holidays. There are no Building Service Hours on Sundays.

    1.14    **"Landlord Work"** means the work that Landlord is obligated to perform in the Premises pursuant to the Work Letter.

    1.15    **"Property"**:  The Building and the parcel(s) of land on which it is located, which land is described in **Exhibit A-1** attached hereto, and, at Landlord's discretion, the parking facilities and other improvements, if any, serving the Building and the parcel(s) of land on which they are located.

    1.16    **"Prepaid Rent"**:  An installment of Base Rent, in the amount of $24,983.42, for the seventh (7th) full calendar month of the Term shall be paid by Tenant to Landlord on the date of the execution of this Lease by Tenant.

**2.  Lease Grant.**

    The Premises are hereby leased to Tenant from Landlord, together with the right to use any portions of the Property that are designated by Landlord for the common use of tenants and others (the **"Common Areas"**).

**3.  Landlord Work; Substantially Complete; "AS IS, WHERE IS".**

    3.01    The date set forth in Section 1.06(b) as the Commencement Date is the **"Target Commencement Date"**.  Landlord's failure to Substantially Complete the Landlord Work by the

Target Commencement Date shall not be a default by Landlord or otherwise render Landlord liable for damages. Promptly after the determination of the actual Commencement Date, Landlord and Tenant shall enter into an Acceptance of Landlord Work Letter Agreement in the form attached as **Exhibit D**; provided, however, that the failure of any party hereto to complete and execute the Acceptance of Landlord Work Letter Agreement shall not affect in any manner the rights or obligations of each party pursuant to this Lease or the Work Letter. The Landlord Work shall be deemed to be "**Substantially Complete**" on the date that all Landlord Work has been performed, other than any details of construction, mechanical adjustment or any other similar matter, the non-completion of which does not materially interfere with Tenant's use of the Premises. If Landlord is delayed in the performance of the Landlord Work as a result of the acts or omissions of Tenant, its employees, agents, contractors, subcontractors, space planners, interior architects, consultants, engineers, suppliers or other representatives (the "**Tenant Related Parties**"), or their respective vendors, including, without limitation, changes requested by Tenant to approved plans, Tenant's failure to comply with any of its obligations under this Lease, or the specification of any materials or equipment with long lead times (a "**Tenant Delay**"), the Landlord Work shall be deemed to be Substantially Complete on the date that Landlord could reasonably have been expected to Substantially Complete the Landlord Work absent any Tenant Delay.

3.02    Subject to Landlord's obligation pursuant to the Work Letter to perform the Landlord Work, the Premises are accepted by Tenant in "**AS IS, WHERE IS**" and "**WITH ALL FAULTS**" condition and configuration without any representations or warranties by Landlord. By taking possession of the Premises, Tenant agrees that the Premises are in good order and satisfactory condition. **LANDLORD HEREBY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE CONDITION OR SUITABILITY OF THE PREMISES ON THE COMMENCEMENT DATE. FURTHER, TO THE EXTENT PERMITTED BY LAW, TENANT WAIVES ANY IMPLIED WARRANTY OF SUITABILITY OR OTHER IMPLIED WARRANTIES THAT LANDLORD WILL MAINTAIN OR REPAIR THE PREMISES OR ITS APPURTENANCES EXCEPT AS MAY BE CLEARLY AND EXPRESSLY PROVIDED IN THIS LEASE**. Tenant further acknowledges and agrees that (i) except and only to the extent of the Landlord Work (as defined in Section 1.14 hereof) to be performed by Landlord, Landlord has no obligation to install or construct any improvements or other alterations or modifications to the Premises; (ii) except and only to the extent of the Construction Allowance (as defined in the Work Letter) and the Test Fit Allowance (as defined in the Work Letter), (a) Landlord has no obligation to pay or reimburse Tenant for any costs or expenses it has paid or incurred, or hereafter pays or incurs, in connection with the installation or construction of any improvements, alterations or modifications to the Premises; and (b) Landlord has no obligation to disburse or advance to Tenant any construction allowance, tenant-finish reimbursement, or other amount in respect of any improvements, alterations or additions constructed, or to be constructed, by or on behalf of Tenant in the Premises. Landlord shall not be liable for a failure to deliver possession of the Premises or any other space due to the holdover or unlawful possession of such space by another party; provided, however, that Landlord shall use reasonable efforts to obtain possession of the Premises. The Commencement Date, in such event, shall be postponed until the date Landlord delivers possession of the Premises to Tenant free from occupancy by any party. On the Commencement Date, Landlord shall tender possession of the Premises to Tenant in a

4

vacuumed and "broom clean" condition with all of the prior tenants' personal property removed from the Premises.

3.03

A. So long as Tenant and the other Tenant Related Parties and their respective vendors do not interfere with, delay or disrupt the construction of the Landlord Work by the general contractor and any of its subcontractors, Landlord shall give Tenant early access to the Premises beginning approximately fourteen (14) days prior to the date Landlord estimates that it shall have Substantially Completed the Landlord Work. Tenant's use of the Premises during such early access period shall be strictly limited to installing Tenant's furniture, trade fixtures and equipment and voice and data cabling and wiring in the Premises.

B. With respect to any portion of the Premises in which Tenant will require leasehold improvements, alterations, additions and/or renovations, at Tenant's option, Tenant and other Tenant Related Parties and their respective vendors shall be permitted to enter the Premises at any time after full execution by both parties thereto of this Lease and the Work Letter for the purposes of inspecting the Premises and for the installing of leasehold improvements therein. Tenant covenants and agrees that none of Tenant, the other Tenant Related Parties and their respective vendors shall interfere with, delay or disrupt the construction of the Landlord Work by the general contractor and any of its subcontractors.

C. The use by Tenant, the other Tenant Related Parties and their respective vendors of and access to the Premises during any of the periods described in Sections 3.03(A) and (B) shall be subject to all provisions of this Lease, except that Tenant shall not be obligated to pay any Base Rent during such periods provided that Tenant does not conduct its business in the Premises and Tenant and the other Tenant Related Parties and their respective vendors do not interfere with, delay or disrupt the construction of the Landlord Work. Prior to any of Tenant's contractors, subcontractors, suppliers or vendors entering into the Building and the Premises, Tenant shall cause such contractors, subcontractors, suppliers and vendors to furnish Landlord reasonably acceptable certificates of insurance evidencing liability coverage. In addition, Tenant shall cause such contractors, subcontractors, suppliers and vendors to procure and maintain in full force and effect while they are in the Building or the Premises all of the following coverages and to furnish Landlord reasonably acceptable certificates of insurance evidencing such coverages: (a) workers compensation coverage as required by the State of Texas and employers liability coverage with a limit of not less than $1,000,000 per accident and per employee; (b) commercial general liability insurance on an occurrence form including products/completed operations and personal injury coverage with a limit of not less than $2,000,000 per occurrence; (c) umbrella or excess insurance in an amount of not less than $3,000,000; and automobile liability coverage with a limit of not less than $1,000,000 combined single limit. All such insurance required under this Section 3.03 (except workers

compensation coverage) shall name Landlord and the Property Manager (as defined in Paragraph 2.02 of **Exhibit B** attached hereto) as additional insureds and shall be considered primary insurance applying without the contribution of any other insurance, which may be available to Landlord or the Property Manager. The parties hereto expressly intend that Tenant's indemnity and hold harmless obligations under this Lease shall apply to acts and omissions of Tenant's contractors, subcontractors, suppliers and vendors in the performance of any work in the Premises. Tenant shall comply with, and cause Tenant's contractors, subcontractors, suppliers and vendors to comply with, all reasonable construction procedures and regulations promulgated by Landlord from time to time for the prosecution of work in the Building by tenants and occupants thereof.

## 4.  Rent.

4.01     Tenant shall pay Landlord, without any setoff or deduction, unless expressly set forth in this Lease, all Base Rent and Additional Rent due for the Term (collectively referred to as "**Rent**"). "**Additional Rent**" means all sums (exclusive of Base Rent) that Tenant is required to pay Landlord under this Lease. Tenant shall pay and be liable for all rental, sales and use taxes (but excluding income taxes), if any, imposed upon or measured by Rent. Base Rent and recurring monthly charges of Additional Rent shall be due and payable in advance on the first day of each calendar month without notice or demand, provided that the Prepaid Rent (defined in Section 1.16) shall be payable upon the execution of this Lease by Tenant. Excluding Base Rent and recurring monthly charges of Additional Rent, all other items of Rent shall be due and payable by Tenant on or before thirty (30) days after billing by Landlord. Rent shall be made payable to the entity, and sent to the address, Landlord designates and shall be made by good and sufficient check or by other means acceptable to Landlord. Landlord's acceptance of less than the correct amount of Rent shall be considered a payment on account of the earliest Rent due. Rent for any partial month during the Term shall be prorated. No endorsement or statement on a check or letter accompanying payment shall be considered an accord and satisfaction. Tenant's covenant to pay Rent is independent of every other covenant in this Lease.

4.02     Tenant shall pay Tenant's Pro Rata Share of Taxes and Expenses in accordance **Exhibit B** of this Lease.

4.03     Tenant hereby acknowledges that late payment by Tenant to Landlord of Base Rent, Additional Rent and other amounts due under this Lease will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges, which may be imposed on Landlord by the provisions of any mortgage or deed of trust encumbering the Premises or any credit agreement executed by Landlord in connection therewith. Accordingly, if Landlord or its designee does not, within five (5) days after the due date thereof, receive any Base Rent, Additional Rent or any other amount due under this Lease, then a late charge ("**Late Charge**") equal to ten percent (10%) of such past due amount or the sum of One Hundred Dollars ($100.00), whichever is greater, shall automatically accrue, and Tenant shall immediately pay such Late Charge to Landlord. The parties hereto hereby agree that such Late Charge represents a fair and reasonable estimate of the costs Landlord will incur

by reason of Tenant's failure to make its payment when due.  Acceptance of such Late Charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such past due amount or restrict or prevent Landlord from exercising and enforcing any of Landlord's other rights and remedies under this Lease and applicable law.  In addition, all past due Base Rent, Additional Rent and other amounts due under this Lease shall accrue interest at the maximum rate permitted by applicable law.

## 5.  Compliance with Laws; Use.

5.01      The Premises shall be used for the Permitted Use and for no other use whatsoever. Tenant shall comply with all statutes, codes, ordinances, orders, rules and regulations of any municipal or governmental entity whether in effect now or later, including the Americans with Disabilities Act ("**Laws**"), regarding the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises.  In addition, Tenant shall, at its sole cost and expense, promptly comply with any Laws that relate to the "Base Building" (defined below), but only to the extent such obligations are triggered by Tenant's use of the Premises, other than for general office use, or Alterations or improvements in the Premises performed or requested by Tenant.   "**Base Building**" shall include the structural portions of the Building, the public restrooms and the Building's mechanical, electrical and plumbing systems and equipment located in the internal core of the Building on the floor or floors on which the Premises are located. Tenant shall promptly provide Landlord with copies of any notices it receives regarding an alleged violation of any Laws.

5.02      Tenant shall comply with the rules and regulations of the Building attached as **Exhibit E** and such other reasonable rules and regulations adopted by Landlord from time to time, including rules and regulations for the performance of Alterations (defined in Section 9).

5.03      Tenant shall not commit, suffer or permit any waste, damage, disfiguration or injury to the Premises, the Common Areas or the fixtures and equipment located therein or thereon.  Tenant shall not permit or suffer any overloading of the floors thereof, and shall not place therein any heavy business machinery, safes, computers, data processing machines, or other items heavier than customarily used for general office purposes without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Tenant shall not use or permit to be used any part of the Building for any dangerous, noxious or offensive trade or business and shall not cause or permit any nuisance, noise, action, or disturbance of other tenants of the Building.

5.04      As used in this Lease, the term "**Hazardous Substances**" means pollutants, contaminants, toxic or hazardous wastes, hazardous materials or any other substances, the use and/or the removal of which is required or the use of which is restricted, prohibited or penalized by an "**Environmental Law**", which term shall mean any federal, state or local law, ordinance or other statute of a governmental or quasi-governmental authority relating to pollution or protection of the environment.

A.      Tenant hereby agrees that (i) no activity will be conducted on the Premises that will produce any Hazardous Substances, except for such activities that are part of

7

the ordinary course of Tenant's business activities (the "**Permitted Activities**") provided such Permitted Activities are conducted in strict compliance and accordance with all Environmental Laws; (ii) the Premises will not be used in any manner for the storage of any Hazardous Substances except for the storage of customary office and cleaning supplies in reasonable quantities and such other materials that are used in the ordinary course of Tenant's business ("**Permitted Materials**") provided such Permitted Materials are properly stored in a manner and location complying with all Environmental Laws; (iii) Tenant shall be responsible for obtaining any required permits and paying any fees and providing any testing required by any governmental agency by virtue of Tenant's activities; (iv) no portion of the Premises will be used as a landfill or a dump; (v) Tenant will not install any underground tanks of any type; (vi) Tenant will not cause any surface or subsurface conditions to exist or come into existence as a result of Tenant's actions or the conduct of Tenant's business on the Premises that constitute or with the passage of time may constitute a public or private nuisance; (vii) Tenant will not cause any Hazardous Substances to be brought in or onto the Premises, except for the Permitted Materials as provided above, or hereafter approved in writing by Landlord and if so brought or found located thereon, the same shall be immediately removed, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws.  Landlord or Landlord's representative shall have the right but not the obligation to enter the Premises (in accordance with the provisions set forth in this Lease for Landlord's entry) for the purposes of inspecting the storage, use and disposal of Permitted Materials to ensure compliance with all Environmental Laws.  Should it be determined that such Permitted Materials are being improperly stored, used, or disposed of by Tenant or at Tenant's request, then Tenant shall promptly take such corrective action as is necessary and/or required, or, if Tenant fails to take such corrective action within thirty (30) days following receipt of written notice from Landlord (or within five (5) business days in the event that such condition creates an immediate threat to health and safety of persons) and thereafter diligently prosecute such action to completion in strict accordance with all Environmental Laws, then Landlord shall have the right to perform such work and Tenant shall promptly reimburse Landlord for any and all reasonable out-of-pocket costs associated with such work.  If at any time during or after the Lease Term, the Premises are found to be so contaminated or subject to such conditions, and such contamination is caused by Tenant or the conduct of its business on the Premises, Tenant shall diligently institute proper and thorough cleanup procedures at Tenant's sole cost. **TENANT HEREBY INDEMNIFIES AND HOLDS LANDLORD, ITS PROPERTY MANAGER AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, ACTIONS, LIABILITIES, COSTS, EXPENSES, DAMAGES AND OBLIGATIONS OF ANY NATURE ARISING, INCLUDING, WITHOUT LIMITATION, COURT COSTS AND REASONABLE ATTORNEYS' FEES AND EXPENSES, FROM OR AS A RESULT OF A BREACH BY TENANT OF THE PROVISIONS OF THIS SECTION 5.04(A) OR FROM OR AS A RESULT OF THE PRESENCE,**

**LEAKAGE, ESCAPE, EMANATION, MIGRATION OR RELEASE OF ANY HAZARDOUS SUBSTANCES ON, UNDER, ABOVE, OR ABOUT THE PREMISES OR THE BUILDING THAT WERE CAUSED BY THE ACTS OR OMISSIONS OF TENANT OR ITS EMPLOYEES, AGENTS OR CONTRACTORS.**  The foregoing indemnification and the responsibilities of Tenant shall survive the termination or expiration of this Lease.

B.  To Landlord's knowledge, as of the actual Commencement Date, there shall be no Hazardous Substances (including, without limitation, asbestos-containing materials) present on, under, above or about the Premises in violation of any Environmental Law.  Landlord warrants to Tenant that, to Landlord's knowledge, the core, shell, restrooms and all Common Areas on each floor or floors of the Building on which the initial Premises are located shall, as of the Commencement Date, comply with all applicable building code requirements, all applicable Environmental Laws, the applicable provisions of the Americans with Disabilities Act (Public Law 101-336, July 26, 1990) and any other applicable law, ordinance or regulation as then in effect.  **LANDLORD HEREBY INDEMNIFIES AND HOLDS TENANT AND TENANT'S OCCUPANTS, PERMITEES, SUCCESSORS AND ASSIGNS HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, ACTIONS, LIABILITIES, COSTS, EXPENSES, DAMAGES AND OBLIGATIONS OF ANY NATURE ARISING, INCLUDING, WITHOUT LIMITATION, COURT COSTS AND REASONABLE ATTORNEYS' FEES AND EXPENSES, FROM OR AS A RESULT OF THE BREACH BY LANDLORD OF ANY REPRESENTATION OR WARRANTY IN THIS SECTION 5.04(B)  OR FROM OR AS A RESULT OF THE PRESENCE, LEAKAGE, ESCAPE, EMANATION, MIGRATION OR RELEASE OF ANY HAZARDOUS SUBSTANCES ON, UNDER, ABOVE, OR ABOUT THE PREMISES OR THE BUILDING THAT WERE CAUSED BY THE ACTS OR OMISSIONS OF LANDLORD OR ITS EMPLOYEES, AGENTS OR CONTRACTORS.**  As between Landlord and Tenant, Landlord shall be solely responsible for the remediation and removal (and all costs associated therewith) of all Hazardous Substances at the Premises and/or Building in violation of any Environmental Law if and to the extent required by any Environmental Law and/or to remediate any immediate threat to the health and safety of persons (unless the existence of such Hazardous Substances is caused by Tenant or any Tenant-related parties, in which event Tenant shall be solely responsible for such remediation and removal and all costs associated therewith).  The foregoing indemnification and the responsibilities of Landlord shall survive the termination or expiration of this Lease.

6.    **Security Deposit.**

The Security Deposit shall be delivered to Landlord upon the execution of this Lease by Tenant and held by Landlord without liability for interest (unless required by Law) as security for the performance of Tenant's obligations.  The Security Deposit is not an advance payment of