# EXHIBIT B

# Part 4 of 4

Rent or a measure of damages.  Landlord may use all or a portion of the Security Deposit to satisfy past due Rent or to cure any Default (defined in Section 18) by Tenant.  If Landlord uses any portion of the Security Deposit, Tenant shall, within five (5) days after demand, restore the Security Deposit to its original amount.  Landlord shall return any unapplied portion of the Security Deposit to Tenant within sixty (60) days after the later to occur of: (a) determination of the final Rent due from Tenant; or (b) the later to occur of the Expiration Date or the date Tenant surrenders the Premises to Landlord in compliance with Section 25.  Landlord may assign the Security Deposit to a successor or transferee and, following the assignment, Landlord shall have no further liability for the return of the Security Deposit.  Landlord shall not be required to keep the Security Deposit separate from its other accounts.

7.    **Building Services.**

7.01      Landlord shall furnish Tenant with the following services: (a) water for use in the Base Building lavatories; (b) customary heat and air conditioning in season during Building Service Hours; (c) standard janitorial service on Business Days; (d) Elevator service; (e) Electricity in accordance with the terms and conditions in Section 7.02; and (f) such other services as Landlord reasonably determines are necessary or appropriate for the Property. Tenant shall have the right to receive HVAC service during hours other than Building Service Hours by paying to Landlord a charge for such additional HVAC service equal to $70.00 per hour for each floor (or portion thereof) on which the Premises is located and providing such prior notice as is reasonably specified by Landlord; provided, however, that notwithstanding the foregoing, so long as no Default by Tenant has occurred and is continuing after any applicable notice is given and any applicable cure period has expired, the hourly charge for the first 100 hours in any calendar year for HVAC service received by Tenant during hours other than Building Service Hours shall be abated by Landlord.

7.02      Electrical Service to the Premises.

A.      Landlord shall have the exclusive right to select any company providing electrical service to the Premises, to aggregate the electrical service for the Building and Premises with other buildings, to purchase electricity through a broker and/or buyers group, and to change the providers and manner of purchasing electricity.

B.      Tenant's use of electrical service shall not exceed, either in voltage, rated capacity, use beyond Building Service Hours or overall load, that which Landlord reasonably deems to be standard for the Building.  If Tenant requests permission to consume excess electrical service, Landlord may refuse to consent or may condition consent upon conditions that Landlord reasonably elects (including, without limitation, the installation of utility service upgrades, meters, submeters, air handlers or cooling units), and the additional usage (to the extent permitted by Law), installation and maintenance cost shall be paid for by Tenant.  Landlord shall have the right to separately submeter electrical usage for the Premises or to measure electrical usage by survey or other methods that Landlord, in its reasonable judgment, deems appropriate and the reasonable cost of any submeter

installed by Landlord to measure the electrical consumption in the Premises shall be paid by Tenant.

7.03     Landlord's failure to furnish, or any interruption, diminishment or termination of services due to the application of Laws, the failure of any equipment, the performance of repairs, improvements or alterations, utility interruptions or the occurrence of an event of Force Majeure (defined in Section 26.03) shall not render Landlord liable to Tenant, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement. However, if an interruption of any Essential Services (as herein defined) affecting the Premises, or a material portion of the Premises, occurs and continues for a period in excess of five (5) consecutive Business Days, which interruption is reasonably within the control of Landlord to correct, then Tenant, as its sole and exclusive remedy for such interruption of Essential Services, shall be entitled to receive an abatement of Rent (including Base Rent and Additional Rent) payable hereunder during the period beginning on the sixth (6th) consecutive Business Day of such interruption of Essential Services and ending on the day the interruption of Essential Services ends.    If the entire Premises have not been rendered untenantable by such interruption of Essential Services, the abatement of Rent shall be equitably prorated based on the area of the portion of the Premises affected by such interruption of Essential Services.    As used herein, the term "**Essential Services**" means (a) electricity; (b) HVAC system serving the Premises; (c) elevator service consisting of at least one (1) passenger elevator to the floor or floors on which the Premises are located; (d) water to points of supply located in the Premises and any Common Areas located on the floor or floors on which the Premises are located; (e) the availability of the parking spaces that Landlord is required to make available to Tenant for its use pursuant to Paragraph I of **Exhibit F** attached hereto; and (f) Tenant's access to the Premises and the Common Areas located on the floor or floors on which the Premises are located on a 24 hours per day, seven (7) days per week basis (subject to Tenant's use of keys and other access codes or devices to all locks or other security devices in and to the Premises).   The foregoing abatement provisions of this Section 7.03 shall not apply to any interruption of Essential Services arising out of or resulting from a fire or other casualty or any other event, which is not within the reasonable control of Landlord.   Instead, in such an event, the terms and provisions of Section 16 shall apply.

7.04     During the Term of this Lease, if Landlord or its property manager at Tenant's request performs any service, incurs any cost or expense, or furnishes any goods to or for the use or benefit of Tenant, or if, pursuant to any provision contained in this Lease, Landlord or its property manager at its option performs, or causes to be performed, any obligation hereunder that Tenant failed to perform, then and in each such instance, in addition to the amount that Tenant is thereupon obligated as a result of the foregoing to pay or reimburse to Landlord, Tenant shall pay to Landlord an administrative fee equal to twenty percent (20%) of such amount.

## 8.     Leasehold Improvements.

All improvements in and to the Premises, including any Alterations (collectively, "**Leasehold Improvements**") shall remain upon the Premises at the end of the Term without compensation to Tenant.   Landlord, however, by written notice to Tenant at least thirty (30) days prior to the Expiration Date, may require Tenant, at its expense, to remove (a) any Cable

(defined in Section 9.01) installed by or for the benefit of Tenant, and (b) excluding the Landlord Work constructed and installed by Landlord in accordance with the provisions of the Work Letter, any Alterations that, in Landlord's reasonable judgment, are of a nature that would require removal and repair costs that are materially in excess of the removal and repair costs associated with standard office improvements (collectively referred to as "**Required Removables**").  The Required Removables shall include, without limitation, internal stairways, raised floors, personal baths and showers, vaults, rolling file systems and structural alterations and modifications.  The designated Required Removables shall be removed by Tenant at its expense before the Expiration Date.   Tenant shall repair all damage caused by the installation or removal of Required Removables.  If Tenant fails to perform its obligations under this Section 8 in a timely manner, Landlord may perform such work at Tenant's expense.  Tenant, at the time it requests approval for a proposed Alteration, may request in writing that Landlord advise Tenant whether the Alteration or any portion of the Alteration is a Required Removable.  Within ten (10) days after receipt of Tenant's request, Landlord shall advise Tenant in writing as to which portions of the Alteration are Required Removables.

9.     **Repairs and Alterations.**

9.01     Tenant shall periodically inspect the Premises to identify any conditions that are dangerous or in need of maintenance or repair.  Tenant shall promptly provide Landlord with notice of any such conditions. Tenant shall, at its sole cost and expense, perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease, and keep the Premises in good condition and repair, reasonable wear and tear excepted. Tenant's repair and maintenance obligations include, without limitation, repairs to:  (a) floor covering; (b) interior partitions; (c) doors; (d) the interior side of demising walls; (e) electronic, voice and data cabling and related equipment that is installed by or for the exclusive benefit of Tenant (collectively, "**Cable**"); (f) supplemental air conditioning units, kitchens, including hot water heaters, plumbing, and similar facilities exclusively serving Tenant; and (g) Alterations.  To the extent Landlord is not reimbursed by insurance proceeds, Tenant shall reimburse Landlord for the cost of repairing damage to the Building caused by the acts of Tenant, the other Tenant Related Parties or their respective vendors.  If Tenant fails to make any repairs to the Premises for more than fifteen (15) days after notice from Landlord (although notice shall not be required in an emergency), Landlord may make the repairs, and Tenant shall pay the reasonable cost of the repairs, together with an administrative charge in an amount equal to 10% of the cost of the repairs.

9.02     Landlord shall keep and maintain in good repair and working order and perform maintenance upon:  (a) structural elements of the Building; (b) mechanical (including HVAC), electrical, plumbing and fire/life safety systems serving the Building in general; (c) Common Areas; (d) roof of the Building; (e) exterior windows of the Building; and (f) elevators serving the Building.  Landlord shall promptly make repairs for which Landlord is responsible.

9.03     Tenant shall not make alterations, repairs, additions or improvements or install any Cable (collectively referred to as "**Alterations**") without first obtaining the written consent of Landlord in each instance, which consent shall not be unreasonably withheld or delayed.  However, Landlord's consent shall not be required for any Alteration that satisfies all of the

following criteria (a "**Cosmetic Alteration**"):  (a) is of a cosmetic nature such as painting, wallpapering, hanging pictures and installing carpeting; (b) is not visible from the exterior of the Premises or Building; (c) will not affect the Base Building; and (d) does not require work to be performed inside the walls or above the ceiling of the Premises.  Cosmetic Alterations shall be subject to all the other provisions of this Section 9.03.  Prior to starting work, Tenant shall furnish Landlord with plans and specifications; names of contractors reasonably acceptable to Landlord (provided that Landlord may designate specific contractors with respect to Base Building); required permits and approvals; evidence of contractor's and subcontractor's insurance in amounts reasonably required by Landlord and naming Landlord and its property manager as additional insureds; and any security for performance in amounts reasonably required by Landlord.  Changes to the plans and specifications must also be submitted to Landlord for its approval.  Alterations shall be constructed in a good and workmanlike manner using materials of a quality reasonably approved by Landlord.  Tenant shall reimburse Landlord for any sums paid by Landlord for third party examination of Tenant's plans for non-Cosmetic Alterations.  In addition, Tenant shall pay Landlord a fee for Landlord's oversight and coordination of any non-Cosmetic Alterations equal to 2.5% of the cost of the Alterations.  Landlord shall not charge any a fee for oversight or coordination of any Cosmetic Alterations.  Upon completion, Tenant shall furnish Landlord with "as-built" plans for non-Cosmetic Alterations, completion affidavits and full and final waivers of lien in recordable form executed by all contractors, subcontractors and suppliers who performed labor or provided materials for any Alterations. Landlord's approval of an Alteration shall not be deemed a representation by Landlord that the Alteration complies with Laws.

## 10.    Entry by Landlord.

Landlord may enter the Premises to inspect, show or clean the Premises or to perform or facilitate the performance of repairs, alterations or additions to the Premises or any portion of the Building.  Except in emergencies or to provide Building services, Landlord shall provide Tenant with reasonable prior verbal notice of entry and shall use reasonable efforts to minimize any interference with Tenant's use of the Premises.   If reasonably necessary, Landlord may temporarily close all or a portion of the Premises to perform repairs, alterations and additions.  However, except in emergencies, Landlord will not close the Premises if the work can reasonably be completed on weekends and after Building Service Hours.  Entry by Landlord shall not constitute a constructive eviction or entitle Tenant to an abatement or reduction of Rent.

## 11.    Assignment and Subletting.

11.01     Except in connection with a Permitted Disposition (defined in Section 11.04), Tenant shall not assign, sublease, transfer or encumber any interest in this Lease or allow any third party to use any portion of the Premises (collectively or individually, a "**Transfer**") without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed if Landlord does not exercise its recapture rights under Section 11.02.  If the entity which controls the voting shares/rights of Tenant changes at any time, such change of ownership or control shall constitute a Transfer unless Tenant is an entity whose outstanding stock is listed on a recognized securities exchange or if at least 80% of its voting stock is owned by another entity, the voting stock of which is so listed.  Any attempted Transfer in violation of

13

this Section 11.01 is voidable by Landlord.  In no event shall any Transfer whether or not consented to or approved by Landlord, including a Permitted Disposition, release or relieve Tenant from any obligation under this Lease.

11.02    Tenant shall provide Landlord with financial statements for the proposed transferee, a fully executed copy of the proposed assignment, sublease or other Transfer documentation and such other information as Landlord may reasonably request. Within fifteen (15) Business Days after receipt of the required information and documentation, Landlord shall either: (a) consent to the Transfer by execution of a consent agreement in a form reasonably designated by Landlord; (b) reasonably refuse to consent to the Transfer in writing; or (c) in the event of an assignment of this Lease or subletting of more than 20% of the Rentable Area of the Premises for more than 50% of the remaining Term (excluding unexercised options), recapture the portion of the Premises that Tenant is proposing to Transfer.  If Landlord exercises its right to recapture, this Lease shall be automatically amended (or terminated if the entire Premises is being assigned or sublet) to delete the applicable portion of the Premises effective on the proposed effective date of the Transfer.  Tenant shall pay Landlord a review fee of $1,500.00 for Landlord's review of any Permitted Disposition or requested Transfer.  In addition, Tenant shall reimburse Landlord for its actual reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Landlord in connection a Permitted Disposition or such proposed Transfer.

11.03    Tenant shall pay Landlord 50% of all rent and other consideration which Tenant receives as a result of a Transfer that is in excess of the Rent payable to Landlord for the portion of the Premises and Term covered by the Transfer.  Tenant shall pay Landlord for Landlord's share of the excess within thirty (30) days after Tenant's receipt of the excess.  Tenant may deduct from the excess, on a straight-line basis, all reasonable and customary expenses directly incurred by Tenant attributable to the Transfer.  If Tenant is in Default, Landlord may require that all sublease payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of Tenant's share of payments received by Landlord.

11.04    Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right from time to time during the Term, without Landlord's prior consent or approval, to make a Permitted Disposition (as herein defined) provided that each of the following conditions precedent to the proposed Permitted Disposition has been satisfied as determined by Landlord:  (a) as of the effective date of the proposed Permitted Disposition, Tenant is not in Default; and (b) Tenant has given Landlord not less than ten (10) business days' prior written notice of Tenant's intent to make a Permitted Disposition, which notice shall include the name of the proposed transferee, the terms and provisions of the proposed Permitted Disposition, and the effective date of the proposed Disposition and shall be accompanied by a draft of the proposed assignment or sublease agreement to be executed by Tenant and the proposed transferee (which assignment or sublease agreement must expressly provide that the use of the Premises by the transferee shall conform to the Permitted Use hereunder, the transferee shall comply with all provisions of this Lease, and in the case of an assignment, the transferee assumes all of Tenant's obligations under this Lease accruing from and after the effective date of the Permitted Disposition).  Tenant's notice of the proposed Permitted Disposition shall also include such other information and documentation evidencing the proposed Permitted Disposition and showing that each of the above conditions has

been satisfied.  For purposes of this Section 11.04, the term "**Permitted Disposition**" means, provided all conditions precedent set forth in this Section 11.04 have been satisfied, the right to assign this Lease, or sublease all or any portion of the Premises, without Landlord's prior consent or approval to:  (i) a Tenant Affiliate (as herein defined), provided Tenant remains liable to pay the rent and to perform all other obligations to be performed by Tenant hereunder; or (ii) a Successor Entity (as herein defined) whose net worth (as determined from the Successor Entity's most recent annual audited financial statements and quarterly unaudited financial statements prior to the transfer) is equal to or exceeds the net worth of Tenant (as determined from the Tenant's most recent annual audited financial statements and quarterly unaudited financial statements prior to the transfer).  For purposes of this Section 11.04, the term "**Tenant Affiliate**" means any corporation, limited liability company, partnership, or other entity which controls, is controlled by or under common control with Tenant.  For purposes of this Section 11.04, the term "**Successor Entity**" means any corporation, limited liability company, partnership or other entity (w) that has merged with or into Tenant; (x) into which Tenant has merged; (y) that was created from any restructuring or reorganization of Tenant; or (z) which acquires all or substantially all of the assets or stock of Tenant.

## 12.   Liens.

Tenant shall not permit mechanics' or other liens to be placed upon the Property, Premises or Tenant's leasehold interest in connection with any work or service done or purportedly done by or for the benefit of Tenant or its transferees.  Tenant shall give Landlord notice at least fifteen (15) days prior to the commencement of any work in the Premises to afford Landlord the opportunity, where applicable, to post and record notices of non-responsibility.  Tenant, within fifteen (15) days of notice from Landlord, shall fully discharge any lien by settlement, by bonding or by insuring over the lien in the manner prescribed by the applicable lien Law.  If Tenant fails to do so, Landlord may bond, insure over or otherwise discharge the lien.  Tenant shall reimburse Landlord for any amount paid by Landlord, including, without limitation, reasonable attorneys' fees.

## 13.   Indemnity and Waiver of Claims.

13.01    Tenant shall indemnify, defend and hold Landlord and its trustees, members, principals, beneficiaries, partners, officers, directors, employees, Mortgagees (defined in Section 23) and agents (the "**Landlord Related Parties**") harmless from and against any and all claims, liability, loss, cost or expense (including reasonable attorneys' fees) arising out of or in connection with (i) any injury or damage to any person or property occurring in, on or about the Premises or any part thereof or the Building or Common Area, if such injury or damage is caused in part or in whole by any act or omission by Tenant, its agents, contractors, employees, or invitees or (ii) any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease.  If any action or proceeding is brought against Landlord or any of the Landlord Related Parties by reason of any such claim, upon notice from Landlord, Tenant shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause, **EVEN IF SUCH DAMAGE OR INJURY RESULTS FROM THE NEGLIGENCE (BUT NOT THE GROSS**

**NEGLIGENCE OR WILLFUL MISCONDUCT) OF LANDLORD OR LANDLORD RELATED PARTIES**, and Tenant hereby waives all claims with respect thereto against Landlord.  The foregoing provisions shall survive the expiration or termination of this Lease.

13.02     If the Premises, the Building, or the Common Areas, or any part thereof, is damaged by fire or other cause against which Tenant is required to carry insurance pursuant to this Lease, Landlord shall not be liable to Tenant for any loss, cost or expense arising out of or in connection with such damage.   Tenant hereby releases Landlord, its directors, officers, shareholders, partners, employees, agents and representatives, from any liability, claim or action arising out of or in connection with such damage.  Furthermore, Tenant shall pursuant to Section 14 maintain insurance against loss, injury, or damage which may be sustained by the person, goods, wares, merchandise or property of Tenant, its agents, contractors, employees, invitees or customers, or any other person in or about the Premises, caused by or resulting from fire, steam, electricity, gas, water, or rain, which may leak or flow from or into any part of the Premises or the Building, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures of the same, whether such damage or injury results from conditions arising within the Premises or other portions of the Building, or from other sources, and Landlord shall not be liable therefor, **EVEN IF SUCH DAMAGE OR INJURY RESULTS FROM THE NEGLIGENCE OF LANDLORD OR LANDLORD RELATED PARTIES,** unless caused by gross negligence or willful misconduct of Landlord or Landlord Related Parties, and in that event only to the extent not covered by the insurance which Tenant is required to carry pursuant to this Lease.  Landlord shall not be liable to Tenant for any damages arising out of or in connection with any act or omission of any other tenant of the Premises or for losses due to theft or burglary or other wrongful acts of third parties.

14.     **Insurance.**

Tenant shall maintain the following insurance ("**Tenant's Insurance**"):  (a) Commercial General Liability Insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a minimum combined single limit of $3,000,000.00; (b) Property/Business Interruption Insurance written on an All Risk or Special Form, with coverage for broad form water damage including earthquake sprinkler leakage, at replacement cost value and with a replacement cost endorsement covering all of Tenant's business and trade fixtures, equipment, movable partitions, furniture, merchandise and other personal property within the Premises ("**Tenant's Property**"); (c) Workers' Compensation Insurance in amounts required by Law; and (d) Employers Liability Coverage of at least $1,000,000.00 per occurrence.   Any company writing Tenant's Insurance shall have an A.M. Best rating of not less than A-VIII.   All Commercial General Liability Insurance policies shall name as additional insureds Landlord (or its successors and assignees), the managing agent for the Building (or any successor), and their respective members, principals, beneficiaries, partners, officers, directors, employees, and agents, and other designees of Landlord and its successors as the interest of such designees shall appear. All policies of Tenant's Insurance shall contain endorsements that the insurer(s) shall give Landlord and its designees at least thirty (30) days' advance written notice of any cancellation, termination, material change or lapse of insurance. Tenant shall provide Landlord with a certificate of insurance evidencing Tenant's Insurance prior to the earlier to occur of the

Commencement Date or the date Tenant is provided with possession of the Premises, and thereafter as necessary to assure that Landlord always has current certificates evidencing Tenant's Insurance. So long as the same is available at commercially reasonable rates, Landlord shall maintain so called All Risk or Special Form property insurance on the Building at replacement cost value as reasonably estimated by Landlord.

### 15.  Subrogation.

Notwithstanding anything to the contrary set forth herein, Landlord and Tenant hereby waive and shall cause their respective insurance carriers to waive any and all rights of recovery, claims, actions or causes of action against the other for any loss or damage with respect to Tenant's Property, Leasehold Improvements, the Building, the Premises, or any contents thereof, **INCLUDING RIGHTS, CLAIMS, ACTIONS AND CAUSES OF ACTION BASED ON NEGLIGENCE**, which loss or damage is (or would have been, had the insurance required by this Lease been carried) covered by insurance.  Landlord and Tenant shall give each insurance company which issues policies of insurance, with respect to the items covered by this waiver, written notice of the terms of this mutual waiver, and shall have such insurance policies properly endorsed, if necessary, to prevent the invalidation of any of the coverage provided by such insurance policies by reason of such mutual waiver.  For the purpose of the foregoing waiver, the amount of any deductible applicable to any loss or damage shall be deemed covered by, and recoverable by the insured under the insurance policy to which such deductible relates.

### 16.  Casualty Damage.

16.01    If all or any portion of the Premises becomes untenantable by fire or other casualty to the Premises (collectively a "**Casualty**"), Landlord, with reasonable promptness, shall cause a general contractor selected by Landlord to provide Landlord and Tenant with a written estimate of the amount of time required using standard working methods to Substantially Complete the repair and restoration of the Premises and any Common Areas necessary to provide access to the Premises ("**Completion Estimate**").  If the Completion Estimate indicates that the Premises or any Common Areas necessary to provide access to the Premises cannot be made tenantable within two hundred seventy (270) days from the date the repair is started, then either party shall have the right to terminate this Lease upon written notice to the other within ten (10) days after receipt of the Completion Estimate.  Tenant, however, shall not have the right to terminate this Lease if the Casualty was caused by the negligence or intentional misconduct of Tenant or any Tenant Related Parties.  In addition, Landlord, by notice to Tenant within ninety (90) days after the date of the Casualty, shall have the right to terminate this Lease if:  (1) the Premises have been materially damaged and there is less than two (2) years of the Term remaining on the date of the Casualty; (2) any Mortgagee requires that the insurance proceeds be applied to the payment of the mortgage debt; or (3) a material uninsured loss to the Building occurs.

16.02    If this Lease is not terminated, Landlord shall commence and proceed with reasonable diligence to repair and restore the Building, Common Areas and the Leasehold Improvements (excluding any Alterations that were performed by Tenant in violation of this Lease).  Such restoration shall be to substantially the same condition that existed prior to the

Casualty, except for modifications required by Law or any other modifications to the Common Areas deemed desirable by Landlord.  However, in no event shall Landlord be required to spend more than the insurance proceeds received by Landlord.  Landlord shall not be liable for any inconvenience to Tenant, or injury to Tenant's business resulting in any way from the Casualty or the repair thereof.  Provided that Tenant is not in Default, during any period of time that all or a material portion of the Premises is rendered untenantable as a result of a Casualty, the Rent shall abate for the portion of the Premises that is untenantable and not used by Tenant.

**17.    Condemnation.**

Either party may terminate this Lease if any material part of the Premises is taken or condemned for any public or quasi-public use under Law, by eminent domain or private purchase in lieu thereof (a "**Taking**").  Landlord shall also have the right to terminate this Lease if there is a Taking of any portion of the Building or Property which would have a material adverse effect on Landlord's ability to profitably operate the remainder of the Building.  The terminating party shall provide written notice of termination to the other party within forty-five (45) days after it first receives notice of the Taking.  The termination shall be effective on the date the physical taking occurs.  If this Lease is not terminated, Base Rent and Tenant's Pro Rata Share shall be appropriately adjusted to account for any reduction in the square footage of the Building or Premises.  All compensation awarded for a Taking shall be the property of Landlord.  The right to receive compensation or proceeds are expressly waived by Tenant; provided, however, that  Tenant may file a separate claim for Tenant's Property and Tenant's reasonable relocation expenses, provided the filing of the claim does not diminish the amount of Landlord's award.  If only a part of the Premises is subject to a Taking and this Lease is not terminated, Landlord, with reasonable diligence, will restore the remaining portion of the Premises as nearly as practicable to the condition immediately prior to the Taking.

**18.    Events of Default.**

Each of the following occurrences shall be a "**Default**": (a) Tenant's failure to pay any portion of Rent when due ("**Monetary Default**"); (b) Tenant's failure (other than a Monetary Default) to comply with any term, provision, condition or covenant of this Lease, if the failure is not cured within ten (10) days after written notice to Tenant is provided, however, if Tenant's failure to comply cannot reasonably be cured within ten (10) days, Tenant shall be allowed additional time (not to exceed thirty (30) days) as is reasonably necessary to cure the failure so long as Tenant begins the cure within ten (10) days and diligently pursues the cure to completion; (c) Tenant or any guarantor becomes insolvent, makes a transfer in fraud of creditors, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts when due or forfeits or loses its right to conduct business; (d) the leasehold estate is taken by process or operation of Law arising from any act or omission of Tenant; or (e) Tenant is in default beyond any notice and cure period under any other lease or agreement with Landlord at the Building or Property.  If Landlord provides Tenant with written notice of Tenant's failure to comply with any specific provision of this Lease on two (2) separate occasions during any twelve (12) month period, Tenant's subsequent violation of such provision shall, at Landlord's option, be an incurable Default by Tenant.  All notices sent under this Section 18 shall be in satisfaction of, and not in addition to, notice required by Law.

**19.   Remedies.**

19.01      Upon Default, Landlord shall have the following rights and remedies, in addition to those allowed by law or equity, any one or more of which may be exercised without further notice to or demand upon Tenant and which may be pursued successively or cumulatively as Landlord may elect:

A.      Landlord may re-enter the Premises and attempt to cure any default of Tenant, in which event Tenant shall, upon demand, reimburse Landlord as Additional Rent for all reasonable costs and expenses which Landlord incurs to cure such default;

B.      Landlord may terminate this Lease by giving to Tenant written notice of Landlord's election to do so, in which event the Term shall end, and all right, title and interest of Tenant hereunder shall expire, on the date stated in such notice;

C.      Landlord may terminate the right of Tenant to possession of the Premises without terminating this Lease by giving written notice to Tenant that Tenant's right to possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice; and

D.      Landlord may enforce the provisions of this Lease by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease.

Landlord shall not be required to serve Tenant with any notices or demands as a prerequisite to its exercise of any of its rights or remedies under this Lease, other than those notices and demands specifically required under this Lease.  In order to regain possession of the Premises and to deny Tenant access thereto, Landlord or its agent may, at the expense and liability of the Tenant, alter or change any or all locks or other security devices controlling access to the Premises without posting or giving notice of any kind to Tenant and Landlord shall have no obligation to provide Tenant a key to new locks installed in the Premises or grant Tenant access to the Premises.  Tenant shall not be entitled to recover possession of the Premises, terminate this Lease, or recover any actual, incidental, consequential, punitive, statutory or other damages or award of attorneys' fees, by reason of Landlord's alteration or change of any lock or other security device and the resulting exclusion from the Premises of the Tenant or Tenant's agents, servants, employees, customers, licensees, invitees or any other persons from the Premises except in the event it is proved that Landlord wrongfully or constructively evicted Tenant from the Premises.  Landlord may, without notice, remove and either dispose of or store, at Tenant's expense, any property belonging to Tenant that remains in the Premises after Landlord has regained possession thereof as provided for by this Lease.   Tenant acknowledges that the provisions of this subparagraph of this Lease supersede the Texas Property Code and Tenant further warrants and represents that it hereby knowingly waives any rights it may have

thereunder. **TENANT EXPRESSLY WAIVES THE SERVICE OF ANY STATUTORY DEMAND OR NOTICE WHICH IS A PREREQUISITE TO LANDLORD'S COMMENCEMENT OF EVICTION PROCEEDINGS AGAINST TENANT, INCLUDING THE DEMANDS AND NOTICES SPECIFIED IN ANY APPLICABLE STATE STATUTE OR CASE LAW. TENANT KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LAWSUIT BROUGHT BY LANDLORD TO RECOVER POSSESSION OF THE PREMISES FOLLOWING LANDLORD'S TERMINATION OF THIS LEASE OR THE RIGHT OF TENANT TO POSSESSION OF THE PREMISES PURSUANT TO THE TERMS OF THIS LEASE AND ON ANY CLAIM FOR DELINQUENT RENT WHICH LANDLORD MAY JOIN IN ITS LAWSUIT TO RECOVER POSSESSION. LANDLORD IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THE FOREGOING WAIVER.**

19.02     If Landlord exercises either of the remedies provided in Sections 19.01(B) or 19.01(C), Tenant shall surrender possession and vacate the Premises and immediately deliver possession thereof to Landlord, and Landlord may re-enter and take complete and peaceful possession of the Premises, and Landlord may remove all occupants and property therefrom, using such force as may be necessary to the extent allowed by law, without being deemed guilty in any manner of trespass, eviction or forcible entry and detainer and without relinquishing Landlord's right to Rent or any other right given to Landlord hereunder or by operation of law.

19.03     If Landlord elects to terminate this Lease or terminates the right of Tenant to possession of the Premises without terminating this Lease by reason of a Default by Tenant, Landlord shall have the right to immediate recovery of all amounts then due hereunder. Such termination of possession shall not release Tenant, in whole or in part, from Tenant's obligation to pay Rent hereunder for the full Term, and Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Rent accruing as it becomes due under this Lease during the period from the date of such notice of termination of possession to the stated end of the Term. In any such case, Landlord shall make reasonable efforts, in accordance with Section 19.05 hereof, to relet the Premises. In attempting to relet the Premises, Landlord may make repairs, alterations and additions in or to the Premises and redecorate the same to the extent reasonably deemed by Landlord necessary or desirable, and Tenant upon demand shall pay the reasonable cost of all of the foregoing together with Landlord's reasonable expenses of reletting. The rents from any such reletting shall be applied first to the payment of the expenses of reentry, redecoration, repair and alterations and the expenses of reletting (including reasonable attorneys' fees and brokers' fees and commissions) and second to the payment of Rent herein provided to be paid by Tenant. Any excess or residue shall operate only as an offsetting credit against the amount of Rent due and owing as the same thereafter becomes due and payable hereunder.

19.04     If this Lease is terminated by Landlord, Landlord shall be entitled to recover from Tenant all Rent accrued and unpaid for the period up to and including such Expiration Date, as well as all other additional sums payable by Tenant, or for which Tenant is liable or for which Tenant has agreed to indemnify Landlord, which may be then owing and unpaid, and all reasonable costs and expenses, including court costs and reasonable attorneys' fees incurred by

Landlord in the enforcement of its rights and remedies hereunder.  In addition, Landlord shall be entitled to recover as damages for loss of the bargain and not as a penalty (a) the unamortized portion of any concessions offered by Landlord to Tenant in connection with this Lease, including without limitation Landlord's contribution to the cost of tenant improvements, if any, installed by either Landlord or Tenant pursuant to this Lease or any work letter in connection with this Lease, (b) the aggregate sum which at the time of such termination represents the excess, if any, of the present value of the aggregate Rent which would have been payable after the Expiration Date had this Lease not been terminated, including, without limitation, the amount projected by Landlord to represent Additional Rent for the remainder of the Term, over the then present value of the then aggregate fair rent value of the Premises for the balance of the Term, such present worth to be computed in each case on the basis of a 10% per annum discount from the respective dates upon which such Rent would have been payable hereunder had this Lease not been terminated, and (c) any damages in addition thereto, including without limitation reasonable attorneys' fees and court costs, which Landlord sustains as a result of the breach of any of the covenants of this Lease other than for the payment of Rent.

19.05     Landlord shall use commercially reasonable efforts to mitigate any damages resulting from a Default by Tenant under this Lease.  Landlord's obligation to mitigate damages after a Default by Tenant under this Lease shall be satisfied in full if Landlord undertakes to lease the Premises to another tenant (a "**Substitute Tenant**") in accordance with the following criteria:  (a) Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for the Premises until Landlord obtains full and complete possession of the Premises including, without limitation, the final and unappealable legal right to relet the Premises free of any claim of Tenant; (b) Landlord shall not be obligated to lease or show the Premises, on a priority basis, or offer the Premises to a prospective tenant when other premises in the Building suitable for that prospective tenant's use are (or soon will be) available; (c) Landlord shall not be obligated to lease the Premises to a Substitute Tenant for a rent less than the current fair market rent then prevailing for similar uses in comparable buildings in the same market area as the Building, nor shall Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Building; (d) Landlord shall not be obligated to enter into a lease with a Substitute Tenant whose use would: (i) violate any restriction, covenant, or requirement contained in the lease of another tenant of the Building; (ii) adversely affect the reputation of the Building; or (iii) be incompatible with the operation of the Building; and (e) Landlord shall not be obligated to enter into a lease with any proposed Substitute Tenant which does not have, in Landlord's reasonable opinion, sufficient financial resources to operate the Premises in a first class manner and to fulfill all of the obligations in connection with the lease thereof as and when the same become due.

19.06     The receipt by Landlord of less than the full Rent due shall not be construed to be other than a payment on account of Rent then due, nor shall any statement on Tenant's check or any letter accompanying Tenant's check be deemed an accord and satisfaction, and Landlord may accept such payment without prejudice to Landlord's right to recover the balance of the Rent due or to pursue any other remedies provided in this Lease.  The acceptance by Landlord of Rent hereunder shall not be construed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease.  No act or omission by Landlord or its employees or agents during the

21

Term of this Lease shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord.

19.07    In the event of any litigation between Tenant and Landlord to enforce or interpret any provision of this Lease or to enforce any right of either party hereto, the unsuccessful party to such litigation shall pay to the successful party all costs and expenses, including reasonable attorney's fees, incurred therein.

19.08    All property of Tenant removed from the Premises by Landlord pursuant to any provision of this Lease or applicable law may be handled, removed or stored by Landlord at Tenant's sole cost and expense, and Landlord shall not be responsible in any event for the value, preservation or safekeeping thereof.  Tenant shall pay Landlord for all expenses incurred by Landlord with respect to such removal and storage so long as the same is in Landlord's possession or under Landlord's control.  All such property not removed from the Premises or retaken from storage by Tenant within 30 days after the end of the Term or termination of this Lease or Tenant's right to possession of the Premises, however terminated, at Landlord's option, shall be conclusively deemed to have been conveyed by Tenant to Landlord by bill of sale with general warranty of title without further payment or credit by Landlord to Tenant.

## 20.    Limitation of Liability.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE, THE LIABILITY OF LANDLORD (AND OF ANY SUCCESSOR LANDLORD) SHALL BE LIMITED TO THE INTEREST OF LANDLORD IN THE PROPERTY. TENANT SHALL LOOK SOLELY TO LANDLORD'S INTEREST IN THE PROPERTY FOR THE RECOVERY OF ANY JUDGMENT OR AWARD AGAINST LANDLORD OR ANY LANDLORD RELATED PARTY. NEITHER LANDLORD NOR ANY LANDLORD RELATED PARTY SHALL BE PERSONALLY LIABLE FOR ANY JUDGMENT OR DEFICIENCY, AND IN NO EVENT SHALL LANDLORD OR ANY LANDLORD RELATED PARTY BE LIABLE TO TENANT FOR ANY LOST PROFIT, DAMAGE TO OR LOSS OF BUSINESS OR ANY FORM OF SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE. BEFORE FILING SUIT FOR AN ALLEGED DEFAULT BY LANDLORD, TENANT SHALL GIVE LANDLORD AND THE MORTGAGEE(S) WHOM TENANT HAS BEEN NOTIFIED HOLD MORTGAGES (DEFINED IN SECTION 23 BELOW), NOTICE AND REASONABLE TIME TO CURE THE ALLEGED DEFAULT.

## 21.    Relocation.

Landlord, at its expense, at any time before or during the Term, may relocate Tenant from the Premises to space of reasonably comparable size and utility ("**Relocation Space**") within the Building or adjacent buildings within the same project upon at least sixty (60) days' prior written notice to Tenant.  From and after the date of the relocation, the Base Rent and Tenant's Pro Rata Share shall be adjusted based on the rentable square footage of the Relocation Space.  Landlord shall pay Tenant's reasonable costs of relocation, including all costs for moving Tenant's furniture, equipment, supplies and other personal property, as well as the cost of printing and

distributing change of address notices to Tenant's customers and one month's supply of stationery showing the new address.

## 22.    Holding Over.

If Tenant fails to surrender all or any part of the Premises at the termination of this Lease, occupancy of the Premises after termination shall be that of a tenancy at sufferance.  Tenant's occupancy shall be subject to all the terms and provisions of this Lease, and Tenant shall pay an amount (on a per month basis without reduction for partial months during the holdover) equal to 200% of the sum of the Base Rent and Additional Rent due for the period immediately preceding the holdover.  No holdover by Tenant or payment by Tenant after the termination of this Lease shall be construed to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise. If Landlord is unable to deliver possession of the Premises to a new tenant or to perform improvements for a new tenant as a result of Tenant's holdover and Tenant fails to vacate the Premises within fifteen (15) days after notice from Landlord, Tenant shall be liable for all damages that Landlord suffers from the holdover.

## 23.    Subordination to Mortgages; Estoppel Certificate.

Tenant accepts this Lease subject and subordinate to any mortgage(s), deed(s) of trust, ground lease(s) or other lien(s) now or subsequently arising upon the Premises, the Building or the Property, and to renewals, modifications, refinancings and extensions thereof (collectively referred to as a "**Mortgage**"). The party having the benefit of a Mortgage shall be referred to as a "**Mortgagee**".  This clause shall be self-operative, but upon request from a Mortgagee, Tenant shall execute a commercially reasonable subordination agreement in favor of the Mortgagee.  As an alternative, a Mortgagee shall have the right at any time to subordinate its Mortgage to this Lease.  Upon request, Tenant, without charge, shall attorn to any successor to Landlord's interest in this Lease.  Landlord and Tenant shall each, within ten (10) days after receipt of a written request from the other, execute and deliver a commercially reasonable estoppel certificate to those parties as are reasonably requested by the other (including a Mortgagee or prospective purchaser). Without limitation, such estoppel certificate may include a certification as to the status of this Lease, the existence of any defaults and the amount of Rent that is due and payable. Landlord shall use reasonable commercial efforts to obtain within ninety (90) days after full execution of this Lease and the Work Letter by Landlord and Tenant, a reasonable subordination, non-disturbance and attornment agreement executed by the Building's existing Mortgagee, and Tenant agrees to execute such reasonable subordination, non-disturbance and attornment agreement.

## 24.    Notice.

All demands, approvals, consents or notices (collectively referred to as a "**notice**") shall be in writing and delivered by hand or sent by registered or certified mail with return receipt requested or sent by overnight or same day courier service at the party's respective Notice Address(es) set forth in Section 1.12. Each notice shall be deemed to have been received on the earlier to occur of actual delivery or the date on which delivery is refused, or, if Tenant has vacated the Premises

or any other Notice Address of Tenant without providing a new Notice Address, three (3) days after notice is deposited in the U.S. mail or with a courier service in the manner described above. Either party may, at any time, change its Notice Address (other than to a post office box address) by giving the other party written notice of the new address.

**25.    Surrender of Premises.**

   At the termination of this Lease or Tenant's right of possession, Tenant shall remove Tenant's Property from the Premises, and quit and surrender the Premises to Landlord, broom clean, and in good order, condition and repair, ordinary wear and tear and damage which Landlord is obligated to repair hereunder excepted.  If Tenant fails to remove any of Tenant's Property within five (5) days after termination of this Lease or Tenant's right to possession, Landlord, at Tenant's sole cost and expense, shall be entitled (but not obligated) to remove and store Tenant's Property. Landlord shall not be responsible for the value, preservation or safekeeping of Tenant's Property. Tenant shall pay Landlord, upon demand, the expenses and storage charges incurred. If Tenant fails to remove Tenant's Property from the Premises or storage, within thirty (30) days after notice, Landlord may deem all or any part of Tenant's Property to be abandoned and title to Tenant's Property shall automatically vest in Landlord.

**26.    Miscellaneous.**

   26.01    This Lease shall be interpreted and enforced in accordance with the Laws of the state of Texas and Landlord and Tenant hereby irrevocably consent to the jurisdiction and proper venue of such state.  If any term or provision of this Lease shall to any extent be void or unenforceable, the remainder of this Lease shall not be affected.  If there is more than one Tenant or if Tenant is comprised of more than one party or entity, the obligations imposed upon Tenant shall be joint and several obligations of all the parties and entities, and requests or demands from any one person or entity comprising Tenant shall be deemed to have been made by all such persons or entities.  Notices to any one person or entity shall be deemed to have been given to all persons and entities.  Tenant represents and warrants to Landlord that each individual executing this Lease on behalf of Tenant is authorized to do so on behalf of Tenant and that Tenant is not, and the entities or individuals constituting Tenant or which may own or control Tenant or which may be owned or controlled by Tenant are not, among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists.

   26.02    If either party institutes a suit against the other for violation of or to enforce any covenant, term or condition of this Lease, the prevailing party shall be entitled to all of its costs and expenses, including, without limitation, reasonable attorneys' fees.  Landlord and Tenant hereby waive any right to trial by jury in any proceeding based upon a breach of this Lease. Either party's failure to declare a default immediately upon its occurrence, or delay in taking action for a default, shall not constitute a waiver of the default, nor shall it constitute an estoppel.

   26.03    Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant (other than the payment of the Security Deposit or Rent), the period of time for the performance of such action shall be extended by the number of days that the performance is

actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist acts, civil disturbances and other causes beyond the reasonable control of the performing party ("**Force Majeure**").

26.04    Landlord shall have the right to transfer and assign, in whole or in part, all of its rights and obligations under this Lease and in the Building and Property.  Upon transfer Landlord shall be released from any further obligations hereunder and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations, provided that, any successor pursuant to a voluntary, third party transfer (but not as part of an involuntary transfer resulting from a foreclosure or deed in lieu thereof) shall have assumed Landlord's obligations under this Lease.

26.05    Tenant hereby represents, warrants and covenants to Landlord that (a) except for Tenant's Broker, no real estate broker, agent or salesperson represented Tenant in connection with this Lease; and (b) except for Landlord's Broker (as to Landlord) and Tenant's Broker (as to Tenant), Tenant has not engaged or dealt with any real estate broker, agent or salesperson in connection with this Lease.  Tenant hereby indemnifies and holds Landlord harmless against any claim, demand, action, cause of action, lawsuit, damages, judgment, settlement, cost, expense or other obligation of any kind, including, but not limited to, reasonable attorneys' fees and court costs incurred by Landlord if Tenant's representations and warranties contained in this Section 26.05 are untrue or inaccurate in any respect.  So long as no Default by Tenant exists under this Lease, if Landlord received from Tenant's Broker all invoices and other documentation ("**Commission Documentation**") required by the written commission agreement between Landlord and Tenant's Broker (the "**Commission Agreement**"), but Landlord does not, within sixty (60) days after the later to occur of the date of full execution of this Lease and the Work Letter by both parties hereto or Tenant's Broker delivery to Landlord of all required Commission Documentation, remit to Tenant's Broker the portion of the commission due to Tenant's Broker pursuant to such invoices and documentation, then provided Tenant actually pays such portion of the commission directly to Tenant's Broker and thereupon furnishes Landlord with satisfactory written evidence of Tenant's payment thereof, then and in such events, Tenant shall be entitled to offset against the next installments of Base Rent coming due under this Lease an amount equal to the portion of the commission actually paid by Tenant directly to Tenant's Broker.  The exercise of such foregoing right to setoff by Tenant, whether or not ultimately determined to be justified, shall not constitute a Default by Tenant under this Lease.  Notwithstanding anything to contrary contained in this Section 26.05, Landlord shall not be excused from the timely payment of the commission due to Tenant's Broker pursuant to the Commission if, as and when required pursuant to the Commission.  Landlord shall continue to be liable for the same until the commission due to Tenant's Broker has been paid in full with any portion of such commission actually paid to Tenant's Broker by Tenant being credited on a dollar-for-dollar basis to the payment of the commission owed by Landlord pursuant to the Commission.

26.06    Time is of the essence with respect to Tenant's performance of its obligations hereunder and its exercise of any expansion, renewal or extension rights granted to Tenant.  The expiration of the Term, whether by lapse of time, termination or otherwise, shall not relieve either party of any obligations which accrued prior to or which may continue to accrue after the expiration or termination of this Lease.

26.07     Tenant may peacefully have, hold and enjoy the Premises, subject to the terms of this Lease, so long as Tenant timely pays the Rent due hereunder and fully performs all of its covenants and agreements.  This covenant shall be binding upon Landlord and its successors only during its or their respective periods of ownership of the Building.

26.08     This Lease does not grant any rights to light or air over or about the Building. Landlord excepts and reserves exclusively to itself any and all rights not specifically granted to Tenant under this Lease.  This Lease constitutes the entire agreement between the parties and supersedes all prior agreements and understandings related to the Premises, including all lease proposals, letters of intent and other documents.  Neither party is relying upon any warranty, statement or representation not contained in this Lease.  This Lease may be modified only by a written agreement signed by an authorized representative of Landlord and Tenant.

26.09     Landlord and Tenant agree that each provision of the Lease for determining charges, amounts and Additional Rent payments by Tenant (including without limitation, Section 4 of this Lease and **Exhibit B** attached to this Lease) is commercially reasonable, and as to each such charge or amount, constitutes a "method by which the charge is to be computed" for purposes of Section 93.012 (Assessment of Charges) of the Texas Property Code, as such section now exists or as it may be hereafter amended or succeeded.

26.10     Tenant hereby grants to Landlord a lien on and security interest in all furniture, fixtures, equipment, inventory, merchandise and other personal property owned by Tenant and now or hereafter located in, on or about the Premises or Building, whether such items are presently owned by Tenant or are after acquired, to secure the payment of all Rent and other charges due and to become due under this Lease and to further secure the full and timely performance by Tenant of all of its other obligations under this Lease, such lien and security interest to be prior to any other lien and security interest on such property except a timely perfected purchase money security interest in favor of the seller or lessor of such property to secure the unpaid purchase price or lease payments thereof.  Tenant hereby expressly waives all exemption laws.  This Lease constitutes a security agreement between Landlord and Tenant for purposes of granting Landlord rights in the collateral described in this Section 26.10.  Landlord shall be entitled to exercise and enforce all rights and remedies of a secured party under the Uniform Commercial Code in force in the state or commonwealth in which the Building is situated, including, without limitation, the right to foreclose and conduct sales of the collateral.  Tenant hereby authorizes Landlord, as the secured party, to file a financing statement to perfect the security interest granted herein.

26.11     Except and only to the extent expressly provided in this Lease, Tenant shall have no option or right whatsoever to renew or extend the Term or any option to lease, right of first offer to lease, or right of first refusal to lease any other space Building.  Tenant hereby acknowledges and agrees that it has no option or right to purchase the Premises, the Building or other property of Landlord and no option or right of first refusal to purchase the Premises, the Building or other property of Landlord.

26.12     The submission by Landlord to Tenant of one or more drafts of this Lease for Tenant's review and comment does not constitute, and shall not be deemed or construed to be, an

offer, option, commitment or agreement by Landlord to execute such draft or drafts, and such submission does not grant or confer any rights or interests to Tenant or impose any obligations on Landlord regardless of any reliance, change or position, or partial performance by either Landlord or Tenant in respect of such submission.  No such drafts shall be binding or enforceable against Landlord or Tenant, it being the intent of each of the parties hereto that this Lease shall not be effective, binding or enforceable against either party hereto until this Lease is duly executed and delivered by both Landlord and Tenant.

26.13    **TENANT HEREBY WAIVES ALL RIGHTS TO PROTEST THE APPRAISED VALUE OF THE PROPERTY OR TO APPEAL THE SAME AND ALL RIGHTS TO RECEIVE NOTICES OF REAPPRAISALS AS SET FORTH IN SECTIONS 41.413 AND 42.015 OF THE TEXAS TAX CODE.**

26.14    **TENANT HEREBY WAIVES ALL ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET. SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.  AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY CONSENTS TO THIS WAIVER.**

26.15    Each party hereto represents and warrants to the other party hereto that the agent, partner or officer executing this Lease on its behalf is fully authorized, directed and empowered to execute and deliver this Lease in such capacity as the act and deed of the party on whose behalf he or she is executing this Lease and that all partnership, corporate or company action requisite to such execution and delivery has been taken by such party.

26.16    This Lease will be executed in multiple counterparts, and each counterpart when fully executed and delivered by the parties hereto will be an original agreement, but all such counterparts will constitute one agreement.

Landlord and Tenant have executed this Lease as of the date first above written.

LANDLORD:                          **YPI 1010 LAMAR, LLC**, a Delaware limited
                                   liability company


                                   By:   _____
                                         John R. Cook, Vice President

TENANT:                            ███████████████████████████


                                   By:   _____
                                   Name: _____

27

Its duly authorized _____

**EXHIBIT A**

**<u>OUTLINE AND LOCATION OF PREMISES</u>**

**<u>TO BE PROVIDED</u>**

## EXHIBIT A-1

## LEGAL DESCRIPTION OF LAND

All that certain 20,603 square feet of land, out of that same called 20,789 square foot tract described in the deed dated January 3, 1994, from Rock properties to Lamar-Fannin Partnership, Ltd., recorded at Clerk File No. P-633427, Film Code No. 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, of the Official Public Records of Real Property of Harris County, Texas, being all of Lot 5 and a portion of Lots 4, 9, 10 and 11, of Block 255, out of South Side Buffalo Bayou (unrecorded and recognized), Houston, Harris County, Texas and being more particularly described by metes and bounds as follows:

Commencing at found City of Houston Engineering Department Reference Monument No. 41 at the intersection of the City of Houston Engineering Department Reference Lines in the center lines of Main Street (90' wide) and Polk Avenue, Thence N 35° 00' 00" E - 660.0l', with said Reference Line in Main Street to a point; Thence S 55° 00' 00" H - 337.50', with the Reference Line in Lamar Avenue (originally 80' wide, currently 69.3' wide) to a point; Thence S 35° 00' 00" W - 29.30', with the Reference Line in Fannin Street to a point; Thence N 55° 00' 00" W - 40.00', to a found brass "L" plate marking the east corner of the 10.7' wide strip described in Cause No. 87651, First Baptist Church of Houston versus the City of Houston, recorded in Volume 8, Page 460, of the District Court Minutes, for the POINT OF BEGINNING of the herein described tract;

THENCE S 35° 00' 00" W, at 10.7' passing the east corner of aforementioned Block 255 and with the northwest right-of-way line of Fannin Street (80' wide) for a total distance of 108.20', to a found building corner for corner;

THENCE N 55° 00' 00" W - 67.50', with the northeast line of that certain 38,579 square foot tract described in the deed dated January 10, 1997, from Lamar-Fannin Partnership, Ltd. to Sakowitz Building-Houston, L.L.C., recorded at Clerk File No, S-279492, Film Code No. 5l1-47-1804, of the Official Public Records of Real Property of Harris County, Texas, to a point for corner;

THENCE N 35° 00' 00" E - 0.50', continuing with said northeast line of the 38,579 square foot tract, to a point for corner;

THENCE N 55° 05' 28" W – 125.13'. continuing along said northeast line of the 38,579 square foot tract, to a point for corner;

THENCE N 35° 01' 04" E - 0.10', with an interior southeast line of said 38,579 square foot tract, to a point for corner;

THENCE S 54° 59' 43" E - 1.24', with the southwest line of that certain 6,644 square foot tract, described in the deed dated August 2, 1995, from Zale Delaware, Inc. to NAJU, Inc., recorded at Clerk File No. R-513136, File Code No. 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, of the official Public Records of Real Property of Harris County, Texas, to a point for corner;

THENCE N 35° 33' 10" E, with the southeast line of said 6,644 square foot tract, at 97.11' passing the original southwest right-of-way line of aforementioned Lamar Avenue and the northeast line of aforementioned Block 255, S.S.B.B., and continuing for a total distance of 107.81', to a point for corner;

THENCE S 55° 00' 00" W – 190.35', with the northeast line of the 10.7' wide strip described in Cause. No. 87651, First Baptist Church of Houston versus the City Houston, recorded in Volume 8, Page 460, of the District Court Minutes, to the POINT OF BEGINNING of the herein described tract and containing 20,603 square feet (0.4730 acre) of land, more or less.

TOGETHER with the rights under that certain Permit for Use And Occupancy Of A Portion of The City's Right-of-Way recorded under Harris County Clerk's File Number(s) F963827 and Correction Permit For Use And Occupancy Of A Portion Of The City's Right-of-Way recorded under Harris County Clerk's File Number(s) M526795.

## END OF EXHIBIT A-1

## EXHIBIT B

## EXPENSES AND TAXES

1.      **Payments**.

1.01      Tenant shall pay Tenant's Pro Rata Share of the amount, if any, by which Expenses (defined below) for each calendar year during the Term exceed Expenses for the Base Year (the "**Expense Excess**") and also the amount, if any, by which Taxes (defined below) for each calendar year during the Term exceed Taxes for the Base Year (the "**Tax Excess**"). If Expenses or Taxes in any calendar year decrease below the amount of Expenses or Taxes for the Base Year, Tenant's Pro Rata Share of Expenses or Taxes, as the case may be, for that calendar year shall be $0.00. Landlord shall provide Tenant with a good faith estimate of the Expense Excess and of the Tax Excess for each calendar year during the Term. On or before the first day of each month, Tenant shall pay to Landlord a monthly installment equal to one-twelfth of Tenant's Pro Rata Share of Landlord's estimate of both the Expense Excess and Tax Excess. After its receipt of the revised estimate, Tenant's monthly payments shall be based upon the revised estimate. If Landlord does not provide Tenant with an estimate of the Expense Excess or the Tax Excess by January 1 of a calendar year, Tenant shall continue to pay monthly installments based on the previous year's estimate(s) until Landlord provides Tenant with the new estimate.

1.02      As soon as is practical following the end of each calendar year, Landlord shall furnish Tenant with a statement of the actual Expenses and Expense Excess and the actual Taxes and Tax Excess for the prior calendar year. If the estimated Expense Excess or estimated Tax Excess for the prior calendar year is more than the actual Expense Excess or actual Tax Excess, as the case may be, for the prior calendar year, Landlord shall either provide Tenant with a refund or apply any overpayment by Tenant against Additional Rent due or next becoming due, provided if the Term expires before the determination of the overpayment, Landlord shall refund any overpayment to Tenant after first deducting the amount of Rent due. If the estimated Expense Excess or estimated Tax Excess for the prior calendar year is less than the actual Expense Excess or actual Tax Excess, as the case may be, for such prior year, Tenant shall pay Landlord, within thirty (30) days after its receipt of the statement of Expenses or Taxes, any underpayment for the prior calendar year.

2.      **Expenses**.

2.01      "**Expenses**" means all costs and expenses incurred in each calendar year in connection with operating, maintaining, repairing, and managing the Building and the Property. Expenses include, without limitation: (a) all labor and labor related costs; (b) management fees; (c) the cost of equipping, staffing and operating an on-site and/or off-site management office for the Building, provided if the management office services one or more other buildings or properties, the shared costs and expenses of equipping, staffing and operating such management office(s) shall be equitably prorated and apportioned between the Building and the other buildings or properties; (d) accounting costs; (e) the cost of services; (f) rental and purchase cost of parts, supplies, tools and equipment; (g) insurance premiums and deductibles; (h) electricity,

gas and other utility costs (excluding (i) amounts received by Landlord as reimbursement for above standard electrical consumption, and (ii) the cost of electricity incurred to provide overtime HVAC to specific tenants (as reasonably estimated by Landlord); and (iii)the amortized cost of capital improvements (as distinguished from replacement parts or components installed in the ordinary course of business) made subsequent to the Base Year which are:  (1) performed primarily to reduce current or future operating expense costs, upgrade Building security or otherwise improve the operating efficiency of the Property; or (2) required to comply with any Laws that are enacted, or first interpreted to apply to the Property, after the date of this Lease). The cost of capital improvements shall be amortized by Landlord over the lesser of the Payback Period (defined below) or the useful life of the capital improvement as reasonably determined by Landlord.   The term **"Payback Period"** means the reasonably estimated period of time that it takes for the cost savings resulting from a capital improvement to equal the total cost of the capital improvement. Landlord, by itself or through an affiliate, shall have the right to directly perform, provide and be compensated for any services under this Lease.  If Landlord incurs Expenses for the Building or Property together with one or more other buildings or properties, whether pursuant to a reciprocal easement agreement, common area agreement or otherwise, the shared costs and expenses shall be equitably prorated and apportioned between the Building and Property and the other buildings or properties.  It is understood that Expenses shall be reduced by all cash discounts, trade discounts, quantity discounts, rebates or other amounts actually received by Landlord or the Property Manager (as defined in Paragraph 2.02 of this **Exhibit B**) in the purchase of any goods, utilities, or services in connection with the operation of the Building or Project.  In the event any facilities, services, or utilities used in connection with the Building or Project are provided from another building owned or operated by Landlord or vice versa, the costs incurred by Landlord in connection therewith shall be allocated to Expenses by Landlord on a reasonably equitable basis.  In no event shall Landlord be entitled recover from all of the tenants of the Property an amount greater than the actual Expenses in any given year or period.

2.02       Expenses shall not include:  (a) management fees payable to the property management company managing the Property (the "Property Manager"), which may be an affiliate of Landlord, in excess of the amounts reasonably customary in the marketplace for office buildings comparable to the Building, but in no event to exceed three percent (3%) of the gross base rents collected by Landlord for the Building; (b) legal services; (c) any capital expenditures except for (i) the cost of any improvements made to the Property by Landlord that are required under any governmental law or regulation which was not promulgated, or which was promulgated but was not applicable to the Building, at the time the Building was constructed, amortized over such period as Landlord shall reasonably determine (but not less than the useful life of such improvement), together with an amount equal to interest on the unamortized balance thereof at a rate which is equal to the lesser of (A) the annual rate of interest charged to Landlord by a third-party institutional lender in connection with any lien against the Property which secures financing of Landlord, or (B) the annual "Prime Rate" published by The Wall Street Journal in its listing of "Money Rates," or if such rate is no longer published, a comparable rate of interest listed in a nationally circulated publication reasonably selected by Landlord, provided that such sum may in no event exceed the maximum interest allowed to be contracted for under applicable law (such sum is herein called the "Amortization Rate"); (ii) the cost of any improvement made to the Common Areas or service corridors of the Property that is required under interpretations or regulations issued after the Commencement Date under, or amendments made after the Commencement Date

to, the provisions of Tex. Gov't Code Ann. §§ 469.001-469.208 and the provisions of the American With Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (such statutes, interpretations, and regulations are herein collectively called the "Disability Acts"), amortized over such period as Landlord shall reasonably determine (but not less than the useful life of such improvement), together with an amount equal to interest on the unamortized balance thereof at a rate which, on the date the improvement in question is fully completed, is equal to the Amortization Rate; (iii) the cost of any other equipment installed in, or capital improvement made to, the Building to the extent such equipment reduces Expenses (but only to the extent of such cost resulted in expense reduction), amortized over such period as is reasonably determined by Landlord (but not less than the useful life of such improvement), together with an amount equal to interest on the unamortized balance thereof at a rate, which on the date the device or equipment in question is fully installed, is equal to the Amortization Rate.  However, in no event shall Landlord include costs for replacement of equipment which has reached the reasonable end of its useful life; (d) any costs associated with the leasing, marketing, solicitation, negotiation and execution of leases in the Building including without limitation promotional and advertising expenses, commission, finder's fees and referral fees, accounting, legal and other professional fees and expenses relating to the negotiation and preparation of any lease; (e) any costs incurred with the original design, construction, landscaping and clean-up of the Building; (f) wages, salaries, fees, and any other form of compensation paid to any employee of Landlord and/or Landlord's managing agent at or above the grade of Building Manager; (g) any costs incurred in connection with upgrading the Building to comply with insurance requirements, life safety codes, ordinances, statutes or other laws in effect prior to the Commencement Date or to comply to a tenant's separate specific request; (h) any costs or expenses related to monitoring, testing, removal, cleaning, abatement or remediation of any hazardous material in the Building or on the Land; (i) any costs of any service or items sold or provided to tenants or other occupants for which Landlord or Landlord's managing agent has been or is entitled to be reimbursed by such tenants or other occupants for such service; (j) expenses in connection with services or other benefits which are provided to another tenant or occupant of the Building and which do not benefit Tenant; (k) costs for sculptures, paintings, fountains or other objects of art or the display of such items; (l) any increase in Landlord's insurance premiums caused by a specific use of another tenant or by Landlord; (m) any Operating Expense covered by insurance or condemnation proceeds or reimbursed by a third party; (n) debt service on any debt of Landlord; (o) repairs or other work occasioned by fire, windstorm, or other casualty or condemnation, including without limitation the amount of any deductible applicable thereto; (p) except as herein provided, depreciation and amortization; (q) except as herein provided, costs of a capital nature, including, but not limited to, capital improvements, capital replacements, capital repairs, capital equipment and capital tools; (r) expenses in connection with services or other benefits of a type which are not provided Tenant but which are provided to another tenant or occupant; (s) costs (including penalties, fines and legal expenses) incurred due to violation by Landlord or any tenant of the terms and conditions of the Lease or any other Lease; (t) fees or other compensation paid to subsidiaries or affiliates of Landlord for services on or to the Building, to the extent that the costs of such services exceed competitive costs of such services were they not so rendered by a subsidiary or affiliate; (u) rental for underground or underlying lease(s); (v) Landlord's general partnership or corporate overhead and general administrative expenses; (w) any compensation paid to clerks, attendants, or other persons in commercial concessions operated by Landlord, except the garage that serves the Building; (x) rentals and other related expenses incurred in leasing air conditioning systems, elevators, or other equipment ordinarily considered to be of a capital nature except in the

case of emergency and except equipment which is used in providing janitorial services and which is not fixed to the Building; (y) any costs, fines, penalties, legal fees or costs of litigation incurred due to violations by Landlord, its employee(s), agents, contractors or assigns, of any governmental rule or authority; (z) replacements of any equipment or component of the Building caused by deficient design or construction; (aa) interest or penalties due to late payments of taxes, utility bills and other costs; (bb) Federal and state taxes on income; death, estate or inheritance taxes, franchise taxes and any taxes imposed or measured on or by the income of Landlord from the operation of the Building or imposed in connection with any change of ownership of the Building; (cc) any expense in excess of Landlord's actual operating costs (consequently, Landlord may not pass onto Tenant any cost, which Landlord did not actually pay or incur); (dd) all extra janitorial and/or cleaning costs for specific tenants, or related to construction of improvements to tenant spaces; (ee) cost of unusual security for particular tenants; (ff) costs in connection with services, items or other benefits of a type which are not standard for the Building and which are not available to Tenant without specific charge therefor; (gg) he costs of any initial "tap fees" or one time lump sum sewer or water connection fees for the Building; and (hh) any other costs or charges which do not constitute operating costs under generally accepted accounting principles, consistently applied.

2.03     If at any time during a calendar year the Building is not at least 95% occupied or Landlord is not supplying services to at least 95% of the total Rentable Square Footage of the Building, Expenses shall, at Landlord's option, be determined as if the Building had been 95% occupied and Landlord had been supplying services to 95% of the Rentable Square Footage of the Building.  If Expenses for a calendar year are determined as provided in the prior sentence, Expenses for the Base Year shall also be determined in such manner.

2.04     Notwithstanding the foregoing provisions of this Section 2, for the purpose only of calculating the Expense Excess for each calendar year during the Term, Expenses in any calendar year commencing after the Commencement Date (an "**Applicable Year**") shall not exceed the difference of (a) the sum of (i) all Controllable Expenses (defined below) actually incurred during calendar year 2013 compounded at a cumulative annual rate of six percent (6%) for each calendar year (or portion thereof) commencing with calendar year 2013 through and including the Applicable Year; and (ii) all Non-Controllable Expenses (defined below) incurred by Landlord during the Applicable Year; LESS (b) the sum of all Controllable Expenses and all Non-Controllable Expenses actually incurred by Landlord during calendar year 2013.  The term "**Controllable Expenses**," as used in this Lease, means all Expenses incurred by Landlord OTHER THAN Non-Controllable Expenses.  The term "**Non-Controllable Expenses**," as used in this Lease, means all insurance costs, security costs, and utilities expenses of the Building and the Property.

3. **Taxes**.

3.01     The term "**Taxes**" means all real property taxes, assessments, excises, association dues, fees, levies, charges and other taxes of every kind and nature whatsoever, general and special, extraordinary and ordinary, foreseen and unforeseen, including interest on installment payments, which may be levied or assessed against or arise in connection with ownership, use, occupancy, rental, leasing, operation or possession of the Building and/or the Property, or paid as rent under any ground lease, including, but not limited to: (a) any tax on the rent or other revenue

from the Property, or any portion thereof, or as against the business of owning or leasing the Property, or any portion thereof, including any business, gross margins, or similar tax payable by Landlord which is attributable to rent or other revenue derived from the Property, and any sales, use, franchise or other tax now or hereafter imposed by any governmental authority upon Rent received by Landlord or on the revenue of Landlord from the Property (this includes, but is not limited to, the Texas Margin tax that is currently calculated at a rate of 0.7% of gross rent); (b) any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the Rent payable hereunder, including assessments for special improvement districts and building improvement districts, governmental charges, fees and assessments for police, fire, traffic mitigation or other governmental service of purported benefit to the Property, taxes and assessments levied in substitution or supplementation in whole or in part of any such taxes and assessments; (c) the Property's share of any real estate taxes and assessments under any reciprocal easement agreement, common area agreement or similar agreement as to the Property; (d) personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the Property, or any portion thereof; (e) any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Property; (f) any assessment, tax, fee, levy or charge substituted, in whole or in part, for a tax previously in existence, or assessed in lieu of a tax increase; and (g) all costs and fees incurred by Landlord in connection with seeking reductions in any tax liabilities described in (a), (b), (c), (d), (e) and (f) of this Section 3.01, including, but not limited to, any costs incurred by Landlord for compliance, review and appeal of tax liabilities.  Without limitation, Taxes shall not include any income, capital levy, transfer, capital stock, gift, estate or inheritance tax.  If a change in Taxes is obtained for any year of the Term during which Tenant paid Tenant's Pro Rata Share of any Tax Excess, then Taxes for that year will be retroactively adjusted and Landlord shall provide Tenant with a credit, if any, based on the adjustment.  Likewise, if a change is obtained for Taxes for the Base Year, Taxes for the Base Year shall be restated and the Tax Excess for all subsequent years shall be recomputed.

   3.02      Tenant shall pay Landlord the amount of Tenant's Pro Rata Share of any such increase in the Tax Excess within thirty (30) days after Tenant's receipt of a statement from Landlord.

4. **Audit Rights**.

   Tenant, within 60 days after receiving Landlord's statement of Expenses, may give Landlord written notice ("**Review Notice**") that Tenant intends to review Landlord's records of the Expenses for the calendar year to which the statement applies.  Within a reasonable time after receipt of the Review Notice, Landlord shall make all pertinent records available for inspection that are reasonably necessary for Tenant to conduct its review.  If any records are maintained at a location other than the management office for the Building, Tenant may either inspect the records at such other location or pay for the reasonable cost of copying and shipping the records. If Tenant retains an agent to review Landlord's records, the agent must be with a CPA firm licensed to do business in the state where the Property is located and shall not be compensated on a contingency fee basis.  Tenant shall be solely responsible for all costs, expenses and fees incurred for the audit.  Within 90 days after the records are made available to Tenant, Tenant

shall have the right to give Landlord written notice (an "**Objection Notice**") stating in reasonable detail any objection to Landlord's statement of Expenses for that year.  If Tenant fails to give Landlord an Objection Notice within the 90 day period or fails to provide Landlord with a Review Notice within the 60 day period described above, Tenant shall be deemed to have approved Landlord's statement of Expenses and shall be barred from raising any claims regarding the Expenses for that year.  In no event shall Tenant be entitled to review or audit Landlord's records for any given calendar year (including, but not limited to, the Base Year) more than one (1) time.  The records obtained by Tenant shall be treated as confidential.  In no event shall Tenant be permitted to examine Landlord's records or to dispute any statement of Expenses unless Tenant has paid and continues to pay all Rent when due.  Any errors agreed by the parties hereto shall be promptly corrected, provided that Landlord shall have the right to cause another independent audit, at Landlord's expense, to be made of such computations. Landlord shall credit any overpayment determined by the audit report against the next Rent due and owing by Tenant or, if no further Rent is due, refund such overpayment directly to Tenant within 30 days of determination.   Likewise, Tenant shall pay Landlord any underpayment determined by the audit report within 30 days of determination.  The foregoing obligations shall survive the expiration or termination of this Lease.   If the audit proves that Landlord's calculation of Expenses for the calendar year under inspection was overstated by more than five percent (5%), then, after verification, Landlord shall pay Tenant's actual reasonable out-of-pocket audit and inspection fees incurred in connection with Tenant's audit, not to exceed $2,500, within 30 days after receipt of Tenant's invoice therefor.

# EXHIBIT C

## WORK LETTER

1.      This Work Letter (this "**Work Letter**") is attached to and part of that certain Office Lease Agreement (the "**Lease**") executed by **YPI 1010 LAMAR, LLC**, a Delaware limited liability company ("**Landlord**") and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ("**Tenant**"), for the lease of certain premises containing 1,939 rentable square feet, as more particularly described in the Lease (the "**Premises**"), on the 6th floor of the office building located at 1010 Lamar Street, Houston, Texas 77002, commonly known as Younan Square (the "**Building**").   Except as expressly defined in this Work Letter, each defined term used in this Work Letter has the same meaning given to such term in the Lease.

2.      Landlord and Tenant acknowledge that Plans (as herein defined) for the Landlord Work have not yet been prepared.  Therefore, it is impossible to determine the exact cost of the Landlord Work at this time.   Accordingly, Landlord and Tenant agree that Landlord's total obligation to pay for or fund the cost of the Landlord Work, plus the sum of all other disbursements, if any, made by Landlord pursuant to the provisions of this Work Letter (excluding, however, the Test Fit Allowance and the cost incurred by Landlord to replace seventeen (17) exterior windows in the Premises, which shall not be deducted or funded from the Construction Allowance) shall not exceed, in the aggregate, an amount equal to **$27.00 per rentable square foot of the Premises** (the "**Construction Allowance**").  Tenant shall at its sole cost and expense pay for all costs of the Landlord Work and such other disbursements made by Landlord under this Work Letter to the extent that such costs and disbursements exceed the Construction Allowance.  If the sum of such costs and disbursements made by Landlord under this Work Letter is less than the Construction Allowance, Tenant shall not be entitled to any credit, payment or abatement on account thereof and Landlord shall retain any unused portion of the Construction Allowance.

3.      In addition to the Construction Allowance and the Test Fit Allowance, Landlord shall at its cost replace seventeen (17) exterior windows in the Premises as shown on **Exhibit C-1** attached hereto.  The cost incurred by Landlord in replacing such windows shall not be deducted or funded from the Construction Allowance.

4.      Landlord shall enter into a direct contract for the Landlord Work with a general contractor selected by Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed if Tenant's proposed general contractor satisfies Landlord's customary requirements for a general contractor performing a scope of work in the Building comparable to the Landlord Work.  Landlord shall have the right to approve of any of the approved general contractor's subcontractors used in connection with the Landlord Work. Tenant shall pay Landlord or its designee a construction fee equal to two and one half percent (2.5%) of the cost of the Landlord Work to compensate Landlord or its designee for construction management services performed in connection with the Landlord Work, which construction fee shall be funded from the Construction Allowance.  Tenant shall at its cost engage a third-party construction manager (such as Colliers International or Ziegler Cooper), provided that a portion of the construction management fees and expenses actually paid by Tenant to its third-party

construction manager, not to two and one half percent (2.5%) of the cost of the Landlord Work, shall be funded by Landlord from the Construction Allowance following its receipt of Tenant's written request therefor.

5.     Space planning, architectural and engineering (mechanical, electrical and plumbing) drawings for the Landlord Work shall be prepared at Tenant's sole cost and expense, subject to funding by Landlord from the Construction Allowance.   The space planning, architectural and mechanical drawings are collectively referred to herein as the "**Plans**".

6.     Tenant shall deliver to Landlord any information reasonably requested by Landlord and shall deliver to Landlord the written  approval or disapproval signed by Tenant of any preliminary or final layout, drawings, or plans within two (2) Business Days after written request.  The approval or disapproval must be in writing and any disapproval shall set forth in reasonable detail the reasons for Tenant's disapproval.   Tenant shall devote such time in consultation with Landlord and Landlord's architect and engineer as may be required to provide all information Landlord deems necessary in order to enable Landlord's architect and engineer to complete, and obtain Tenant's written approval of the Plans for Landlord Work by not later than _____ (__) days after full execution of the Lease and this Work Letter by Landlord and Tenant (the "**Plans Due Date**").   In the event that Tenant fails to approve the Plans by the Plans Due Date, Tenant shall be responsible for one (1) day of Tenant Delay for each day during the period beginning on the day following the Plans Due Date and ending on the date Tenant approves the Plans in writing delivered to Landlord.  Neither the approval of the Plans nor the supervision of the Landlord Work by Landlord shall constitute a representation or warranty by Landlord as to the accuracy, adequacy, sufficiency and propriety of the Plans or the quality of workmanship or compliance of the Landlord Work with applicable law.

7.     Prior to commencing construction of the Landlord Work, Landlord shall submit to Tenant a written estimate setting forth the anticipated cost of the Landlord Work, including, but not limited to labor and materials, architect's fees, contractor's fees and permit fees.  Within three (3) Business Days thereafter, Tenant shall either deliver to Landlord in writing Tenant's approval of the cost estimate or Tenant's detailed written objections thereto in sufficient detail, including any desired changes to the proposed Landlord Work.  In the event Tenant notifies Landlord of any objections and/or any desired changes, Tenant shall work with Landlord in good faith to alter the scope of the Landlord Work in order to reach a mutually acceptable alternative cost estimate; provided that each day after the expiration of the three (3) Business Day period that Tenant has not approved the original cost estimate shall be a day of Tenant Delay.

8.     If Landlord's estimate and/or the actual cost of the Landlord Work, together with the sum of all other disbursements made by Landlord under this Work Letter, exceed the Construction Allowance (such excess being herein referred to as the "**Excess Costs**"), Tenant shall pay to Landlord such Excess Costs within two (2) Business Days after Landlord's written demand.  Landlord shall not be required to proceed with the Landlord Work until Tenant pays any Excess Costs and any delay in the completion of the Landlord Work due to a delay by Tenant in paying Excess Costs shall be deemed a Tenant Delay.   The statements of costs submitted to Landlord by its contractors shall be conclusive for purposes of determining the actual cost of the items described therein. The Excess Costs constitute Rent payable pursuant to

the Lease, and the failure to timely pay same constitutes a material event of default by Tenant under the Lease.

9.      If Tenant shall request any changes to the Landlord Work that are approved by Landlord (**"Change Orders"**), Landlord shall have any necessary revisions to the Plans prepared, and Tenant shall reimburse Landlord on demand for the cost of preparing such revisions.  Landlord shall notify Tenant in writing of the estimated increased cost, if any, which will be chargeable to Tenant by reason of such Change Orders, which increased cost shall be deemed Excess Costs hereunder and shall be subject to the provisions of Paragraph 8 hereof. Tenant shall, within one (1) Business Day after receiving Landlord's estimate of the cost of the Change Order, notify Landlord in writing whether it desires to proceed with such Change Order. In the absence of such written authorization, Landlord shall have the option to continue work on the Premises, disregarding the requested Change Order, or Landlord may elect to discontinue work on the Premises until Landlord receives written notice of Tenant's decision, in which event Tenant shall be responsible for any delay in completion of the Landlord Work resulting therefrom.  In addition, Landlord shall be entitled to a construction fee equal to two and one half (2.5%) of the increased cost, if any, chargeable to Tenant by reason of such Change Orders.

10.      Provided that Tenant delivers to Landlord copies of invoices and similar supporting documentation and Tenant's canceled checks or other satisfactory evidence of payment of fees and expenses of Ziegler Cooper (Tenant's architect), then as part of Tenant's initial evaluation of the Building's suitability, Landlord to provide Tenant with a test fit allowance (the **"Test Fit Allowance"**) in an amount not to exceed **$0.10 per rentable square foot of the Premises**.  The Test Fit allowance shall be provided by Landlord to Tenant even if the parties do not execute the Lease or this Work Letter and the amount of the Test Fit Allowance shall not be deducted from the Construction Allowance.

11.      Tenant shall be permitted to use a portion of the Construction Allowance to defray its costs of installing Tenant's display on the vacant double-sided slot on the Building's existing monument sign as permitted by Paragraph VI of **Exhibit F** attached to the Lease.

12.      Landlord shall secure an asbestos letter from the City of Houston prior to Tenant's occupancy of the Premises.

13.      Landlord shall cause the Landlord Work to be constructed substantially in accordance with the approved Plans, so long as no Default by Tenant has occurred under the Lease.   Landlord shall notify Tenant in writing when the Landlord Work is Substantially Complete.  Within ten (10) days after Landlord notifies Tenant that the Landlord Work is Substantially Complete, Tenant shall prepare a written "punch list" based on a walkover of the Premises by the Property Manager and Tenant's representatives specifying the items of the Landlord Work that Tenant claims were not Substantially Completed by Landlord as required by this Work Letter, and Landlord shall, within thirty (30) days after Landlord's receipt of the punch list, remedy all punch list items that Landlord's architect or engineer agrees are included in the scope of the Landlord Work.

14.     If Landlord is delayed in the performance of the Landlord Work as a result of the acts or omissions of Tenant or any of the other Tenant Related Parties or their respective vendors, including, without limitation, Change Orders requested by Tenant to the approved Plans, Tenant's failure to perform its obligations under the Lease, or the specification of any materials or equipment with long lead times, such delay or delays shall constitute and be deemed and construed to be Tenant Delay and the Landlord Work shall be deemed to be Substantially Complete on the date that Landlord could reasonably have been expected to Substantially Complete the Landlord Work absent any Tenant Delay.

15.     This Work Letter exclusively governs and controls all Landlord Work to be performed by Landlord in the Premises, and no other work letter, tenant finish agreement or other leasehold improvements provisions contained in the Lease shall apply to or govern the performance by Landlord of the Landlord Work.

16.     If Tenant, any of the Tenant Related Parties and/or their respective vendors has access to or takes possession of the Premises prior to the Commencement Date, then Tenant shall, as provided in Section 3.03 of the Lease, not disrupt or delay Landlord's performance of the Landlord Work.

17.     This Work Letter shall not apply to any additional space in the Building hereafter leased by Tenant at any time or from time to time or to any portion of the Premises or any additions to the Premises if the Term is hereafter renewed or extended.

18.     This Work Letter will be executed in multiple counterparts, and each counterpart when fully executed and delivered by the parties hereto will be an original agreement, but all such counterparts will constitute one agreement.

*(signature page follows)*

Each of Landlord and Tenant has executed this Work Letter as of the Effective Date.

LANDLORD:                           **YPI 1010 LAMAR, LLC**, a Delaware limited liability company

By: _____

John Cook, Vice President

TENANT:

By: _____
Name: _____
Its duly authorized _____

C-5

**EXHIBIT C-1**

**LOCATION OF 17 EXTERIOR WINDOWS TO BE REPLACED**

**TO BE PROVIDED**

# EXHIBIT D

## <u>ACCEPTANCE OF LANDLORD WORK LETTER AGREEMENT</u>

_____, 2012

████████████████

Re:     Acceptance of Landlord Work Letter Agreement pursuant to that certain Office Lease Agreement (the "**Lease**") executed by **YPI 1010 LAMAR, LLC**, a Delaware limited liability company ("**Landlord**") and ████████████████ ("Tenant"), for the lease of certain premises, as more particularly described therein (the "**Premises**"), in the building located at 1010 Lamar, Houston, Texas 77002, commonly known as Younan Square

Dear Tenant:

Unless otherwise defined herein, each term used in this Acceptance of Landlord Work Letter Agreement has the same meaning given to such term in the above-referenced Lease.   In accordance with the provisions of the Lease, Tenant hereby accepts the Landlord Work constructed by Landlord pursuant to the Work Letter attached as **Exhibit C** to the Lease.   In addition, Tenant hereby certifies to Landlord as follows:

1.     Landlord first gave Tenant access to the Premises on _____, 2012.

2.     Landlord notified Tenant on _____, 2012, that the Landlord Work was Substantially Complete.

3.     The actual Commencement Date is _____, 2012.

4.     Tenant first occupied the Premises on _____, 2012.

5.     Tenant first conducted business in the Premises on _____, 2012.

6.     The actual Expiration Date is _____.

Please acknowledge Tenant's agreement to the provisions hereof by signing all three (3) counterparts of this Acceptance of Landlord Work Letter Agreement in the space provided below and returning three (3) fully-executed counterparts to my attention.

Sincerely,

_____
Authorized Signatory for Landlord

**AGREED TO AND ACCEPTED** by
Tenant on _____, 2012:



By: _____
Name: _____
Its duly authorized _____

D-2

## EXHIBIT E

## BUILDING RULES AND REGULATIONS

The following rules and regulations shall apply, where applicable, to the Premises, the Building, the parking facilities (if any), the Property and the appurtenances. In the event of a conflict between the following rules and regulations and the remainder of the terms of the Lease, the remainder of the terms of the Lease shall control. Capitalized terms have the same meaning as defined in the Lease.

1.      Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises. No rubbish, litter, trash, or material shall be placed, emptied, or thrown in those areas. At no time shall Tenant permit Tenant's employees to loiter in Common Areas or elsewhere about the Building or Property.

2.      Plumbing fixtures and appliances shall be used only for the purposes for which designed and no sweepings, rubbish, rags or other unsuitable material shall be thrown or placed in the fixtures or appliances. Damage resulting to fixtures or appliances by Tenant, its agents, employees or invitees shall be paid for by Tenant and Landlord shall not be responsible for the damage.

3.      No signs, advertisements or notices shall be painted or affixed to windows, doors or other parts of the Building, except those of such color, size, style and in such places as are first approved in writing by Landlord. All tenant identification and suite numbers at the entrance to the Premises shall be installed by Landlord, at Tenant's cost and expense, using the standard graphics for the Building. Except in connection with the hanging of lightweight pictures and wall decorations, no nails, hooks or screws shall be inserted into any part of the Premises or Building except by the Building maintenance personnel without Landlord's prior approval, which approval shall not be unreasonably withheld.

4.      Landlord may provide and maintain in the first floor (main lobby) of the Building an alphabetical directory board or other directory device listing tenants and no other directory shall be permitted unless previously consented to by Landlord in writing.

5.      Tenant shall not place any lock(s) on any door in the Premises or Building without Landlord's prior written consent, which consent shall not be unreasonably withheld, and Landlord shall have the right at all times to retain and use keys or other access codes or devices to all locks within and into the Premises. A reasonable number of keys to the locks on the entry doors in the Premises shall be furnished by Landlord to Tenant at Tenant's cost and Tenant shall not make any duplicate keys. All keys shall be returned to Landlord at the expiration or early termination of the Lease.

6.      All contractors, contractor's representatives and installation technicians performing work in the Building shall be subject to Landlord's prior approval, which approval shall not be

unreasonably withheld, and shall be required to comply with Landlord's standard rules, regulations, policies and procedures, which may be revised from time to time.

7.    Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of merchandise or materials requiring the use of elevators, stairways, lobby areas or loading dock areas, shall be restricted to hours reasonably designated by Landlord.  Tenant shall obtain Landlord's prior approval by providing a detailed listing of the activity, which approval shall not be unreasonably withheld.   If approved by Landlord, the activity shall be under the supervision of Landlord and performed in the manner required by Landlord.  Tenant shall assume all risk for damage to articles moved and injury to any persons resulting from the activity.   If equipment, property, or personnel of Landlord or of any other party is damaged or injured as a result of or in connection with the activity, Tenant shall be solely liable for any resulting damage, loss or injury.

8.    Landlord shall have the right to approve the weight, size, or location of heavy equipment or articles in and about the Premises, which approval shall not be unreasonably withheld. Damage to the Building by the installation, maintenance, operation, existence or removal of Tenant's Property shall be repaired at Tenant's sole expense.

9.    Corridor doors, when not in use, shall be kept closed.

10.    Tenant shall not:  (1) make or permit any improper, objectionable or unpleasant noises or odors in the Building, or otherwise interfere in any way with other tenants or persons having business with them; (2) solicit business or distribute or cause to be distributed, in any portion of the Building, handbills, promotional materials or other advertising; or (3) conduct or permit other activities in the Building that might, in Landlord's sole opinion, constitute a nuisance.

11.    No animals, except those assisting handicapped persons, shall be brought into the Building or kept in or about the Premises.

12.    No inflammable, explosive or dangerous fluids or substances shall be used or kept by Tenant in the Premises, Building or about the Property, except for those substances as are typically found in similar premises used for general office purposes and are being used by Tenant in a safe manner and in accordance with all applicable Laws.  Tenant shall not, without Landlord's prior written consent, which consent may be withheld or denied for any or no reason in Landlord's sole discretion, use, store, install, spill, remove, release or dispose of, within or about the Premises or any other portion of the Property, any asbestos-containing materials or any solid, liquid or gaseous material now or subsequently considered toxic or hazardous under the provisions of 42 U.S.C. Section 9601 et seq. or any other applicable environmental Law which may now or later be in effect.  Tenant shall comply with all Laws pertaining to and governing the use of these materials by Tenant and shall remain solely liable for all costs of abatement and removal.

13.     Tenant shall not use or occupy the Premises in any manner or for any purpose which might injure the reputation or impair the present or future value of the Premises or the Building. Tenant shall not use, or permit any part of the Premises to be used for lodging, sleeping or for any illegal purpose.

14.     Tenant shall not take any action which would violate Landlord's labor contracts or which would cause a work stoppage, picketing, labor disruption or dispute or interfere with Landlord's or any other tenant's or occupant's business or with the rights and privileges of any person lawfully in the Building ("**Labor Disruption**").  Tenant shall take the actions necessary to resolve the Labor Disruption, and shall have pickets removed and, at the request of Landlord, immediately terminate any work in the Premises that gave rise to the Labor Disruption, until Landlord gives its written consent for the work to resume.  Tenant shall not have any claim for damages against Landlord or any of the Landlord Related Parties nor shall the Commencement Date of the Term be extended as a result of the above actions.

15.     Tenant shall not install, operate or maintain in the Premises or in any other area of the Building, electrical equipment that would overload the electrical system beyond its capacity for proper, efficient and safe operation as determined solely by Landlord. Tenant shall not furnish cooling or heating to the Premises, including, without limitation, the use of electric or gas heating devices, without Landlord's prior written consent. Tenant shall not use more than its proportionate share of telephone lines and other telecommunication facilities available to service the Building.

16.     Tenant shall not operate or permit to be operated a coin or token operated vending machine or similar device (including, without limitation, telephones, lockers, toilets, scales, amusement devices and machines for sale of beverages, foods, candy, cigarettes and other goods), except for machines for the exclusive use of Tenant's employees and invitees.

17.     Bicycles and other vehicles are not permitted inside the Building or on the walkways outside the Building, except in areas designated by Landlord.

18.     Landlord may from time to time adopt systems and procedures for the security and safety of the Building and Property, its occupants, entry, use and contents.  Tenant, its agents, employees, contractors, guests and invitees shall comply with Landlord's systems and procedures.

19.     Landlord shall have the right to prohibit the use of the name of the Building or any other publicity by Tenant that in Landlord's sole opinion may impair the reputation of the Building or its desirability.  Upon written notice from Landlord, Tenant shall refrain from and discontinue such publicity immediately.

20.     Neither Tenant nor its agents, employees, contractors, guests or invitees shall smoke or permit smoking in the Common Areas, unless a portion of the Common Areas have been declared a designated smoking area by Landlord, nor shall the above parties allow smoke

E-3

from the Premises to emanate into the Common Areas or any other part of the Building. Landlord shall have the right to designate the Building (including the Premises) as a non-smoking building, in which case smoking in the Building of any tobacco product in any form, including, but not limited to, cigarettes, cigars and pipes, shall be strictly prohibited at all times and smoking shall only be permitted by Landlord in the areas outside of the Building as may be designated by Landlord from time to time in its sole discretion.

21.     Landlord shall have the right to designate and approve standard window coverings for the Premises and to establish rules to assure that the Building presents a uniform exterior appearance.   Tenant shall ensure, to the extent reasonably practicable, that window coverings are closed on windows in the Premises while they are exposed to the direct rays of the sun.

22.     Deliveries to and from the Premises shall be made only at the times in the areas and through the entrances and exits reasonably designated by Landlord.   Tenant shall not make deliveries to or from the Premises in a manner that might interfere with the use by any other tenant of its premises or of the Common Areas, any pedestrian use, or any use which is inconsistent with good business practice.

23.     The work of cleaning personnel shall not be hindered by Tenant after 5:30 p.m., and cleaning work may be done at any time when the offices are vacant. Windows, doors and fixtures may be cleaned at any time.  Tenant shall provide adequate waste and rubbish receptacles to prevent unreasonable hardship to the cleaning service.

# EXHIBIT F

## ADDITIONAL PROVISIONS

I.    <u>PARKING</u>

    A.    Landlord shall make available to Tenant during the Term, for Tenant's nonexclusive use, for so long as Tenant is not in Default under this Lease, forty (40) unassigned and unreserved parking spaces in the parking garage serving the Building; provided, however, that Tenant at its option may substitute up to ten (10) of such unassigned and unreserved parking spaces for an identical number of reserved parking spaces in the garage.  Tenant shall pay to Landlord, as Additional Rent, a monthly parking charge equal to $200.00 (plus all applicable taxes) for each reserved parking space and $170.00 (plus all applicable taxes) for each unassigned and unreserved parking space; provided, however, that during the period of one (1) year beginning on the Commencement Date, Landlord shall abate a portion of such monthly parking charges equal to $20.00 per reserved parking space and $20.00 per unassigned and unreserved parking space.  The initial reserved parking spaces, which Tenant elects to use hereunder, shall be located in the areas designated on **Exhibit F-1** attached hereto.  Tenant's failure to pay any monthly parking charges hereunder shall constitute a Monetary Default under the Lease.  All unassigned and unreserved parking spaces made available by Landlord pursuant hereto shall be on a non-exclusive, unassigned and unreserved, first-come, first-served basis.  Landlord reserves the right upon written notice posted in the Building or in the parking garage to change the parking system for the parking garage to provide special requirements for weekend, holiday or after hours usage and to temporarily close the parking garage, or portions thereof, to make such repairs or alterations as Landlord may deem appropriate.  In addition, to the extent available from time to time, Tenant may at its sole cost and expense contract directly with the operator of the parking garage serving the Building for the use of one (1) or more reserved parking spaces on a monthly basis at the then market rate for reserved parking (plus all applicable taxes).

    B.    Tenant shall pay the replacement fee charged from time to time by Landlord for the loss of any magnetic parking card or parking sticker issued by Landlord.  As partial consideration for use of the foregoing parking spaces, Tenant hereby waives on behalf of itself all claims, whether based on negligence or other grounds, against Landlord, its agents and employees arising out of any loss or damage to automobiles or other property while located in the parking garage or arising out of any personal injuries sustained in connection with the use of the parking garage.

    C.    Tenant's failure to comply with the rules and regulations governing the use of the parking garage, including, but not limited to, the rules establishing time limits on the use of the parking spaces in the parking garage, shall constitute a Default under the Lease and shall entitle Landlord, in addition to any other rights and

remedies available to Landlord under the Lease and applicable law, to terminate Tenant's right to use the parking spaces hereunder and tow any vehicles which are in violation of such rules and regulations from the parking garage at the sole cost and expense of Tenant and without liability for damages resulting therefrom.

D.      During the period beginning on the date of full execution of this Lease by Landlord and Tenant through and including the Commencement Date, and thereafter, during the period of time in which any Leasehold Improvements are being constructed in any additional space in the Building hereafter leased by Tenant, Landlord shall not charge Tenant or its interior architect, engineers, consultants, general contractor or its subcontractors for their use of unassigned and unreserved parking spaces in the garage.

## II.     PROOF OF TENANT'S INSURANCE

Prior to Tenant's entering into or taking occupancy of the Premises, Tenant shall submit to Landlord a certificate of insurance, including a separate attached endorsement naming Landlord and Landlord's property manager, YOUNAN PROPERTIES, INC., as additional insureds (where applicable under Section 14 of this Lease), for all Tenant's Insurance required to be maintained by Tenant under Section 14 of this Lease.

## III.    SUITE SIGNAGE AND BUILDING DIRECTORY

Landlord at its expense shall provide Tenant at no charge with the Building standard suite signage and one (1) Building lobby directory listing for Tenant's identity.

## IV.    RENEWAL OPTION

Provided that as of the date of the Renewal Notice (as herein defined) and also as of the last day of the initial Term, no Default by Tenant has occurred and is continuing after any applicable notice is given and any applicable cure period has expired, Tenant shall have the option of further extending the Term (the "**Option to Renew**") for one (1) additional consecutive renewal term (the "**Renewal Term**") of not less than sixty-six (66) months, nor more than eighty-four (84) months, subject to and in accordance with the following terms and conditions: (a) Tenant shall exercise the Option to Renew by giving Landlord written notice (the "**Renewal Notice**") of Tenant's exercise of the Option to Renew no earlier than fifteen (15) months and no later than nine (9) months prior to the expiration of the initial Term; (b) the Renewal Notice shall specify the exact number of months of the Renewal Term and if the Renewal Notices does not specify such number, then the Renewal Term shall be deemed and construed for all purposes to be eighty-four (84) months in duration; (c) the Renewal Term, if any, shall commence on the day immediately following the last day of the initial Term; (d) the rent rate applicable to the Renewal Term shall be equal to the then Fair Market Rate (as herein defined) as reasonably determined by Landlord for the then Premises; (e) the Base Year applicable to the Renewal Term shall be the year in which the Renewal Term commences; and (f) if Tenant does not timely exercise the Option to Renew for the Renewal Term, then all of Tenant's rights to renew or extend the Term shall automatically terminate and be null and void and of no further force or effect.  As used

herein, the term "**Fair Market Rate**" means the amount per rentable square foot of the then Premises that a willing, comparable tenant would pay and a willing, comparable landlord would accept in an arm's length transaction, for delivery on or about the expiration of the initial Term for comparable non-renewal, non-expansion space in the Building and in other comparable buildings in the central business district of Houston, Texas, similarly improved, without any allowances (such as construction allowances, moving allowances, tenant finish allowances, rent credits, etc.), rent abatements, or other rent concessions and taking into account the other terms and provisions hereof.  In no event shall the Fair Market Rate impute a value upon any leasehold improvements or fixtures installed by Tenant at its expense.  Landlord shall have no obligation to determine the Fair Market Rate and other terms and conditions of the Renewal Term, or to notify Tenant thereof, any earlier than thirty (30) days after Landlord's receipt of the Renewal Notice. If Tenant does not accept Landlord's determination of the Fair Market Rate of the Renewal Term within fifteen (15) days after Tenant's receipt of Landlord's written determination of the Fair Market Rate, or if Landlord fails to timely provide its written determination of the Fair Market Rate, then Tenant may either (i) retract the Renewal Notice, whereupon Tenant's right to exercise the Option to Renew hereunder shall automatically terminate and be null and void and of no further force or effect, and the Lease shall automatically expire on the expiration of the initial Lease Term; or (ii) notify Landlord in writing of Tenant's appointment of a licensed real estate agent (an "**Expert**") and the identity and contact information of such Expert.  Upon receipt of written notice from Tenant of the appointment, identity and contact information of an Expert, Landlord shall, within fifteen (15) days thereafter, appoint its own Expert and furnish Tenant with the identity and contact information of such Expert.  The instructions of the two (2) Experts appointed by the parties hereunder shall be to agree to a Fair Market Rate based on the criteria contained in this Paragraph IV.  If the Fair Market Rate determined by one Expert is within five percent (5%) of the Fair Market Rate determined by the other Expert, then the average of the two (2) Fair Market Rates shall be the Fair Market Rate hereunder.  However, if the two (2) Experts are unable to agree within ten (10) days on a Fair Market Rate, and the Fair Market Rate determined by one Expert is more than five percent (5%) of the Fair Market Rate determined by the other Expert, then the two (2) Experts will jointly appoint a third Expert, who shall be subject to the written approval of Landlord and Tenant.  If the two (2) Experts jointly appoint a third Expert who is not approved in writing by either or both of Landlord and Tenant, then the two (2) Experts shall continue to jointly appoint a third Expert until Landlord and Tenant both approve such third Expert.  The Fair Market Rate will thereupon be determined by the third Expert based on the criteria contained in this Paragraph IV and such determination shall be conclusive and binding on Landlord and Tenant unless it is higher than the higher of the first two (2) determinations, in which case, the middle of the three (3) determinations will control for all purposes.  If Tenant is not willing to accept the Fair Market Rental determined in accordance with the foregoing determination process, then Tenant shall have the right, exercisable by giving Landlord written notice no later than ten (10) days after the conclusion of the determination process and reimbursing to Landlord all of Landlord's reasonable costs of the determination obtained by Landlord from Landlord's Expert and 100% of the costs of the determination of the third Expert, to retract the Renewal Notice, whereupon Tenant's right to exercise the Option to Renew hereunder shall automatically terminate and be null and void and of no further force or effect, and this Lease shall automatically expire at the end of the initial Term. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS PARAGRAPH IV, (1) Tenant's rights pursuant to this Paragraph IV are personal to Tenant and

nontransferable and shall automatically terminate if Tenant assigns the Lease or any of Tenant's rights under the Lease to any person or entity (other than pursuant to a Permitted Disposition) or subleases all or any portion of the Premises to any person or entity (other than pursuant to a Permitted Disposition); and (2) Tenant's rights pursuant to this Paragraph IV shall automatically terminate if, as of the date of the Renewal Notice  and also as of the last day of the initial Term, a Default by Tenant has occurred and is continuing after any applicable notice is given and any applicable cure period has expired.

V.   <u>RIGHT OF FIRST REFUSAL</u>

Provided that, as of the date of any ROFR Notice (as herein defined), no Default by Tenant has occurred under the Lease, as amended hereby, and is continuing after any applicable notice was given and any applicable grace or cure period has expired, and further expressly subject to Landlord's prior commitments to other tenants of the Building, including any formal renewal option and/or expansion option contained in an existing lease agreement between Landlord and a tenant of the Building, if Landlord receives a bona fide written offer from a third party to lease all or any portion of the rentable square feet located on the 15th, 16th or 17th floors of the Building that becomes available for direct lease from Landlord (the "**ROFR Space**"), then Landlord shall so inform Tenant by written notice (a "**ROFR Notice**"), stating the approximate location and configuration of the space to be leased (the "**Offer Space**"), an estimate of the approximate amount of rentable square feet of the Offer Space, the rental rate or rates and the other charges to be paid by the third party, the duration of the lease term, and the other terms and conditions of the proposed lease.  Tenant shall have seven (7) days (the "**Acceptance Period**") after receipt of a ROFR Notice to elect to lease ALL (but not less than all) of the Offer Space at the rental rate or rates, for the entire duration of the lease term, and otherwise subject to the identical terms and conditions contained in the ROFR Notice by delivering to Landlord, before the Acceptance Period expires, written notice of Tenant's exercise of its right of first refusal to lease, which notice shall be executed by a duly-authorized officer of Tenant; provided, however, that notwithstanding the foregoing, if Tenant timely exercises its right of first refusal to lease such Offer Space and Tenant does not, within fifteen (15) days after receipt from Landlord of an amendment to the Lease adding such Offer Space to the Premises at the rate or rates, for the duration of the lease term, and otherwise on the identical terms and conditions contained in such ROFR Notice, execute and deliver such amendment to Landlord, then Tenant's acceptance thereof shall thereupon automatically terminate and be null and void and of no force or effect, whereupon Landlord shall thereupon be free to lease such Offer Space to the third party on the terms and conditions contained in such ROFR Notice. If Tenant does not elect to lease such Offer Space before the Acceptance Period expires, then Landlord shall thereupon be free to lease such Offer Space to the third party on the terms and conditions contained in such ROFR Notice. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS PARAGRAPH V**, (a) Tenant's right of first refusal to lease and other rights pursuant to this Paragraph V are expressly subject to Landlord's prior commitments to other tenants of the Building, including any formal renewal option and/or expansion option contained in an existing lease agreement between Landlord and a tenant of the Building and Tenant's rights pursuant to this Paragraph V shall be subordinate, junior and inferior to such rights of other tenants of the Building provided that such rights existed prior to the Effective Date; (b) Tenant's right of first refusal to lease all or any part of the ROFR Space pursuant to this Paragraph V shall apply to the

initial Term and the Renewal Term, if any; (c) Tenant's right of first refusal to lease all or any part of the ROFR Space pursuant to this Paragraph V is personal to Tenant and non-transferable and shall automatically terminate if Tenant assigns the Lease, as amended hereby, or any of Tenant's rights under the Lease, as amended hereby, to any person or entity (other than pursuant to a Permitted Disposition) or if Tenant subleases the Premises or any portion thereof to any person or entity (other than pursuant to a Permitted Disposition); and (d) Tenant's right of first refusal to lease all or any part of the ROFR Space pursuant to this Paragraph V shall automatically terminate if, as of the date of any ROFR Notice, a Default by Tenant has occurred under the Lease and is continuing after any applicable notice was given and any applicable grace or cure period has expired.

VI.   <u>MONUMENT SIGNAGE</u>

So long as no Default by Tenant has occurred under the Lease and is continuing after any applicable notice was given and any applicable grace or cure period has expired and Tenant leases and occupies at least 15,799 rentable square feet in the Building, Tenant at its sole cost and expense shall be entitled to use, subject to Landlord's prior written approval (as set forth in this Paragraph VI), one (1) vacant double-sided slot on the Building's existing monument sign located near the intersection of Lamar and Fannin Streets, to display Tenant's corporate identity ONLY (which may consist, at Tenant's option, subject to the other provisions hereof, of either Tenant's name or logo).   Notwithstanding anything to the contrary contained in this Paragraph VI or the Lease, (a) the location, content, color, design criteria, illumination, materials, plans and specifications and construction drawings of Tenant's display on the existing monument sign shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld; (b) the installation of Tenant's display on such vacant double-sided slot on the monument sign shall be performed by Landlord's sign contractor at Tenant's expense following Tenant's written approval of the bid for such work; (c) Tenant's display on such slot shall strictly conform to all governmental laws, regulations, ordinances and codes and to all deed restrictions and restrictive covenants encumbering the Property; and (d) Tenant shall pay or reimburse to Landlord all costs of maintaining such slot during the initial Term and any Renewal Term.   In addition, Tenant shall pay for all costs of removing Tenant's display from the monument sign (i) if the Lease is terminated or expires, if Tenant's right to possession of the Premises is terminated, or if Tenant itself ceases to lease and occupy at least 15,799 rentable square feet in the Building; (ii) if the Lease is assigned to any person or entity (other than pursuant to a Permitted Disposition); (iii) if the Premises is subleased to any person or entity (other than pursuant to a Permitted Disposition); or (iv) if a Default by Tenant has occurred under the Lease and is continuing after any applicable notice was given and any applicable grace or cure period has expired.   Nothing contained in this Paragraph VI shall obligate Landlord to remove the display of any current tenant or occupant of the Building from any slot of the monument sign or to construct or install a new or additional monument sign or addition or expansion of the existing monument sign.

**END OF EXHIBIT F**

**EXHIBIT F-1**

**Location of Initial Reserved Parking Spaces Selected by Tenant**

**TO BE PROVIDED**