# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Q 1010 LAMAR PROPERTY, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 4:12-cv-01949 |
| | § | |
| YPI 1010 LAMAR, LLC AND ZAYA S. | § | |
| YOUNAN, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

## PLAINTIFF'S AMENDED VERIFIED COMPLAINT AND APPLICATION FOR THE APPOINTMENT OF RECEIVER

Plaintiff Q 1010 Lamar Property, L.P. ("**Q1010**") files this Amended Verified Complaint and Application for Appointment of Receiver, and respectfully shows the Court as follows:[1]

### INTRODUCTION

1.      This is a lawsuit between Q1010, Zaya Younan ("**Younan**"), and entities controlled by Younan. Younan is the personal guarantor on a $32 million loan secured by the office building located at 1010 Lamar in Houston, Texas (the "**Building**"). Younan and his entities have committed fraud through intentional and deliberate misrepresentations to Q1010 in a brazen effort to prevent Q1010 from taking action to protect its interest in the Note (as defined below). As discussed in detail herein, Younan has repeatedly lied about his financial affairs, all in an effort to hide his steep and increasing downward financial trajectory.

2.      Shortly after learning Q1010 had purchased the Note, Younan began to manufacture false statements showing inexplicable swings in his net worth from negative $32

---

[1] Because the parties are not diverse, this Court has no subject matter jurisdiction in this case. Q1010 filed its Motion to Remand on July 5, 2012. This Amended Complaint is filed subject to and without waiving that Motion.

million in August 2011 to positive $137 million in December 2011 – a short period of time in which Younan showed a miraculous increase in the value of his personal real estate holdings of over 1,000x while market real estate values remained essentially flat. Not surprisingly, Younan has refused to provide Q1010 any substantive information explaining the magically positive swing in Younan's self-reported valuations of the properties in his portfolio. Instead, Younan has chosen to hide the information that would otherwise reveal his true insolvency and his inability to stand behind his guaranty.

3.   All the while, Younan engages in ongoing conduct sure to diminish the value of the Building by agreeing to well-below-market leases with new tenants, apparently, because he has squandered his assets and no longer has the necessary cash required to pay for upfront tenant improvements that would be commensurate with a market lease. Younan's ineptness as the owner/operator of this Building can further be seen by his unique ability to drive vacancy rates from less than 7% when he first purchased the Building in 2007 to almost 40% as of today – a feat almost as impressive as the magical swings in his net worth.

4.   As a result of (i) Younan's default on his guaranty, (ii) Younan's failure to maximize leasing opportunities for a period of years, and (iii) Younan's recent agreements to execute leases at below market rates without Q1010's approval, Q1010 is now faced with a note expiring in November and collateral that decreases in value each day as Younan continually makes detrimental, self-interested economic decisions. Younan's conduct as the guarantor has caused Q1010 to stand-by while he propels YPI into deeper and deeper insolvency. Younan had a duty to deal truthfully with Q1010 regarding his financial affairs, and a duty to his creditors to preserve value in the collateral. He did not and continues to refuse to do so. Q1010 brings this

suit to seek the appointment of a neutral receiver who will preserve the value of Q1010's collateral.

## PARTIES

5.     Plaintiff Q1010 is a Texas limited partnership, with its main office at 301 Commerce Street, Suite 3200, Fort Worth, Texas. *See* Exhibit 1, Affidavit of Thomas F. Ellis III ("Aff."), at ¶ 3.[2]  Because Q1010 has limited partners that are citizens in California, Maryland, and North Carolina for purposes of federal diversity jurisdiction, Q1010 is a citizen of California, Maryland, and North Carolina under 28 U.S.C. 1332(c). *See* Motion to Remand and Request for Expedited Treatment and Supporting Brief [Dkt. No. 4], at 5-8.

6.     Defendant YPI 1010 Lamar Property, L.P. ("**YPI**") is a Delaware limited liability company and a citizen of California, Maryland, and North Carolina for purposes of federal diversity jurisdiction.  *See* Notice of Removal [Dkt. No. 1], ¶ 9-10.  YPI is the owner and operator of the Building, which is located at 1010 Lamar Street in Houston, Texas.  Aff. at ¶ 5.  YPI does not engage in any business or activity other than the ownership and operation of the Building or own any property or assets other than the Building and such incidental personal property necessary or useful for the operation of the Building.  *Id.*; *see also* Ex. A to the Aff. (the Loan Agreement) at § 5.2 (c).  YPI is engaged in only one business activity and substantially all, if not all, of its producing assets, such as the Building, are located in Texas.  Thus, YPI's principal place of business is in Harris County, Texas.  YPI has already appeared in this action.

7.     Defendant Younan is an individual resident of California whose address is 2400 White Stallion Road, Westlake Village, California 91361.  Younan is an owner of a direct or indirect ownership interest in YPI. Aff. at ¶ 6; see also Ex. E to the Aff. (the Guaranty) at Recital

---

[2] Exhibit 1 (and all of the exhibits attached thereto) is attached to the Original Verified Petition, Application for Temporary Restraining Order and Temporary Injunction, and Application for Appointment of Receiver and it is incorporated herein by reference.

C.  Younan owns dozens of properties in Texas and conducts substantial business in the state. And he is the personal guarantor of the Note at issue in this case.  As such, he is subject to both general and specific personal jurisdiction in Texas.  Younan has already appeared in this action.

## GENERAL ALLEGATIONS

### The Loan Documents and the Loan to YPI

8.      YPI is a party to a November 30, 2007 Loan Agreement as amended by the July 23, 2010 First Amendment to Loan Agreement (the "**Loan Agreement**"), between YPI and Q1010 (as successor-in-interest to National City Bank and PNC Bank, National Association).[3] Aff. at ¶ 7; *see also* Ex. A to the Aff. (the Loan Agreement), which is incorporated herein by reference.  Pursuant to the terms of the Loan Agreement, the Lender made a loan to YPI with a maximum principal amount of $33,500,000 (the "**Loan**").  The Loan will mature in less than six months on November 30, 2012. *Id.*

9.      In connection with the Loan Agreement, YPI also executed and delivered a November 30, 2007 Promissory Note (the "**Note**"), payable to Q1010 (as successor in interest to National City Bank and PNC Bank, National Association), in the original principal amount of $33,500,000.  Aff. at ¶ 8; *see also* Ex. B to the Aff. (the Note), which is incorporated herein by reference.  The Note matures on November 30, 2012. *Id.*

10.     YPI is also a party to a November 30, 2007 Deed of Trust, Security Agreement and Financing Statement (with Assignment of Rents) (the "**Deed of Trust**"), by which YPI conveyed the Building and substantially all related assets of the Building to a trustee to hold for the benefit and security of Q1010 (as successor in interest to National City Bank and PNC Bank, National Association).  Aff. at ¶ 9; *see also* Ex. C to the Aff. (the Deed of Trust), which is

---

[3] PNC Bank, National Association, as the successor-by-merger to National City Bank, sold and assigned the Loan (as defined below) and its interests in and to the Loan Documents to Q1010 on or about January 18, 2012.  Aff. at ¶ 3.

incorporated herein by reference.  The Deed of Trust was recorded in the real property records of Harris County, Texas on December 4, 2007 as document number 20070713102. Aff. at ¶ 9.  The "Mortgaged Property" under and as defined in the Deed of Trust is collectively referred to herein as the "**Collateral**." *Id.*

11.     YPI is also a party to a November 30, 2007 Assignment of Leases, Rents, Contracts, Income and Proceeds (the "**Assignment**").  Aff. at ¶ 10; *see also* Ex. D to the Aff. (the Assignment), which is incorporated herein by reference.  The Assignment was recorded in the real property records of Harris County, Texas on December 4, 2007 as document number 20070713120. Aff. at ¶ 10.

12.     Younan is a party to a November 30, 2007 Unconditional and Continuing Guaranty by Younan in favor of Q1010 (as successor-in-interest to National City Bank and PNC Bank, National Association) (the "**Guaranty**").  Aff. at ¶ 11; *see also* Ex. E to the Aff. (the Guaranty), which is incorporated herein by reference.  Pursuant to the terms of the Guaranty, Younan agreed to guarantee the payment of a portion of the principal indebtedness advanced under the Note, accrued and unpaid interest thereon, and certain other costs and expenses more particularly set forth in the Guaranty. *Id.*

13.     The Loan Agreement, the Note, the Deed of Trust, the Assignment, the Guaranty, and all other loan documents executed by YPI and Q1010 in connection with the Loan Agreement are herein collectively referred to as the "**Loan Documents**." Aff. at ¶ 12.

14.     YPI is also a party to a July 23, 2010 Consent to Transfer of Interests of Managing Member and Loan Modification Agreement between YPI and Q1010 (as successor-in-interest to PNC Bank, National Association) (the "**Consent**").  Aff. at ¶ 13; *see also* Ex. F to the Aff. (the Consent), which is incorporated herein by reference.

***YPI and Younan Have Failed to Manage the Building Properly***

15.     Over the term of the Loan, YPI has failed to manage the Building properly, causing the value of the Building to drastically deteriorate over the last four years. Aff. at ¶ 14. In 2007, occupancy was at approximately 93%, meaning that only 7% of the Building was vacant. *Id.* Currently, the Building is approximately 40% vacant. *Id.* The amount of rents at the Building has not correspondingly increased to compensate for the skyrocketing vacancy rate. *Id.* The vast majority, if not all, of the Building's revenue comes from payments by the Building's tenants for rent and other amenities. *Id.* Thus, such revenue is the only source of funds to service debts and other obligations. *Id.*

16.     Based on these statistics, YPI has not been diligently and effectively retaining current tenants and/or seeking replacement tenants when tenants vacate the Building. Aff. at ¶ 15. As a result, the Building's revenue is dwindling, and its value for years to come has been crippled. *Id.* For example, in 2007 (when the Building had a 93.4% occupancy rate), the Building's "as is" value was appraised at $42.0 million. *Id.* By 2010 (when the Building's occupancy rate had dropped to 70%), the Building's "as is" value was appraised at $26.5 million, which is a drop of approximately $15.5 million in only three years and significantly lower than the principal amount owed on the Loan. *Id.* On June 28, 2012, Q1010 received an appraisal review showing the "as is" value of the Building at $20,700,000, a decrease of more than $21 million since the inception of the Loan. *See* Exhibit 2, Second Affidavit of Thomas F. Ellis III ("Second Aff."), at ¶ 4;[4] *see also* Ex. A (the Appraisal Review) to the Second Aff. If YPI retains its management of the Building, then the Building is at substantial risk of continued loss, waste, and dissipation. Aff. at ¶ 15.

---

[4] Exhibit 2 (and all of the exhibits attached thereto) is attached to the Emergency Motion to Extend State Court Temporary Restraining Order After Removal and Preliminary Injunction and it is incorporated herein by reference.

***YPI is Insolvent or in Imminent Danger of Insolvency and Has Been Operating at a Net Loss of More than $650,000 Over the Last 15 Months.***

17.     Although YPI and Younan have been unwilling to provide all of the financial data necessary for Q1010 to fully analyze their current financial condition, the limited information provided to Q1010 shows that YPI is insolvent or in imminent danger of insolvency. Aff. at ¶ 16.

18.     On May 18, 2012, YPI provided Q1010 with the 2012 first-quarter income statement and rent roll. Aff. at ¶ 17.   The quarterly income statement showed that for the first three months of 2012, YPI operated at a net loss of $147,881.03. *Id.*

19.     On May 22, 2012, YPI provided Q1010 with the 2011 annual income statement. Aff. at ¶ 18.  The annual income statement reflected that YPI incurred a net loss of $537,826.75 in 2011. *Id.*  Thus, according to the financial statements provided, YPI has been collectively operating at a net loss of more than $650,000 over the last 15 months. *Id.*

20.     Additionally, Younan provided Q1010's predecessor-in-interest with his net worth calculation as of August 23, 2011. Aff. at ¶ 19.  As of August, 23, 2011, Younan had a negative net worth of $31,974,717. *Id.*

21.     YPI's and Younan's financial data evidences that YPI is insolvent and in imminent danger of insolvency and the Guaranty is in jeopardy.  YPI will not be able to continue to pay its debts and fully satisfy the Loan at the expiration of the Loan Agreement in November of 2012 and Younan's ability to satisfy his Guaranty obligations is in serious doubt. Aff. at ¶ 20.  Q1010 identified this concern in its April 26, 2012 correspondence to YPI and Younan. *Id.*; *see also* Ex. G to the Aff. (April 26 Letter).  However, YPI and Younan have yet to provide any response to Q1010's concern. Aff. at ¶ 20.

***YPI Has Failed to Provide Requested Financial Statements and Has Defaulted on the Note***

22.      Section 5.1 of the Loan Agreement provides that YPI is obligated to furnish Q1010 with: (1) unaudited quarterly financial statements in a form reasonably acceptable to Q1010 within 45 days of the end of each fiscal quarter; (2) unaudited yearly financial statements within 120 days of the end of the fiscal year; and (3) such other supporting documentation as Q1010 reasonably requires. Aff. at ¶ 21; *see also* Ex. A to Aff. at § 5.1. Section 3.6 of the Guaranty provides that Younan is obligated to furnish Q1010 with such additional financial information as Q1010 may reasonably request. Aff. at ¶ 21; *see also* Ex. E to Aff. at § 3.6.

23.      On April 26, 2012, Q1010 sent YPI and Younan a letter formally alerting them of Q1010's concerns regarding YPI's management and operation of the Building and the deteriorating financial condition of both YPI and Younan. Aff. at ¶ 22; *see also* Ex. G to Aff. Specifically, Q1010 explained that it "foresees no realistic avenue for [YPI] to pay the Loan in full on the maturity date." *Id.* By letter of April 30, 2012, YPI and Younan refused Q1010's request and did not respond to Q1010's concern about their inability to pay the Loan in full on the maturity date. Aff. at ¶ 22; *see also* Ex. H to Aff. (the April 30 Letter).

24.      On May 17, 2012, Q1010 again wrote YPI and Younan to clarify its request and formally informed YPI of its existing default under Section 6.1 of the Loan Agreement. Aff. at ¶ 23; *see also* Ex. I (the May 17 Letter). Specifically, Q1010 requested immediate compliance with the Loan Documents by providing YPI's complete quarterly and annual financial statements, which had been due on May 15, 2012 and May 1, 2012 respectively, along with other necessary documents such as YPI's K-1s, a list of tenants that have vacated or are planning to vacate the Building in 2012, and Younan's financial statements. *Id.* As discussed in paragraphs 17-19 above, YPI provided an annual income statement and a quarterly income statement and

rent roll worksheet, but otherwise YPI and Younan refused to furnish any of the other pertinent documents requested by Q1010.   Aff. at ¶ 23; *see also* Ex. J to the Aff. (the May 21 Letter).

25.     On May 22, 2012, Q1010 again wrote YPI and Younan requesting the information requested in the May 17 Letter and to explain the deficiencies in YPI's prior production. Aff. at ¶ 24; *see also* Ex. K (the May 22 Letter).   Specifically, Q1010 requested: (1) YPI's complete financial statements including balance sheets and cash flow statements, not just income statements; (2) YPI's K-1s from 2007-2010; (3) a list of tenants that had vacated or were planning to vacate the Building in 2012; (4) Younan's quarterly financial statements from 2010 to present; (5) a detailed explanation for the difference between Younan's net worth on August 23, 2011 and December 31, 2011; and (6) documents related to the status of loans shown on Younan's December 2011 financial statement.  *Id.*  On May 25, 2012, YPI and Younan provided a list of tenants that had vacated or were planning to vacate the Building in 2012, but otherwise refused to furnish any of the additional documents requested by Q1010.  Aff. at ¶ 24; *see also* Ex. L (the May 25 Letter).

26.     As a result, YPI has failed to comply with its obligations under Section 5.1 of the Loan Agreement. Aff. at ¶ 25; *see also* Ex. A to the Aff. at §  5.1.

27.     On June 18, 2012, Q1010 sent YPI and Younan a letter notifying them of their continuing defaults under the Loan Documents. Aff. at ¶ 26; *see also* Ex. M to the Aff. (the June 18 Letter).  Because YPI has failed to cure the defaults mentioned above within 30 days (or by June 16, 2012), its defaults constitute an "Event of Default" under Section 6.1(d) of the Loan Agreement.  Aff. at ¶ 26; *see also* Ex. A to the Aff. at § 6.1.  Q1010 has not waived any other defaults. Aff. at ¶ 26.

28.     Accordingly, YPI's defaults under the Loan Agreement also constitute an "Event of Default" under Section 4.1 (a) of the Deed of Trust, which makes a default of an obligation under the Loan Agreement a default under the Deed of Trust.  Aff. at ¶ 27; *see also* Ex. C to the Aff. at § 4.1.

29.     Section 5.7 of the Deed of Trust provides that, after the occurrence of an Event of Default under the Deed of Trust, Q1010 "may, at its option . . ., make application to a court of competent jurisdiction for the appointment of a receiver" for the Building.  Aff. at ¶ 28; *see also* Ex. C to the Aff. at § 5.7.  In the Deed of Trust, YPI irrevocably consented to the appointment of a receiver under such circumstances.  *Id.*  Thus, Q1010's application for the appointment of a receiver is expressly authorized by the Deed of Trust and YPI has consented to such action.

### YPI Executes Below Market Leases and Further Defaults

30.     Section 9(e) of the Assignment provides that YPI "shall not enter into any new Lease for premises at the Property, other than Leases at market rates and terms entered into in the ordinary course of [YPI]'s business and pursuant to a form of lease approved in advance by [Q1010], without the prior written consent of" Q1010.  *See* Ex D to the Aff. at § 9(e).

31.     On June 27, 2012, counsel for YPI provided three leases executed for the Building and one lease being negotiated by YPI for the Building.  *See* Second Aff. at ¶ 6; *see also* Ex. B to the Second Aff. (the June 27, 2012 Letter).  The rental rates agreed to in these leases are below-market.  *See id.*  In fact, leases for comparable properties to the Building in Houston, Texas are currently approximately $24 per square foot.  *See id.*  These leases that YPI has recently executed are being leased on average for less than $20 per square foot.  *See id.*  Because these leases are long-term leases and below the market rate, YPI is further damaging the Building's value and long-term viability in an effort to increase the occupancy rate.  *See id.*  YPI

did not receive Q1010's consent prior to executing these below-market leases as required by the Assignment and, thus, is in default under the Assignment. *See* Second Aff. at ¶ 6; *see also* Ex. C to the Second Aff. (the June 29, 2012 Letter).

***Younan Refuses to Provide Requested Financial Information, Fails to Maintain Minimum Net Worth, and Has Defaulted on his Guaranty***

32.     Section 3.5 of the Guaranty requires that Younan "shall at all times maintain" an individual net worth of not less than $65 million. Aff. at ¶ 29; *see also* Ex. E to the Aff. at § 3.5. Younan provided Q1010 with financial statements detailing his net worth as of August 23, 2011 and as of December 31, 2011. Aff. at ¶ 29. In the August 23, 2011 financial statement, Younan's net worth is shown as -$31,974,717. *Id.* Thus, as of August 23, 2011, Younan was in default under the Guaranty. *Id.*

33.     Younan's December 31, 2011 financial statement, however, shows that Younan's net worth as of that date is $136,531,769. Aff. at ¶ 30. In other words, Younan's net worth increased by more than $165,000,000 in just over three months. Aff. at ¶ 30. Younan's support for his net worth increase is at best suspicious. *Id.* A careful analysis of the supporting documentation shows that approximately $155,000,000 of this increase can be attributed to increases in Younan's real estate holdings held on both August 23, 2011 and December 31, 2011. *Id.* However, these increased values are "based on [Younan's] estimates and not based on appraisals or third-party evaluations." *Id.*

34.     Section 3.6 of the Guaranty requires Younan to "provide the Bank with such additional financial information with respect to Younan as the Bank may reasonably request." Aff. at ¶ 31; *see also* Ex. E to the Aff. at § 3.6.

35.     As explained above, in response to the December 31, 2011 Younan Financial Statement and as allowed by Section 3.6 of the Guaranty, Q1010 requested additional

information from Younan and YPI on three separate occasions regarding this radical change in Younan's net worth. Aff. at ¶ 32. On May 25, 2012, YPI and Younan refused to furnish any of the additional documents related to Younan. *Id.*; *see also* Ex. L to the Aff.

36. As a result, Younan has failed to comply with its obligations under sections 3.5 and 3.6 of the Guaranty. Aff. at ¶ 33; *see also* Ex. E to the Aff. at § 3.5. Younan's defaults under the Guaranty constitute "Events of Default" under Section 6.1(c) of the Loan Agreement and Section 4.1(c) of the Deed of Trust. Aff. at ¶ 33; *see also* Ex. A to the Aff. at § 6.1; Ex. C to the Aff. at § 4.1. Younan and YPI have failed to cure the defaults mentioned herein. Aff. at ¶ 33. Q1010 has not waived any other defaults. *Id.*

### *Younan Has Made Fraudulent Misrepresentations to Q1010*

37. As discussed above, Younan provided his net worth calculation as of December 31, 2011 to Q1010 in early 2012 showing a net worth of $136,531,769. Q1010 relied on this representation that Younan satisfied his obligation under Section 3.5 of the Guaranty (as discussed above) to maintain not less than $65 million. *See* Ex. E to the Aff. at § 3.5.

38. Based on this representation by Younan, Q1010 believed it possessed a viable guarantor for the Note. If Q1010 had not received the December 31, 2011 Personal Financial Statement showing a net worth greater than $65 million, then Q1010 would have immediately sought relief under the Loan Documents. This delay has caused Q1010 damages because the Building's value further deteriorated from March 14 through the time Q1010 discovered Younan's fraud.

39. A few months after receiving the December 31, 2011 Personal Financial Statement, Q1010 discovered that it contained various materially false representations by Younan. Many, if not all, of Younan's estimates found in the December 31, 2011 Personal

Financial Statement are drastically more than subsequent appraisals or the value assigned to the properties by the county appraisal districts.  For example, Younan represented that the Building is valued at $35,000,000.  An appraisal completed in late June 2012 shows that the Building is in fact valued at only approximately $20,700,000, a difference in value of $14,300,000.  *See* Second Aff. at ¶ 4; *see also* Ex. A to the Second Aff.  This valuation is consistent with the recent tax protest, filed by YPI, which resulted in a new $20,000,000 tax appraisal just last week.  *See* Second Aff. at ¶ 5.  Similarly, Younan made the following representations: (1) he represented that the Lakeside Square property was valued at $43,000,000 when the Dallas County Appraisal District lists the property at only $29,750,000, a difference in value of approximately $13,000,000; (2) he represented that the Galleria Plaza was valued at $24,000,000 when the Dallas County Appraisal District lists the property at only $13,761,000, a difference in value of approximately $10,000,000; and (3) he represented that the Westchase Bank Building property was valued at $20,000,000 when the Houston County Appraisal District lists the property at only $9,456,664, a difference in value of approximately $10,000,000.  Q1010 now believes many other line items of Younan's financial submissions contain material overstatements of value.

40.     Thus, Younan made multiple materially false misrepresentations in the December 31, 2011 Personal Financial Statement that Younan knew were false or he was reckless in making.

41.     Upon information and belief, Younan made these materially false representations in the December 31, 2011 Personal Financial Statement with the intent to conceal the fact that his net worth breached Section 3.5 of the Guaranty because he wanted to stop Q1010 from exercising its contractual rights under the Loan Documents.

42.     When Q1010 discovered the drastic difference in the net worth calculations, it began requesting additional information from Younan.  Despite his obligations to provide such information under Section 3.6 of the Guaranty, Younan refused to provide any of the requested information.

***YPI and Younan Have Failed to Reinvest Income in the Building or Allocate Income for Future Expenses***

43.     Based on Younan's actions, the deterioration of the Building, Defendants' worsening financial situation, and Defendants' unwillingness to provide key financial information requested (all described in more detail above), Q1010 has reason to believe that YPI is taking for itself any income received from the Building rather than investing that income back into the Building to avoid further deterioration and to attempt to retain or gain tenants for the Building.   Aff. at ¶ 34.  As detailed above, YPI has failed to operate and manage the Building properly or to maintain or obtain funds necessary to operate and manage the Building properly. *Id.*  This failure by YPI has led to the deterioration of the Building over the last several years. *Id.*

44.     For example, YPI is responsible for paying any and all taxes of the Building under the Loan Documents.  Aff. at ¶ 35.  Section 5.5 of the Loan Agreement and Section 3.5 of the Deed of Trust state that YPI will pay all taxes and will further be responsible for all taxes that accrue through the date of any foreclosure. *Id.*; *see also* Ex. A to the Aff. at § 5.5; Ex. C to the Aff. at § 3.5.  According to the 2011 annual income statement, real property taxes for 2011 were approximately $652,000.  Aff. at ¶ 35.  The 2012 property taxes will be due by January 31, 2013, which is after the maturity of the Loan. *Id.*

45.     Despite this obligation, YPI has not—and refuses to—set aside any of the Building's revenue for payment of these taxes.  Aff. at ¶ 36.  On April 26, 2012, Q1010 requested adequate assurances that YPI intended to pay the Building's property taxes. *Id.*; *see also* Ex. G

to the Aff.  Defendants refused and responded that "[YPI] has timely paid all such taxes and will continue to do so *during the pendency of the Loan*."  Aff. at ¶ 36; *see also* Ex. H to the Aff. Since the property taxes will not become due "during the pendency of the Loan," Q1010 is concerned by YPI's statement that seems to suggest that YPI does not intend to pay the property taxes (which are its obligation to pay) because those taxes will not become due during the "pendency of the Loan."  Aff. at ¶ 36.  Thus, Q1010 is concerned that YPI intends to leave Q1010 with the obligation to pay such taxes (despite these taxes being the responsibility of YPI), while [YPI] continues to waste the Building's revenues including paying itself exorbitant management fees. *Id.*

46.     The revenue (mostly rental revenue) from the Building represents the only likely source from which the Loan and any other obligations of the Building can be serviced if YPI is unable to fully meet its obligations (which is a significant risk based on YPI's financial information provided to Q1010).  Aff. at ¶ 37.  Given the fact that YPI's financial condition makes it unlikely that YPI will be able to satisfy the Loan fully on November 30, 2012, Defendants' conduct is causing immediate and irreparable harm to Q1010's Collateral, and Q1010's Collateral is at substantial and immediate risk of continued loss, waste, and dissipation. *Id.*  Because tenants at the Building began paying July rents recently (and recently paid June rents as well) into an account accessible by YPI, Q1010 faces immediate harm that YPI will receive the rental revenues (which is the only known source from which to service the Loan) and continue to use or otherwise waste these proceeds. *Id.*

47.     The appointment of a receiver (as authorized by the Deed of Trust and Texas law) will enable such receiver, on behalf of YPI, to properly invest the proceeds from the Building, allocate funds appropriately for payment of certain obligations (such as taxes), and properly

comply with the Loan Documents. The injunctive relief requested in Q1010's Emergency Motion to Extend State Court Temporary Restraining Order after Removal and Preliminary Injunction will ensure that such receiver will be able to perform his or her respective duties and responsibilities without impediment or delay and/or stop YPI from further depleting the Building's resources in an effort to line its own pockets.

### FIRST CLAIM FOR RELIEF
**Breaches of Loan Documents**

48.     Q1010 realleges and incorporates by reference each and every allegation of this Complaint, as though fully set forth herein.

49.     The Loan Documents constitute valid contractual relationships between YPI, Younan, and Q1010.

50.     Q1010 has fully performed its obligations under the Loan Documents.

51.     YPI has defaulted under the terms of the Loan Documents and the terms of the Deed of Trust as described in paragraphs 22-31 hereof by failing to provide the documentation required by the Loan Documents and as requested by Q1010 on numerous occasions. Younan has defaulted under the terms of the Loan Documents as described in paragraphs 32-36 hereof by failing to provide the documentation required by the Loan Documents and as requested by Q1010 on numerous occasions and by not maintaining the appropriate net worth at all times. Younan's defaults also constitute an "Event of Default" under the terms of the Loan Agreement and the Deed of Trust as described in paragraph 36 hereof. The Events of Default by YPI and Younan constitute breaches of the Loan Documents.

52.     YPI and Younan have failed to cure their defaults in the time allowed by the Loan Documents, where applicable.

53.     As a result of these breaches, Q1010 will incur actual damages.  In addition, according to the terms of the Loan Documents and Section 38.001 of the Texas Civil Practice and Remedies Code, Q1010 is entitled to its reasonable and necessary attorneys' fees.

## SECOND CLAIM FOR RELIEF
### Appointment of Receiver

54.     Q1010 realleges each and every allegation of this Complaint as if fully set forth herein and, without waiving any other or alternative remedies, seeks the appointment of a receiver.

55.     A receiver is necessary in this case to protect Q1010 during the pendency of this suit.

56.     Q1010 is entitled to the appointment of a receiver under Section 5.7 of the Deed of Trust as more fully described in paragraph 29 hereof.

57.     Q1010 is also entitled to the appointment of a receiver under statutory and equitable grounds.

58.     As set forth above, Q1010 is a secured creditor of YPI (which are insolvent or in imminent danger of insolvency) and the appointment of a receiver is necessary in order to subject the Collateral to Q1010's claim.  TEX. CIV. PRAC. & REM. CODE § 64.001(a); TEX. BUS. ORG. CODE §11.401 et seq.

59.     Furthermore, Q1010's Collateral and the Building are in danger of being injured, wasted, lost, and dissipated as a result of YPI's mismanagement in maintaining and preserving the Collateral.  TEX. BUS. ORG. CODE § 11.401 et seq.; TEX. CIV. PRAC. & REM. CODE §64.001(a). Accordingly, the appointment of a receiver is necessary to avoid further loss, damage, injury, and dissipation to Q1010 and its Collateral.  *Id.*; TEX. CIV. PRAC. & REM. CODE § 64.001(a)(6).

60.     Other remedies available either at law or in equity are inadequate to protect the Collateral.  If YPI is allowed to stay in control then YPI can continue its indifference toward improving the occupancy rate at the Building, increasing revenues at the Building, and setting aside funds to satisfy future expenses of the Building.  Additionally, Q1010 has lost its trust in YPI and Younan to act honestly and in good faith based on their unwillingness to provide required financial information and the suspicious circumstances surrounding Younan's calculations of his own net worth as of December 31, 2011.

61.     The only likely source from which taxes, the Loan, and other obligations of the Building can be repaid and serviced is the Collateral.  YPI does not engage in any business or activity other than the ownership and operation of the Building or own any property or assets other than the Building and such incidental personal property necessary or useful for the operation of the Building.  As set forth herein, the Collateral is at substantial risk of injury, waste, damage, loss, and dissipation without further action.

62.     Unless a receiver is appointed by this Court, Q1010's interest in the Collateral will be lost, injured, damaged, wasted, dissipated and/or materially prejudiced.

63.     By reason of said facts, it is necessary that a receiver be appointed to be given the powers (to be exercised by receiver as appropriate in his business judgment and/or as necessary to fulfill his duties as receiver) and Q1010 prays that this Court appoint a receiver in accordance with applicable law to, among other things:

(a)     take control of, manage, and lease the Building and any of YPI's business and investments related to the Building, including the payment of YPI's debts;

(b)     take any actions which could be taken by the officers, directors, managers, members, partners, trustees, general partner, or other principals of YPI related to the Building;

(c)     take control of, manage, and access YPI's business records, books, ledgers, and other documents pertaining to the Building and any of YPI's other businesses and investments as the receiver deems necessary for the proper administration, management and/or control thereof;

(d)     take full and complete control of all bank accounts of YPI related in any way to the Building to include, without limitation, power to amend, remove, and change authorized signatories on any such accounts;

(e)     take possession of all personal property of YPI related to the Building, if any, used in the operation of YPI's business, including all inventory, furniture, furnishings, fixtures, equipment, together with all other personal property of every kind and description, all products, and proceeds of the aforesaid property as well as the proceeds of insurance thereof;

(f)     manage, control, care for, preserve, maintain, and incur the expenses necessary for the ordinary management, control, care, preservation, and maintenance of, the Building and related business and investments;

(g)     conserve and manage the Building and any related assets in accordance with the Loan Documents;

(h)     with the consent of Q1010 (which may be given or withheld in Q1010's sole discretion), enter into agreements with third-party professionals (including financial advisors and lawyers) on behalf of the Building or receiver, to assist the receiver in performing the duties hereunder;

(i)     with the consent of Q1010 (which may be given or withheld in Q1010's sole discretion), undertake all acts and expenses necessary to maintain, preserve, and maximize the value of the Building and/or YPI's other assets and investments related to the Building;

(j)     with the consent of Q1010 (which may be given or withheld in Q1010's sole discretion) or as otherwise permitted under the Loan Documents, sell, liquidate, pledge and transfer assets related to the Building;

(k)     demand, collect, and receive all monies, dividends, distributions, loan payments, rents, income, profits and lease payments hereafter coming due to YPI related to the Building;

(l)     pay the taxes and assessments on the Building and other related assets of YPI incurred during the receivership to the extent necessary to maintain, preserve, and maximize the value of the Building and such assets;

(m)     pay insurance premiums and other obligations or expenses (including leasing commissions, costs related to the construction of tenant improvements and other leasing costs) of the Building and other related assets of YPI incurred during the receivership to the extent necessary to maintain, preserve, and maximize the value of the Building and such assets;

(n)     open up bank accounts as deemed necessary by the receiver in connection with the above-referenced duties;

(o)     prepare and/or manage the preparation of financial statements, accounts, and tax returns;

(p)      endorse, cash and negotiate checks on behalf of the Building for permitted uses in accordance herewith;

(q)      take charge and keep exclusive possession free from interference by any other person or entity of the Building and all related assets and property of YPI; and

(r)      all other powers and duties referred to in this Complaint or the general powers of receivers in cases of this kind, together with any and all other powers and acts necessary to carry out the receiver's duties and responsibilities.

## THIRD CLAIM FOR RELIEF
### Fraud

64.      Q1010 realleges and incorporates by reference each and every allegation of this Complaint, as though fully set forth herein.

65.      Younan made material representations to Q1010 that his net worth is more than $65 million dollars and that the values of certain properties in which he holds interests are significantly greater than their actual values.

66.      When Younan made the false representations, he knew the representations were false or he made the representations recklessly, as a positive assertion, maliciously, and without knowledge of the truth.

67.      Younan made the representations with the intent to cause Q1010 to refrain from acting.

68.      Q1010 did not know of the falsity of the representation and reasonably relied on Younan's false representations in not declaring a default under the Loan Documents.

69.      Younan's representations caused Q1010 financial injury and monetary loss due to the delay in seeking to protect its Collateral.  Accordingly, Q1010 seeks to recover from Younan its actual damages, in an amount within the jurisdictional limits of this Court; exemplary damages; pre-judgment and post-judgment interest; and costs.

## RESERVATION OF RIGHTS

70.     Q1010 reserves all rights and remedies against YPI and all affiliated or related companies, Younan, and all of their respective directors, officers and employees and otherwise related parties.  The filing of this Complaint is not intended to be a waiver of any remedies or an election of remedies.

## PRAYER FOR RELIEF

WHEREFORE, Q1010 respectfully requests the Court to enter judgment in its favor and against YPI and Younan as follows:

(a)     Damages for all amounts owed due to breaches of the Loan Documents;

(b)     Damages for all amounts owed relating to Younan's fraud including actual damages, exemplary damages, interest, and costs;

(c)     Q1010's reasonable attorneys' fees and costs;

(d)     That a receiver be appointed to:

(i)     take control of, manage, and lease the Building and any of YPI's business and investments related to the Building, including the payment of YPI's debts;

(ii)     take any actions which could be taken by the officers, directors, managers, members, partners, trustees, general partner, or other principals of YPI related to the Building;

(iii)     take control of, manage, and access YPI's business records, books, ledgers, and other documents pertaining to the Building and any of YPI's other businesses and investments as the receiver deems necessary for the proper administration, management and/or control thereof;

(iv)     take full and complete control of all bank accounts of YPI related in any way to the Building to include, without limitation, power to amend, remove, and change authorized signatories on any such accounts;

(v)     take possession of all personal property of YPI related to the Building, if any, used in the operation of YPI's business, including all inventory, furniture, furnishings, fixtures, equipment, together with all other personal property of every kind and description, all products, and proceeds of the aforesaid property as well as the proceeds of insurance thereof;

(vi)   manage, control, care for, preserve, maintain, and incur the expenses necessary for the ordinary management, control, care, preservation, and maintenance of, the Building and related business and investments;

(vii)   conserve and manage the Building and any related assets in accordance with the Loan Documents;

(viii)   with the consent of Q1010 (which may be given or withheld in Q1010's sole discretion), enter into agreements with third-party professionals (including financial advisors and lawyers) on behalf of the Building or receiver, to assist the receiver in performing the duties hereunder;

(ix)   with the consent of Q1010 (which may be given or withheld in Q1010's sole discretion), undertake all acts and expenses necessary to maintain, preserve, and maximize the value of the Building and/or YPI's other assets and investments related to the Building;

(x)   with the consent of Q1010 (which may be given or withheld in Q1010's sole discretion) or as otherwise permitted under the Loan Documents, sell, liquidate, pledge and transfer assets related to the Building;

(xi)   demand, collect, and receive all monies, dividends, distributions, loan payments, rents, income, profits and lease payments hereafter coming due to YPI related to the Building;

(xii)   pay the taxes and assessments on the Building and other related assets of YPI incurred during the receivership to the extent necessary to maintain, preserve, and maximize the value of the Building and such assets;

(xiii)   pay insurance premiums and other obligations or expenses (including leasing commissions, costs related to the construction of tenant improvements and other leasing costs) of the Building and other related assets of YPI incurred during the receivership to the extent necessary to maintain, preserve, and maximize the value of the Building and such assets;

(xiv)   open up bank accounts as deemed necessary by the receiver in connection with the above-referenced duties;

(xv)   prepare and/or manage the preparation of financial statements, accounts, and tax returns;

(xvi)   endorse, cash and negotiate checks on behalf of the Building for permitted uses in accordance herewith;

(xvii)   take charge and keep exclusive possession free from interference by any other person or entity of the Building and all related assets and property of YPI; and

(xviii) all other powers and duties referred to in this Complaint or the general powers of receivers in cases of this kind, together with any and all other powers and acts necessary to carry out the receiver's duties and responsibilities.

(e)     For all other relief requested in this Complaint and all such other and further relief as the Court may deem just and appropriate.

**DATED** this 6th day of July, 2012.

Respectfully submitted,
VINSON & ELKINS LLP

By:    /s/ John C. Wander
        Pat Mizell
        State Bar No. 14233980
        First City Tower
        1001 Fannin Street, Suite 2500
        Houston, Texas  77002
        Telephone:  (713) 758-2222
        Facsimile:   (713) 758-2346

        John C. Wander
        State Bar No. 00791877
        Andrew E. Jackson
        State Bar No.  24055720
        Trammell Crow Center
        2001 Ross Avenue, Suite 3700
        Dallas, Texas 75201-2975
        Phone: (214) 220-7700
        Fax: (214) 999-7716

**Attorneys for Q1010**

## CERTIFICATE OF SERVICE

On July 3, 2012, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court, which served the document on all counsel of record.

        /s/ John C. Wander
        John C. Wander